2023-2373

# United States Court of Appeals
# for the Federal Circuit

MUHR UND BENDER KG,

*Appellant,*

v.

RASSINI SUSPENSIONES, S.A. DE C.V.,

*Appellee.*

Appeal from the United States Patent and Trademark
Office, Patent Trial and Appeal Board in IPR2022-00278

## BRIEF OF APPELLANT

John P. Rondini
Marc Lorelli
Frank A. Angileri
Kyle G. Konz
BROOKS KUSHMAN P.C.
150 W. Second St., Suite 400N
Royal Oak, MI 48067-3846
(248) 358-4400

 February 1, 2024 

*Counsel for Appellant*

Claims 1 and 10 of the U.S. Patent No. 9,868,330 contain the limitations at issue in this appeal, shown with emphasis:

1.     A leaf spring assembly for a wheel suspension of a motor vehicle, comprising:

*a leaf spring of fiber-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle*, the leaf spring comprising a first end portion, a spring portion extending from the first end portion, a second end portion, a bendable portion extending from the second end portion, *wherein the spring portion extends substantially in a longitudinal direction of the motor vehicle in an installed state and is configured to accommodate the wheel carrier*, wherein the spring portion and the bendable portion are connected to each other by a curved transition portion and wherein the spring portion is longer than the bendable portion;

a first receiving device for supporting the first end portion;

a second receiving device for supporting the second end portion;

wherein the first receiving device and the second receiving device are provided so as to hold the first end portion and the second end portion in a non-displaceable way relative to one another, *wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading;*

further wherein at least one of the first and second receiving devices provides pivotable support to the associated one of the first end portion and the second end portion around a pivot axis extending transversely to a longitudinal axis of the vehicle;

and further wherein in the installed state of the leaf spring the first end portion and the spring portion extending therefrom are positioned towards a front end of the motor vehicle, and the second end portion and the bendable portion extending therefrom are positioned towards a rear end of the motor vehicle.

10.   The leaf spring assembly of claim 1, wherein the leaf spring is ***designed such that the spring portion***, ***upon elastic deformation due to vertical forces introduced from the wheel carrier***, ***is subjected to pressure loading in a first spring travel range and is subjected to tensile loading in a second spring travel range***.

(Appx207-208, Claims 1 and 10.)

## CERTIFICATE OF INTEREST

Counsel for Appellant, Muhr und Bender KG, certifies the following:

1.   **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.  Muhr und Bender KG

2.   **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.    None

3.   **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  Dr.-Ing. Thomas Muhr GmbH  and Dr.-Ing. Rudolf Muhr GmbH

4.   **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).   Thomas E. Bejin, Charles A. Bieneman and William K. Broman of Bejin Bieneman PLC

5.   **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the

pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir.R.47.5(b).   None

      6.    **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).   None

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES..............................................................vi

I.     STATEMENT OF RELATED CASES ............................................1

II.    STATEMENT OF JURISDICTION................................................1

III.   STATEMENT OF THE ISSUES....................................................2

IV.    STATEMENT OF THE CASE ........................................................3

      A.     Introduction....................................................................3

              1.     Background of Technology ...............................3

              2.     Fiber-Reinforced Plastic Leaf Springs...........7

              3.     Muhr's Innovative Design................................9

              4.     Background of Rassini Suspensiones ...........10

              5.     Backdrop of the Underlying IPR ..................11

      B.     Overview of the '330 Patent...................................12

      C.     Overview of IPR Proceedings.................................16

              1.     IPR Grounds and Institution Decision .........16

              2.     Overview of Enomoto ....................................16

               3.     Petitioner's Arguments ...................................19

               4.     Muhr's Response .............................................24

               5.     Rassini's Reply ...............................................27

               6.     Muhr's Sur-Reply...........................................28

               7.     Board's Final Written Decision ....................29

V.   SUMMARY OF THE ARGUMENT .................................................31

    A.   The Board's Claim Construction is Erroneous .....................31

    B.   The Board's Decision is Based on the Incorrect Claim
        Construction ..........................................................................34

    C.   There is no Motivation to Modify Enomoto other than
        Improper Hindsight .............................................................35

    D.   Enomoto Teaches Away from an FRP Leaf Spring
        Design and there is no Motivation to Combine ...................37

VI.  ARGUMENT .................................................................................39

    A.   Standard of Review .............................................................39

    B.   The Board Erred in Its Construction of "Tensile
        Loading" ..............................................................................40

        1.   The Claim Language is Clear that Tensile Loading
            is Not Claimed to Occur in the Abstract .....................40

        2.   The Specification Emphasizes Leaf Spring Tensile
            Loading Occurs While Installed on a Vehicle .............42

        3.   The Claims Require the Leaf Spring is Subjected
            to Tensile Loading in the Installed State ...................45

            a.   The Board Erred in Its "Intended Use"
                Construction ......................................................47

            b.   To the Extent that the Board Found the
                Claims Cover Only Capability in the
                Abstract, that was also Error .............................51

    C.   The Board's Analysis is Either Irrelevant or Superficial.....55

        1.   The Board's Analysis Based on an Improper Claim
            Construction of Capability in the Abstract is
            Incorrect .....................................................................55

2.     The Board's Obviousness Analysis Based on the Installed State is Conclusory and not Based on Substantial Evidence ....................................................57

D.     Rassini Improperly Presented a New Obviousness Theory within its Reply .........................................................62

E.     Reversal is Warranted Because the Board's Findings were not Supported by Substantial Evidence ......................65

1.     There is no Motivation to Modify given Enomoto's Express Teachings of Using a Metal Two-Piece Leaf Spring..............................................................69

2.     Enomoto Teaches Away from the Use of FRP............72

F.     The Board Erred by Ignoring the Language of Claim 10.....75

VII.   CONCLUSION AND RELIEF SOUGHT .....................................78

ADDENDUM

Judgment Final Written Decision Determining All Challenged Claims Unpatentable Denying in-Part and Dismissing in-Part Patent Owner's Motion to Exclude and Patent Owner's Motion to Strike 35 U.S.C. § 318(a), Paper No. 39 ...................................................................Appx1-94

U.S. Patent No. 9,868,330 B2 .................................... Appx194-208

CERTIFICATE OF COMPLIANCE  WITH TYPE-VOLUME LIMITATIONS

# TABLE OF AUTHORITIES

## Cases

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
    651 F.3d 1318 (Fed. Cir. 2011)......................................................46

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
    239 F.3d 1343 (Fed. Cir. 2001)......................................................49

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012)..............................................54, 75

*Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*,
    555 F.3d 984 (Fed. Cir. 2009)......................................................54

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015)......................................................59

*CardSoft, LLC v. VeriFone, Inc.*,
    807 F.3d 1346 (Fed. Cir. 2015)......................................................39

*Chemours Company Fc, LLC v. Daikin Industries, Ltd.*,
    4 F.4th 1370 (Fed. Cir. 2021) ....................................... 67, 69, 75, 77

*Dane Indus., Inc. v. Ameritek Indus., LLC*,
    154 F. App'x 894 (Fed. Cir. 2005) .................................................46

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
    859 F.3d 1341 (Fed. Cir. 2017)......................................................39

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010)......................................................48

*Forest Lab'ys, Inc. v. Abbott Lab'ys*,
    239 F.3d 1305 (Fed. Cir. 2001)......................................................47

*Grain Processing Corp. v. American Maize-Products Co.*,
    840 F.2d 902 (Fed. Cir. 1988)......................................................72

*In re Chudik*,
 674 Fed.Appx. 1011 (Fed. Cir. 2017) ............................................ 50

*In re Kotzab*,
 217 F.3d 1365 (Fed. Cir. 2000) ...................................................... 39

*In re Leithem*,
 661 F.3d 1316 (Fed. Cir. 2011) ...................................................... 63

*In re NuVasive*,
 841 F.3d 966 (Fed. Cir. 2016) ................................................... 63, 65

*In re Schrieber*,
 128 F.3d 1473 (Fed. Cir. 1997) ...................................................... 49

*Interconnect Planning Corp. v. Feil*,
 774 F.2d 1132 (Fed. Cir. 1985) ................................................. 36, 72

*Inverness Medical Switzerland GmbH v. Warner Lambert Co.*,
 309 F.3d 1373 (Fed. Cir. 2002) ...................................................... 46

*Jack Frost Lab'ys, Inc. v. Physicians & Nurses Mfg. Corp.*,
 124 F.3d 229, 1997 WL 592814 (Fed. Cir. 1997) ........................... 47

*K-2 Corp. v. Salomon S.A.*,
 191 F.3d 1356 (Fed. Cir. 1999) ...................................................... 52

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
 688 F.3d 1342 (Fed. Cir.2012) ....................................................... 69

*KSR Intern. Co. v. Teleflex Inc.*,
 550 U.S. 398, 127 S.Ct. 1727 (2007) .............................................. 69

*Merck & Co. v. Teva Pharms. USA, Inc.*,
 395 F.3d 1364 (Fed. Cir. 2005) ...................................................... 51

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
 287 F.3d 1062 (Fed. Cir. 2002) ...................................................... 49

*Netword, LLC v. Centraal Corp.*,
  242 F.3d 1347 (Fed. Cir. 2001) ...................................................... 42

*Pers. Web Techs., LLC v. Apple, Inc.*,
  848 F.3d 987 (Fed. Cir. 2017) .................................................. 59, 60

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............... 40, 42, 46, 49-51

*Redline Detection, LLC v. Star Envirotech, Inc.*,
  811 F.3d 435 (Fed. Cir. 2015) ........................................................ 39

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ...................................................... 42

*Rivera-Davila v. Asset Conservation, Inc.*,
  230 F.3d 1378, 2000 WL 27891 (Fed. Cir. 2000) ........................... 47

*Rotron, Inc. v. U.S. Int'l Trade Comm'n*,
  845 F.2d 1034, 1988 WL 12108 (Fed. Cir. 1988) (unpublished) .... 61

*Rowe v. Dror*,
  112 F.3d 473 (Fed. Cir. 1997) ........................................................ 50

*Sensonics, Inc. v. Aerosonic Corp.*,
  81 F.3d 1566 (Fed. Cir. 1996) .................................................. 59, 75

*Stiftung v. Renishaw PLC*,
  945 F.2d 1173 (Fed. Cir. 1991) ...................................................... 57

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  135 S. Ct. 831 (2015) ...................................................................... 39

*TQ Delta, LLC v. CISCO Systems, Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ...................................................... 62

*Trivascular Inc. v. Samuels*,
  812 F.3d 1056 (Fed. Cir. 2016) ...................................................... 67

*Vivint, Inc. v. Alarm.com Inc.*,
    754 F. App'x 999 (Fed. Cir. 2018) (unpublished)......................59, 61

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017)........................................................51

*Wright Medical Technology, Inc. v. Osteonics Corp.*,
    122 F.3d 1440 (Fed.Cir.1997)........................................................53

# I.   STATEMENT OF RELATED CASES

No other appeal in or from this case has been before either this Court or any other appellate court. The undersigned counsel are not aware of any other case, pending in another court, which will be directly affected by this Court's decision in the pending appeal.

# II.   STATEMENT OF JURISDICTION

This Court's jurisdiction over this appeal is governed by 28 U.S.C. § 1295(a)(4)(A). Pursuant to Rule 28(a)(5), Muhr represents the judgment appealed from is final.

## III.  STATEMENT OF THE ISSUES

1.     Whether the Board erred in construing "tensile loading" in claim 1 as not requiring the leaf spring is subject to tensile loading "when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state"?

2.     Whether the Board erred finding obviousness because one skilled in the art could make modifications and design the leaf spring of the Enomoto prior art so that it would operate under tensile loading in the installed state?

3.     Whether the Board improperly denied Patent Owner's Motion to Strike presenting an "obviousness" position not raised in the Petition based on designing a leaf spring in the installed state?

4.     Whether the Board lacked substantial evidence in finding obviousness where: (1) Enomoto was selected based on improper hindsight only and contrary to the express teachings of the Enomoto, and (2) Enomoto teaches away from using a leaf spring made of fiber reinforced plastic ("FRP")?

5.     Whether the Board erred in failing to apply the claim language of claim 10 as written in its invalidity analysis?

2

# IV.   STATEMENT OF THE CASE

## A.     Introduction

Muhr und Bender KG ("Muhr") is a private family-owned company that was founded in 1916. Over the last 100 years, Muhr has grown from twelve employees into an international company with more than 15,000 employees at 50 locations in 18 countries. Muhr is an established automotive supplier and specializes in light-weight automotive suspension components to Original Equipment Manufacturers ("OEMs").

In the early-to-mid-2000s, Muhr spent significant resources to develop a novel glass fiber reinforced plastic ("FRP") leaf spring. While it is undisputed FRP leaf springs have existed since the 1960s, Muhr's recognized its unique design and operating structural characteristics were novel, as did others in the industry. Muhr therefore sought and was awarded U.S. Patent No. 9,868,330 ("the '330 Patent")(Appx194-208). The claims of the '330 Patent pertaining to Muhr's novel FRP leaf spring design are the subject of the present appeal.

### 1.     Background of Technology

For over 100 years, automakers have used suspension systems to improve the ride comfort and various driving aspects of a vehicle. (Appx2186.)  One aspect of a suspension system is to address vertical

3

forces caused by a bumpy road. *Id*. Another critical aspect of a suspension system is controlling forces produced by the tires, which includes longitudinal forces (e.g., forces generated by acceleration and braking of the vehicle) and lateral forces (e.g., forces generated by vehicle cornering/turning). *Id.*

One of the most "familiar form[s]" of suspension systems employed is known as a "Hotchkiss" suspension system. (Appx2187-2188.) As shown below, a Hotchkiss system includes longitudinal oriented leaf springs attached to the vehicle chassis at both ends and to a drive axle/wheel carrier near the center portion. (Appx1840-1842, ¶¶38-41.)



*Figure 1* – Fig 7.1 from *Gillespie (annotated)*, Hotchkiss rear suspension

**Appx1840-1841, ¶39; *citing* Appx2187-2188**

The Hotchkiss leaf spring has been used for decades since it is one of the "simplest and least expensive of all suspension[]" systems. (Appx2187.) These leaf springs were formed of steel and typically

4

included a vertical stack of metal leaves having progressively shorter lengths. (Appx1845-1846, ¶¶45-46.)

Hotchkiss metal leaf-spring suspensions were also known to be advantageous because they were "compliant in the vertical direction" while the "leaf is relatively stiff in the lateral and longitudinal directions, thereby reacting [to] the various forces between the sprung and unsprung masses." (Appx2187.) The leaf springs were known to be bound by a shackle (circled red above) that allowed longitudinal movement and prevented vertical displacement. (Appx2212.) However, Hotchkiss leaf springs were problematic due to the "inherent friction of the springs and the loss inside stability of the springs as they were made longer to achieve lower spring rates." (Appx2187-2188.)

It is also undisputed that leaf spring suspension systems were not constrained to just the Hotchkiss style leaf spring style. Indeed, Rassini Suspensiones ("Rassini") even cites a 1997 patent that discloses a ***one-piece*** metal leaf spring having a complex "convolute" shape. (*See* Appx1469-1476 (U.S. Patent No. 5,938,221 "the '221 Patent").)



**Appx1471, Fig. 2**

As annotated, the '221 Patent illustrates a "convolute single-leaf spring" (annotated green and labeled "14") that is mounted on both ends to the vehicle chassis (labeled "20"). (Appx1474, 3:8-20.) The convolute single-leaf spring is designed with varying thickness and curvature. (Appx1474, 4:47-62.) The '221 Patent claims the single-leaf spring design will provide a "front cantilever portion [having] a relatively high spring rate" and a "rear cantilever portion [having] a relatively low spring rate." (Appx1473, 2:44-47.)

This design – including the specific use of **metal** – is disclosed as providing additional "roll stiffness" allowing the elimination of additional roll stabilizers from the overall suspension system. (Appx1473, 1:39-47.) But the '221 Patent discloses – and illustrates – the complete suspension system includes both the single-leaf spring and a **separate air spring** (labeled 12 and shaded red above). (Appx1474, 3:6-13.) This air spring

6

and leaf spring are designed to cooperate and provide "very low natural frequency of vertical deflection[.]" (Appx1473, 1:51-56.)

### 2.    Fiber-Reinforced Plastic Leaf Springs

Neither party disputes fiber-reinforced plastic or "FRP" leaf springs have been known for *over* 50 years. (Appx310, ¶60; Appx1855, ¶59.) Rassini's expert – Dr. Robert Wagoner – even discusses how U.S. Patent No. 3,142,598 ("the '598 Patent") discloses an FRP leaf spring that was designed in the 1960s. (Appx310, ¶60.) As shown below, the '598 Patent is similar to known Hotchkiss-style leaf springs in that it includes several composite leaf springs (labeled 30, 32, 34) joined together by a pair of retaining clips (labeled 44).



**'598 Patent, Fig. 1**

Dr. Wagoner also cites U.S. Patent No. 3,586,307 ("the '307 Patent") which relates to another "Composite Spring Assembly" known since the early 1970s. (Appx310, ¶60.) As shown below, the '307 Patent discloses a single-piece composite leaf spring for use within a suspension system.

7



**'307 Patent, Figs. 7-8**

Likewise, more complex convolute single-piece FRP leaf springs have also been known since at least the early 2000s. (*See* Appx1352-1361, Appx1362-1374, Appx1375-1379.) One known convolute FRP leaf-spring was disclosed in U.S. Patent No. 6,435,485 ("Greco"). (Appx1375-1379.)



**Appx1376, Figs. 1 and 3**

The foreign equivalent of Greco was cited in the background of the '330 Patent. (Appx202, 1:27-36, *citing* DE10202114; *see also* Appx1168.) This U.S. patent was addressed during the prosecution of the '330 Patent. (Appx701-703.)   As shown above, similar to metal leaf springs, the "composite bow leaf spring 12" is also attached to the "vehicle frame 16" (i.e., chassis) at both ends.

### 3.    Muhr's Innovative Design

Against the backdrop of known metal and FRP leaf-springs, Muhr began development of a glass-FRP tension leaf spring (shown below), which it has publicly sold since 2018.  Since its introduction, Muhr's glass-FRP tension leaf spring has achieved commercial success and received industry acclaim such as the 2020 Altair's Enlighten Award for Enabling Technology. (Appx1542-1545.)



**Appx1545**

Muhr received the 2020 Altair Enlighten Award as its FRP "tension leaf spring" was recognized as providing the benefits of "reduce[d] vehicle weight," improved "emissions targets," and for "inspiring breakthrough advancements that push the industry towards a more sustainable future." (Appx1542.) In fact, Muhr's glass-FRP tension leaf spring is

9

capable of reducing the overall vehicle weight by as much as 40 kilograms, thereby achieving a higher cargo load or lower fuel consumption as compared to a vehicle with conventional metal leaf springs. (Appx1548.)

### 4.    Background of Rassini Suspensiones

Rassini Suspensiones ("Rassini"), the Petitioner in the underlying IPR proceedings, also supplies automotive suspension components. It is not disputed that Rassini and Muhr are competitors in suppling suspension components to automotive OEMs. But, unlike Muhr, Rassini does not currently offer any convolute single-piece FRP leaf spring.

Instead, in 2021, Rassini introduced a "composite leaf spring" that includes a parabolic ***metal*** leaf spring that is supported by an FRP "helper" leaf spring. (Appx1560-1561.)



**Appx1560**

Rassini promotes that its composite metal/FRP leaf spring design offers a 16-kilogram weight reduction when compared to conventional all-metal leaf springs. (Appx1561.) Rassini's metal/FRP leaf spring therefore doesn't come close to the 40-kilogram weight reduction provided by Muhr's FRP leaf spring. Rassini's composite metal/FRP leaf spring is heavier because it still requires the use of a metal leaf spring.

### 5.    Backdrop of the Underlying IPR

It is clear Rassini took notice of Muhr's innovative FRP tension leaf spring and its success in the market. Rather than invest in developing its own full FRP leaf spring design – as opposed to a composite metal/FRP leaf spring – Rassini instead wants to copy Muhr. That is why Rassini

chose a litigious route filing the underlying IPR against Muhr. Rassini filed this IPR *without any pending or threat of litigation by Muhr.*

It is quite clear Rassini filed the underlying IPR acknowledging the importance of Muhr's award winning design in the marketplace. Rassini's IPR was therefore filed to eviscerate Muhr's investment in innovation that the patent laws of the United States currently protect so that Rassini could take advantage of Muhr's designs without any innovation on their part.

## B.    Overview of the '330 Patent

After recognizing the benefits of its unique FRP design, Muhr sought patent protection within Germany in 2013 (DE 10 2013 107 88); internationally in 2014 (PCT/EP2014/065801), and within the United States in 2016 (Appx194-208, '330 Patent). Muhr therefore properly sought – and was granted – patent protection for its novel FRP design in several jurisdictions.

But Muhr did not just seek patent protection in a vacuum. Nor did Muhr try to deceive any patent office – let alone the U.S. Patent Office – into assuming *any* FRP leaf spring was novel. In fact, the "Background" section of the '330 Patent expressly discloses FRP leaf springs that were known. (Appx202, 1:16-2:5.) When filed with the U.S. Patent Office,

Muhr provided copies of numerous prior art one-piece FRP leaf springs like those shown below.



**Appx1239;** *see also* **Appx1214, ¶0001**



**Appx1109, Fig. 1B;** *see also* **Appx1107, ¶0019**

In fact, Muhr even disclosed its own prior "leaf spring 1 … [that is] made of a fiber-reinforced plastic material in one piece." (Appx1254, ¶0032.)



**Appx1262, Fig. 2;** *see also* **Appx1246, ¶0001; Appx1254, ¶0030**

But the novelty of the '330 Patent was more than just a one-piece FRP leaf spring. Indeed, the inventor of the '330 Patent discovered ride and handling could be improved by a progressive FRP leaf spring having non-displaceable but pivoting support that operated with ***tensile*** reaction forces. (Appx202, 2:10-12, 2:25-33.) The '330 Patent discloses a leaf spring that "is configured such that, at least when higher vertical forces are introduced from the wheel carrier, the leaf spring is subjected to tensile loads" and operates in pressure loading when lesser vertical forces are introduced from the wheel carrier. (Appx202, 2:33-35; Appx203, 4:22-28.)

As noted, the first end and the second end of the FRP tension leaf spring, while at least one is pivotable, "are each fixed in a non-displaceable way in the respective receiving devices." (Appx202; 2:25-33, 2:45-47.) Because of the non-displaceability, the end portions of the leaf

spring "cannot be substantially displaced in the longitudinal direction when the spring is under load." (*Id.*, 2:49-51.) The leaf spring is designed such that tensile stress on the spring increases progressively with an increasing load from the wheel carrier so that the spring rate progressively increases when in operation. (*Id.*, 2:56-60.)

Specifically, the leaf spring includes a "spring portion" that extends from a first end and a "bendable portion" that extends from a second end. (Appx205, 7:26-36.) The spring portion and bendable portion are connected by a curved transition portion. *Id.* The disclosed and claimed shape provide unique operating characteristics. For instance, when vertical forces are introduced from the wheel carrier, tensile loading will occur in the spring portion thereby causing the bendable portion to bend toward the second end. *Id.*

In the installed state, this means that with an increasing load on the motor vehicle, the suspension becomes stiffer, which has an advantageous effect on the driving comfort and driving stability of the motor vehicle. (Appx202, 2:56-63.) That is, "[t]he stresses generated in the spring portion and the bendable portion, respectively, change with an increasing load and differ from each other with regard to their single

stress components. With vertical forces introduced by the wheel carrier, the spring portion is particularly subjected to tensile load and the bendable portion, with the spring portion being under tensile load, is particularly subjected to bending." (Appx202-203, 2:64-3:3.)

## C.     Overview of IPR Proceedings

### 1.     IPR Grounds and Institution Decision

Rassini petitioned for *inter partes* review of claims 1–5, 8, 10–15, and 17 of the '330 Patent. (Appx209.) Ground 1 alleged claims 1–5, 8, 10–14, and 17 were obvious in view of Japanese Patent Publication JP3872719 (Appx1330-1351, "Enomoto") alone. Ground 2 alleged claim 15 was obvious in view of Enomoto and U.S. Patent No. 9,765,838 (Appx1421-1441). (Appx226.) The Board instituted review of both Grounds. (Appx1731.)

### 2.     Overview of Enomoto

The specific Enomoto patent relied on by Rassini in the underlying IPR is very detailed with respect to the prior art it was evaluating and the problems it sought to overcome. (Appx1330-1351.)

Enomoto begins by explaining known "prior art" suspension systems are designed to prevent extreme "rolling or tilting of a vehicle vertically, longitudinally, and laterally during travel[.]" (Appx1331,

16

¶0002.) The ability for suspension systems to handle vertical forces, longitudinal forces (e.g., forces from acceleration/braking), and lateral forces (e.g., forces experienced during turns) ensure "a comfortable ride" for the passengers. *Id.* In the "Problem to be Solved by the Invention," Enomoto describes a known suspension system for handling these forces. This suspension system includes a leaf spring structure formed from a plurality of individual metal leaf springs (labeled "e," "f," "g").[1] (Appx1333-1335.)



**Appx1350, Fig. 8**

Enomoto recognized problems with the prior art leaf springs, including: (1) the need for shackles (shaded green and labeled "l") to absorb displacement due to vertical flex of the leaf spring; (2) a stabilizer

---

[1] As explained in Section IV.A.1 above, Enomoto is describing a form of Hotchkiss leaf spring suspension system.

(shaded red and labeled "q") that acts as "resistance when turning in vertically inverted phases" thereby providing rolling rigidity; (Appx1332-1333, ¶¶0007-0008) and (3) poor riding comfort (Appx1333, ¶0009).

To overcome the problems of prior art leaf spring designs, Enomoto's solution was a ***two-piece metal*** leaf spring having: (1) a "thick forward leaf" (below red); and (2) a "thin rear leaf"/"section" with a "curved section" (below green). (Appx1335-1336, ¶0015.)



**Appx1348, Fig. 3**

Enomoto explains his leaf spring is made from two separate pieces of metal where: (1) each piece could be "individually heat treated so as to retain separate target strengths" and this heat treatment is done "ahead of time" (Appx1331, Claim 2; Appx1336, ¶0019; Appx1342, ¶0045); (2) the front leaf section (shaded red above) can have a separate length, width and thickness to the rear leaf section (shaded green); (Appx1336, ¶0019); (3) the front leaf alone can provide tilting of the vehicle left and right and "rigidity during braking" (Appx1343, ¶0050); and (4) the rear "leaf" could

18

be made "thinner than the forward leaf 25A" thereby lowering the "vertical spring constant" to "improv[e] maneuverability and ride comfort" (Appx1344, ¶0054). In being able to handle these additional forces, Enomoto's design eliminated the need for the "stabilizer" and "shackle" necessary in the prior art suspension system. (Appx1332-1333, ¶¶0007, 0009.)

But Enomoto continued to use an "air spring" to "support vertical loads acting on the axle b." (Appx1334, ¶0007.) Enomoto explains, the two-piece metal leaf spring still cooperated with an air spring to absorb vertical forces. (Appx1334, ¶0011.) Indeed, Enomoto expressly recognized his *leaf spring could break*. (Appx1343, ¶0051.) But, as Enomoto states, even if the leaf spring breaks, the positioning of the wheel on the axle ensures the vehicle could still operate. *Id.* Enomoto's design ensured the vehicle could still operate because the *air spring* handles the primary vertical forces.

### 3.    Petitioner's Arguments

Rassini's proposed a construction of "tensile loading" that eliminates the novel structural characteristics claimed by the '330 Patent. (Appx223-226.) Petitioner's construction relies on its expert – Dr.

19

Robert Wagoner – that "tensile loading" is not informed by any preferred embodiment of the '330 Patent and does not require any "location *where* tensile loading occurs but encompasses springs with different configurations that have fixed ends that they will necessarily experience tensile loading." (Appx224, citing Appx381, ¶183.) The Petition's proposed construction for tensile loading was "*when* the horizontal components of the reaction force imposed on each leaf spring end by a respective device are directed in opposite directions away from each other," but does not identify *when or where* such tensile loading must occur.[2] (Appx225-226; Appx362, ¶143.) Using this construction, Petitioner alleged, "[o]nce the spring is subjected to a sufficient vertical load, the overall spring length must increase relative to its unloaded stated, but is prevented from doing so by the non-displaceable fixation of the end portions." (Appx251, citing Appx330-337, ¶¶91-105; Appx381-382, ¶¶183-184.) Basically, the Petition argued tensile loading is an "inherent result" and "[a]ny leaf spring with non-displaceable ends will, *when deflected sufficiently*, be subject to tensile loading." (Appx381, ¶183.)

---

[2] All emphasis is added unless otherwise noted.

Next, Rassini and Dr. Wagoner argue FRP leaf springs have existed since the 1960s. Oddly, Rassini's Petition does not allege it would be obvious to modify and replace an older metal leaf spring with an FRP leaf spring. Instead, Rassini argues that that Enomoto's ***two-piece metal leaf spring*** when modified renders obvious the claims of the '330 Patent. (Appx228-257; Appx265-267.)

Rassini specifically argues that it would be obvious to modify Enomoto's two-piece metal leaf spring to be a single-piece FRP leaf spring. Rassini argues this modification would be obvious as the FRP leaf spring would reduce the weight and components of the disclosed two-piece metal leaf spring. (Appx229.)

But Rassini does not address ***why*** it is obvious to modify Enomoto's claimed two-piece metal leaf spring instead of, for example, the numerous other leaf springs designed by "Mitsuru Enomoto" like those cited during prosecution of the '330 Patent. (*See* Appx782-800.)  As shown below, a ***2004*** Enomoto patent cited within the file history of the '330 Patent even discloses using a ***single-piece metal*** leaf spring to reduce costs and parts. (Appx782.)

21

Regardless, Rassini's Petition does not rely on the disclosure of the 2002 Enomoto as teaching tensile loading of the leaf spring. Instead, Rassini's obviousness theory is Enomoto disclosed a leaf spring that inherently transitioned from compression to tension ("C-T") and was "increasingly subjected to tensile loading" when unidentified but sufficient vertical forces were introduced. (*See* Appx254; Appx3166.)

Rassini's obviousness position primarily relied on Dr. Wagoner who opined computer simulations (FEA) were "required" for a POSITA to determine the C-T transition point for complex shapes like Enomoto. (Appx350, ¶119.) Dr. Wagoner therefore performed computer simulations to illustrate the operation of various leaf springs including Enomoto's leaf spring. Dr. Wagoner argued his simulation showed Enomoto's spring – and in fact ***any leaf spring*** – would transition from compressive loading to tensile loading ***if*** (1) the leaf spring is pinned at both ends; and (2) the leaf spring is deflected upward sufficiently past its neutral point. (*See* Appx346, ¶116.)

Dr. Wagoner's simulation did not consider the material of the leaf spring nor whether it was capable of reaching tensile loading without breaking. (*See* Appx1765; Appx1797.)

22

Moreover, Dr. Wagoner's simulation was divorced from Enomoto's complete suspension system (i.e., removed from its installed state) which requires the leaf spring co-operate with an "air spring 4" (shaded red) and "shock absorber 23" (shaded blue).



**Appx1347, Fig. 1**

Petitioner stated that analyzing the leaf spring in its operational state was not necessary because of its proposed claim construction. The Petition also claimed that Enomoto's air spring and shock absorber would not prevent the leaf spring from traveling upwardly past the neutral point and into tension. (Appx253.)

23

### 4.    Muhr's Response

Muhr responded that Rassini's Petition erroneously relied on an incorrect claim construction where Petitioner assumes the leaf spring will travel unlimited distances without regard to the installed state of the leaf spring and without regard to force or stress which may cause the leaf spring to fail long prior to any hypothetical tensile loading. (Appx1763, Appx1783.) Relying on the *recited* claim language and intrinsic record, Muhr argued the claims require the leaf spring – *in the installed state* – be increasingly subjected to tensile loading in response to wheel carrier forces. (*Id.*)

That is, the claims are limited to their installed state and not so broad to capture any leaf spring *capable* of achieving tensile loading when sufficiently deflected upwardly in the abstract. (Appx1770, Appx1780.) Muhr explained the '330 Patent recites a particular physical relationship between the leaf spring, the wheel carrier, the vehicle, and that the claimed tensile loading – structural forces – occurs within this context. *Thus, it would be improper to construe claim 1 in the abstract and divorced from the context of the invention.* Muhr argued that the claims should be construed to require how the leaf spring

operates with structural forces when installed on the vehicle and when receiving vertical forces introduced by the wheel carrier of the vehicle during operation. (Appx1781-1782.)

Muhr specifically cited the Greco reference, which was overcome during prosecution, in support of claim 1 being limited to tensile loading in the *installed state*. (Appx1772.) Muhr explained the Examiner initially rejected claim 1 as unpatentable because Greco was *capable of* tensile loading but dropped that position and allowed the application as a result of attorney argument, in part, related to the installed state of the leaf spring, *i.e.*, that Greco is subjected to compression not tension. (Appx1782-1783.)

Muhr also pointed out several deficiencies in Dr. Wagoner's testimony, including (1) his failure to account for Enomoto's air spring/shock absorber; (2) his analysis did not account for whether Enomoto's leaf spring – if modified using FRP – would break prior to tensile loading; and (3) his analysis did not account for whether modifying Enomoto's leaf spring using FRP would require additional components (like a torsion bar or stabilizer) to be re-added back into the suspension system. (Appx1765, Appx1796-1797, Appx1799-1800,

Appx1810, Appx1812.) ***According to a proper finite element analysis, it does break***. (Appx1969.)

Muhr further disputed it would be obvious to modify Enomoto's two-piece metal leaf spring with a single piece FRP leaf spring. While acknowledging FRP leaf springs were well-known to a POSITA,[3] Muhr argued a POSITA would not automatically make a one-to-one substitution of FRP for steel in all cases. (Appx1814; Appx1974-1975, ¶¶200-203.) The file history of the '330 Patent discloses numerous prior art FRP leaf-spring designs. (*See, e.g.,* Appx728-747.) The file history also discloses numerous prior art metal leaf spring designs – including additional metal leaf springs patented by Misuru Enomoto. (*See* Appx782-788.)

Importantly, the Enomoto reference relied upon here expressly teaches the selection of a two-piece ***metal*** leaf spring to replace prior art metal leaf springs as this would eliminate the need for commonly employed stabilizer systems and shackles. (Appx1973, ¶¶198-199.) Muhr explained that if Enomoto's leaf spring was modified as a one-piece FRP

---

[3] Indeed, the Background of the '330 Patent even discloses numerous prior art FRP leaf springs. (Appx202.)

design, such a stabilizer system would need to be **re-added** cutting against Enomoto's teachings. *Id.* Muhr argued the re-addition of components Enomoto expressly wants to remove emphasizes it would not be obvious to modify Enomoto as proposed by Rassini.

### 5.    Rassini's Reply

On the claim construction front, Rassini newly argued several express limitations of claim 1 should not be included in the scope of the claim. Rassini argued that several limitations of claim 1 were merely "intended use" and thus only required a leaf spring *capable of* experiencing tensile loading in the abstract – not on a vehicle as disclosed in Enomoto. Rassini pointed to Dr. Wagoner's analysis, which analyzed the leaf spring 25 in isolation, as showing that Enomoto's leaf spring 25 was capable of tensile loading. (Appx2507-2508.) No consideration was given to where or when such structural forces are required by the claims.

Perhaps recognizing its strained claim construction position, Rassini established a new obviousness theory that a POSITA would be **capable of** modifying Enomoto's leaf spring to operate in tension as recited by claim 1 and not fail.

> It is well known that adjustment of various leaf spring dimensions, such as length, width and thickness as well as

27

material selection will achieve different spring characteristics. Ex. 1033, ¶¶26, 66, 94; Ex. 1001, 9:33-9:38. It was well known to a [POSITA] how to vary dimensions of Enomoto's leaf spring based on its material properties such that it would not fail within the travel limits of any particular suspension system.

(Appx2509.)

### 6.    Muhr's Sur-Reply

Muhr responded to Rassini's new argument that "a POSITA would know how to vary dimensions of Enomoto's leaf spring ... such that it would not fail within the travel limits of any particular suspension system." (Appx3192.) Muhr first pointed out that Rassini's original petition lacked any evidence to support this conclusion. (Appx3207.) Muhr further explained, "Enomoto does not provide any teaching or motivation to modify additional componentry to achieve tensile loading" and Rassini fails to "identify what these modifications would be, why a POSITA would be motivated to make them, or how such modifications are consistent with the teachings of Enomoto." (Appx3208.)

Muhr explained that a POSITA would need to significantly redesign Enomoto to change from steel to FRP in a way contrary to the invention of Enomoto. Again, Enomoto specifically choose to address "roll stability and wind-up rigidity" using a two-piece steel leaf spring which

28

eliminated from the suspension system additional roll stabilizers and shackles. (Appx1473, 1:39-47.) Citing to Dilling's declaration, Muhr explained Rassini's proposed modification to Enomoto would require the **re-addition** of roll stabilizers because FRP is softer than steel. (Appx3209.) In short, Muhr argued modifying Enomoto as proposed would not only goes against its express teachings, but also does so in a way that renders the design inoperable as intended.

### 7.    Board's Final Written Decision

Going against Muhr, the Board latched onto Rassini's new arguments and adopted its claim construction in finding claim 1 obvious because recited limitations were "superfluous" and non-limiting "intended use" clauses. (Appx21-22.) The Board stated the recited "intended use" only required a leaf spring *capable* of performing the claimed function in the abstract. (Appx25; Appx62.) As such, the Board found Enomoto was *capable* of operating in tension and thus met the limitations of claim 1. (Appx63; Appx65; Appx79.) The Board also rejected Muhr's argument that Enomoto's modification was "hindsight bias" because in the Board's opinion Rassini had relied on what was "well-known in the art." (Appx73.)

Muhr timely appealed what it believed to be an erroneous decision by the Board.

## V.   SUMMARY OF THE ARGUMENT

### A.   The Board's Claim Construction is Erroneous

The Board erred in its construction of the claims of the '330 Patent. While the '330 Patent claims, as detailed by the specification and prosecution history, are directed to a leaf spring designed to operate in a specific manner when **in the installed state** on a motor vehicle, the Board held that numerous claim limitations were an "intended use" and "superfluous." When properly construed, claim 1 of the '330 Patent covers a leaf spring that is subject to "tensile loading" – not in the abstract – but "*when vertical forces are introduced from a wheel carrier while in its installed state*" on a vehicle.  The proper construction is confirmed by review of the intrinsic record for which there is no real dispute. Indeed, the Board held that Muhr's proposed construction "simply reiterates what is already expressly recited in claim 1." (Appx23.)

Claim 1 includes numerous definitional parameters as to when "tensile loading" of the claimed leaf spring is to occur. First, it is expressly claimed that "with an increasing load due to vertical forces ***introduced from the wheel carrier***," the leaf spring then "***is increasingly subjected*** to tensile loading." (Appx207, 12:31-33.)   These are not

statements of intended use. Instead, these are active claim limitations directed to physical and structural characteristics of the leaf spring when installed on a vehicle.

The claim itself further bolsters the proper construction. Claim 1 outlines how the leaf spring is oriented on "the motor vehicle in an installed state and is configured to accommodate the wheel carrier." And importantly, the load is due to "vertical forces introduced from the wheel carrier" of the motor vehicle, not just any vertical force. The claim requires that the leaf spring "is increasingly subjected to tensile loading" only in this installed state on a vehicle with the wheel carrier – not in the abstract. (Appx207, 12:18-20, 12:31-33, 12:32-33.)

The specification confirms the proper construction. "In the installed state, this means that with an increasing load on the motor vehicle, the suspension becomes stiffer, which has an advantageous effect on the driving comfort and driving stability of the motor vehicle." (Appx202, 2:60-64.) The specification repeats that "[a]t increasing load … the spring portion is increasingly tension loaded" which improves "driving comfort and driving stability." (Appx203, 4:19-22; Appx206, 9:14-15.) The specification also explains that this benefit must occur "for at least a part

of the entire spring travel that is possible." (Appx202, 2:37-38.) The specification was ignored by the Board.

The express language of claim 10 of the '330 Patent was also ignored by the Board. Claim 10 recites, "the leaf spring ***is designed such that*** the spring portion, upon elastic deformation due to vertical forces introduced from the wheel carrier, is subjected to pressure loading" in one travel range, and tensile loading in another travel range. (Appx208, 13:13-16.) Again, this clear claim language requires the leaf spring be designed to operate in connection with a wheel carrier of a vehicle in a certain manner. The Board held that this claim was satisfied by Enomoto that was "capable of transitioning" in the abstract, even though there was no evidence presented that Enomoto was "designed such that" it would transition to tensile loading reacting to a wheel carrier of a vehicle in its installed state. Instead, Enomoto was shown to fail prior to any hypothetical tensile loading, which is expected as Enomoto mostly supports vertical loads with the air spring rather than the leaf spring. (Appx1332-1333; Appx1343, ¶¶0007 and 0051.)

**B.     The Board's Decision is Based on the Incorrect Claim Construction**

By ignoring fundamental aspects of the claim that the leaf spring is subject to tensile loading in the installed state, the Board held, "it is irrelevant whether [prior art] Enomoto's leaf spring might be designed to fail or is impeded by an air spring prior to transitioning to tension" as presented by the FEA of Patent Owner's expert, Mr. Dilling. (Appx62.) While assuming Mr. Dilling's analysis was correct, the Board found it irrelevant whether Enomoto ***as disclosed*** meets the limitations of claim 1 as construed by the Board.

The Board also erred in providing a superficial and unsupported conclusion regarding capability or the installed state. First, the Board credited Muhr's expert that explained that Enomoto if made from FRP would fail before tension, which means it is not capable of tensile loading. (Appx65; Appx67-68.) Second, the Board erred in deciding – beyond any argument or position presented in the Petition – that a person of ordinary skill in the art was *capable of* designing the leaf spring of Enomoto in a *particular* way and installed in a *particular* environment (different from the disclosure in Enomoto) to transition from compression to tension in the installed state.  (Appx64-65.)  Simply, there is no justification or

34

explanation for this finding. The reason is simple. This was not included in the Petition and was plucked from a single superficial paragraph in Petitioner's Reply Declaration. Not only is this insufficient to satisfy Petitioner's burden, but the Board also erred in denying Patent Owner's Motion to Strike (Appx3165-3171) this content of the Reply Declaration (Appx3117-3164).

## C.    There is no Motivation to Modify Enomoto other than Improper Hindsight

Rassini's Petition is based on the incorrect premise that a POSITA would start with, and then modify, Enomoto thereby rendering obvious the challenged claims of the '330 Patent. (Appx229–233.)

But Petitioner's expert testified that a POSITA understood Enomoto's leaf spring to be "impractical and [a] dangerous aspect" of the overall design of the suspension because it included a joint which – in his opinion – would break. (Appx367, ¶152; Appx2152, 159:12-24.) Dr. Wagoner testified that modifying and designing the leaf spring using FRP would eliminate this potential failure point. Dr. Wagoner conceded, however, that his modeling did not illustrate nor confirm whether an FRP leaf spring would resolve the dangerous aspect of Enomoto's design because it "wasn't germane" to his analysis, even though it was his stated

justification of the modification to FRP. (Appx2154, 161:18-25.) Dr. Wagoner also conceded he "didn't care" if his Enomoto's leaf spring when modified and constructed of FRP included a potential high-stress area that could fail because his only concern was whether it could "go from compression to tension." (Appx2158, 165:9-17.)

But it is improper to select from the prior art components of the inventor's combination using the "blueprint" supplied by the inventor in the patent. *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1143 (Fed. Cir. 1985) (Holding it improper to select from prior art the separate components of the inventor's combination using the "blueprint" supplied by the inventor in the patent.)  Yet that is exactly what Petitioner did and what the Board relied on in finding the '330 Patent claims invalid. Dr. Wagoner started with a reference he initially believed was problematic and modified it in a way to meet the '330 Patent claims but it was still problematic (and does fail).

Petitioner's hindsight-biased selection and modification is an improper basis upon which the Board relied in rendering the claims unpatentable.

**D.    Enomoto Teaches Away from an FRP Leaf Spring Design and there is no Motivation to Combine**

Enomoto's invention sought to improve upon the conventional (i.e., stacked) metal leaf-spring, which operated in tandem with a "shackle" that handled longitudinal forces and a "stabilizer" that handled lateral forces. Enomoto details how its two-piece *metal* leaf spring was an improvement over the prior-art metal leaf spring in that it was designed to handle the longitudinal and lateral forces thereby eliminating the need for the "shackle" and "roll stabilizer." (Appx1335, ¶0014; Appx1344, ¶0053.)

Enomoto describes each piece of the leaf spring will have different thicknesses, target strengths, and be heat treated in different manners. (Appx1336.) These differences allow each piece to handle the longitudinal and lateral forces – i.e., rolling rigidity and wind-up rigidity – that were previously handled by the eliminated components. *Id*. The unique design that allows for removal of prior art components is not some abstract reasoning buried within the teaching of Enomoto, instead *it is the basis of Enomoto's claimed invention*. (Appx1330-1331, Claims 1-2.)

Petitioner argued, and the Board adopted, that against these clear teachings it was obvious to modify Enomoto's two-piece metal design

37

using a one-piece FRP leaf spring. But both metal *and* FRP leaf springs had existed and were known since the *1960s*. (Appx310.) Enomoto was filed in *2002* and **did not** select an FRP leaf spring. Given the express basis as to why Enomoto selected a two-piece metal leaf spring, there is no motivation to modify Enomoto as it teaches away from using any other material – let alone FRP. These teachings include a two-piece metal leaf spring that eliminates the roll stabilizers and shackles previously used to handle the longitudinal and lateral forces experienced by the vehicle. (Appx1332-1333, ¶¶7, 9; Appx1330-1331, Claim 1.)

Thus, even if the Board's construction erasing key claim limitations is adopted, the claims of the '330 Patent are not invalid because it was not obvious to modify the two-piece metal leaf spring of Enomoto to be a single-piece FRP leaf spring.

# VI.   ARGUMENT

## A.   Standard of Review

The Board's claim construction is reviewed *de novo*, with underlying fact findings, if any, reviewed under a clearly erroneous standard. *CardSoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1349-1350 (Fed. Cir. 2015) (*citing Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015)).

The Board's compliance with the Administrative Procedure Act is also reviewed *de novo*. *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341 (Fed. Cir. 2017).

The Board's factual findings are reviewed for substantial evidence. *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 449 (Fed. Cir. 2015). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000).

**B.     The Board Erred in Its Construction of "Tensile Loading"**

The Board construed "tensile loading" as "when the horizontal components of the reactive force imposed on each leaf spring end by a respective receiving device are directed in opposite directions away from each other." (Appx24.) The Board's construction is incomplete insofar as it ignores that the leaf spring as claimed "is increasingly subjected to tensile loading" **in its installed state on a vehicle**.

### 1.     The Claim Language is Clear that Tensile Loading is Not Claimed to Occur in the Abstract

As directed, a proper claim construction analysis begins with the claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). Claim 1 of the '330 Patent recites:

> wherein the spring portion [of the leaf spring] extends substantially in a longitudinal direction of the motor vehicle in an installed state and is configured to accommodate the wheel carrier.

(Appx207, 12:17-20.)

An abstract leaf spring is not claimed. Instead, a "leaf spring assembly" is claimed such that "in an installed state" it must "extend [ ] substantially in a longitudinal direction of the motor vehicle." The leaf

spring must also be "configured to accommodate the wheel carrier" in its installed state on the vehicle.

Claim 1 continues:

> wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading.

(Appx207, 12:31-33.)

The claimed leaf spring "***is increasingly subjected to*** tensile loading." Again, this reaction is not in the abstract. Instead, the leaf spring is subjected to actual structural and measurable forces – tensile loading – with an increasing load. The increasing load is also not in the abstract. The increasing load is "due to vertical forces ***introduced from the wheel carrier***." Forces from a wheel carrier can only be introduced to a leaf spring when installed on a vehicle, i.e., the installed state as claimed. When installed on a vehicle in the longitudinal direction,[4] and "with increasing load due to vertical forces introduced from a wheel," is when the leaf spring "is increasingly subjected to tensile loading" according to the claims. (Appx207, 12:31-33.)

---

[4] Claim 1 also requires that spring portion is positioned towards the front of the vehicle and the bendable portion is positioned towards the rear of the vehicle "in the installed state." (Appx207, 12:39-44.)

Indeed, the Board held: "Patent Owner's proposed [and rejected] claim language, specifically the dependent clause 'when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state,' to a great extent simply reiterates what is already expressly recited in claim 1." (Appx23.) There is no dispute – in fact there is an express acknowledgement – that Muhr's proposed construction is "expressly recited" in the claims.

### 2.    The Specification Emphasizes Leaf Spring Tensile Loading Occurs While Installed on a Vehicle

"The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose." *Phillips*, 415 F.3d at 1316. (quoting *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The claimed requirements of "installed state," "configured to accommodate the wheel carrier," and that the leaf spring "is increasingly subjected to tensile loading" when "vertical forces introduced from the wheel carrier" increase are well-developed in the '330 Specification:

**(1)** The SUMMARY section describes the "need for a leaf spring" mounted on a motor vehicle that "under load, comprises a progressive spring rate." (Appx202, 2:9-13.) The '330 Patent specification states that "[a]t increasing load … the spring portion is increasingly tension loaded." (Appx203, 4:19-22.) In the context of the '330 Patent, this means the leaf spring has a progressive spring rate – getting stiffer due to an increase in tensile loading. (Appx202, 2:58-60.)

This progressive spring rate is achieved by a leaf spring that is increasingly subjected to tensile loading when "higher vertical forces are introduced from the wheel carrier" of the vehicle.

> The leaf spring is configured such that, at least when higher vertical forces are introduced from the wheel carrier, the leaf spring is subjected to tensible loads, and therefore it can also be referred to as leaf tensile spring. This applies for at least a part of the entire spring travel that is possible.

(Appx202, 2:33-38.)  It is notable that the leaf spring being subjected to tensile loading is required for "part of the entire spring travel that is

possible." (*Id.*) A leaf spring that is subjected to tensile loading in the abstract – or spring travel that is impossible – is irrelevant to the '330 Patent.

**(2)**    The specification also explains that "tensile loading" is not relevant in the abstract. Instead, the specification addresses the problem of improving ride quality and stability of a vehicle with a leaf-spring assembly, and thus overcomes prior disadvantages of the prior art. (Appx202, 2:60-64.) It is part of the invention to subject this novel leaf spring to "tensile loading" in the installed state to improve ride quality.

> In the installed state, this means that with an increasing load on the motor vehicle, the suspension becomes stiffer, which has an advantageous effect on the driving comfort and driving stability of the motor vehicle.

(Appx202, 2:60-64.) The requirements of the invention, specifically the structural forces, are extolled in the installed state. The claimed "installed state" is also expressly defined in the specification.

> In the installed state, i.e., when installed in a vehicle, of the leaf spring, a wheel carrier is fixed at the spring portion, via which wheel carrier forces of the vehicle wheel are introduced into the leaf spring.

(Appx203, 3:44-48.)  Only in the installed state on a vehicle can the wheel carrier forces be introduced into the leaf spring as claimed. The progressive spring rate characteristic for "spring travel that is possible"

44

– that occurs during operation on a vehicle – is what provides improved "driving comfort and driving stability of the motor vehicle." (Appx202, 2:39-63.)

### 3. The Claims Require the Leaf Spring is Subjected to Tensile Loading in the Installed State

Claim 1 expressly claims details of a leaf spring and its active structural characteristics when installed with a particular orientation on a vehicle, just as explained in the specification. In that installed state, as the claim states, the leaf spring "*is increasingly subjected* to tensile loading" when "vertical forces *introduced from the wheel carrier are increased*." The leaf spring "is increasingly subjected to" – this is an active verb requiring this operation of structural forces. This operation must occur in response to "an increasing load due to vertical forces introduced from the wheel carrier." (Appx207, 12:31-32.) This is express claiming of how the claimed leaf spring operates under certain conditions, i.e., when in the installed state on a vehicle and in response to increasing vertical forces from the vehicle wheel carrier.[5]

---

[5] The Court also instructs that the prosecution history should be considered. But, because the prosecution history represents an "ongoing negotiation between the PTO and the applicant, rather than the final

The Board appears to believe that if a physical component is not positively claimed as part of the apparatus, the apparatus cannot be claimed in relation to those other physical components. This is a clear misunderstanding of the law. How devices operate (or here, how a device possesses reactive forces) with parts outside of the claimed apparatus are common claiming techniques long endorsed by the Federal Circuit. *See, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1325, 1339-40 (Fed. Cir. 2011) (reviewing construction of claim directed to system for use in a vehicle reciting operation with "components of the vehicle" without positively claiming the components); *Dane Indus., Inc. v. Ameritek Indus., LLC*, 154 F. App'x 894, 895 (Fed. Cir. 2005) (construing and finding valid claims directed to an apparatus for moving shopping

---

product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 (citing *Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002)).  Here, the Examiner indicated that the claims required that the spring "be subject to increased tensile loading *as the vertical load on the vehicle* is increased. Although not applied." (Appx759.)  This indicates that the Examiner understood that the claim evaluates whether there is increased tensile loading as installed and operating on the vehicle.  Moreover, the arguments of the Applicant also make clear that the claims are not directed to mere capability of any spring, as Applicant argued the '485 patent to Greco was not subjected to tensile loading, even though it may be possible in the abstract. (Appx701-703.)

46

carts reciting operation with components of shopping carts without positively claiming them); *See also Rivera-Davila v. Asset Conservation, Inc.*, 230 F.3d 1378, 2000 WL 27891, *1 (Fed. Cir. 2000); *Jack Frost Lab'ys, Inc. v. Physicians & Nurses Mfg. Corp.*, 124 F.3d 229, 1997 WL 592814, *2 (Fed. Cir. 1997).

The language of this claim is no different than claiming a device based on how the device structurally responds (reactive forces) under certain conditions (input forces). *See, e.g.*, *Forest Lab'ys, Inc. v. Abbott Lab'ys*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (to infringe a claim requiring certain characteristics of a material in dried form, the accused material must have those characteristics "as recited in [the claim], when it is in dried form"); *Jack Frost Lab'ys, Inc.*, 124 F.3d 229, 1997 WL 592814 at *5 (a thermal pack must maintain its integrity upon exposure to microwave power for at least one minute to fall within the scope of a claim for a thermal pack specifying that the pack does not rupture when heated at full microwave power for one minute).

### a.    The Board Erred in Its "Intended Use" Construction

In its claim construction determination, the Board held that "installed state" was an intended use, entitled to no patentable weight.

47

Similarly, the Board also held that "wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading" is also only an intended use. These claim construction rulings are incorrect.

With respect to the "tensile loading" limitation, the Board relied exclusively on *Finjan, Inc. v. Secure Computing Corp*., 626 F.3d 1197, 1204-1205 (Fed. Cir. 2010). But, Finjan was not an intended use case. Instead, the Federal Circuit explained – in the context of software code – the claims were directed to capability as opposed to operation of the code. In such situations, operation *per se* is not required for direct infringement. *Finjan*, 626 F.3d at 1205 ("program code for causing a server …" claim "language does not require the program code be 'active,' only that it be written 'for causing.'") The code, or course, must cause a server to perform when active, but being "active" was not a requirement for direct infringement. *Finjan* and its claims regarding program code as written are not relevant here. The '330 Patent claims did not even recite a leaf spring capable of tensile loading. Instead, the claims recite that the leaf spring "***is increasingly subjected to*** increasing tensile loading" under certain conditions. Capability is not in question, actual tensile

48

loading in certain orientation and conditions is what is required by the claims.

With respect to "installed state," the Board relied solely on *In re Schrieber*, 128 F.3d 1473, 1477-78 (Fed. Cir. 1997).[6] *Schrieber* involved an anticipation assertion based on inherency, which is not at issue here. Additionally, *Schrieber* followed the broadest reasonable interpretation standard, not the applicable *Phillips* standard. No claim language was ignored in *Schrieber*. On the anticipation front, *Schrieber* did not claim its conical shaped top operated differently than what was disclosed in the prior art. Here, the leaf spring assembly is expressly claimed to operate differently and have different structural characteristics in the "installed state" than the prior art. The claim covers a leaf spring that "***is*** increasingly subjected to tensile loading" when "vertical forces ***introduced from the wheel carrier are increased***" in its "installed state" on a vehicle. *Schrieber* did not hold functional language can be

---

[6] The Board also relies upon Enomoto in its claim construction analysis of installed state. Just like construing claims in light of the accused products is error, *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002), construing claims based on the invalidity allegations asserted is also error. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

49

ignored for validity purposes as implied by the Board. (Appx22.) In fact, numerous decisions explain functional language is not a license to remove it from the claim. *In re Chudik*, 674 Fed.Appx. 1011 (Fed. Cir. 2017). All claim limitations must be evaluated for infringement and validity. *Id.* at 1016.

Applying Patent Office anticipation concepts, not proper claim construction under *Phillips*, the Board held, "[s]tatements of intended use in an apparatus claim do not distinguish the claims over prior art apparatus. *In re Sinex*, 309 F.2d 488, 492 (CCA 1962)." (Appx23.) Again, *Sinex* applied the broadest reasonable interpretation standard and involved a preamble and inherency. It is well-established that a preamble is not limiting when the claim "uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). The present dispute does not concern the preamble, nor is this claim about intended use. The Board admits as much when it acknowledges the claim language is directed to "how the leaf spring operates." (Appx28.)

In summary, the Board held these express claim limitations are "superfluous" as "intended use" language. (Appx24.) The Board's

conclusion is not supported by the law and is also against well-established canons of claim construction under *Phillips*. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1373 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

> **b.    To the Extent that the Board Found the Claims Cover Only Capability in the Abstract, that was also Error**

Armed with its conclusion that in the "installed state" and when "vertical forces introduced from the wheel carrier are increased" is only an intended use, the Board held that the claims covered any leaf spring with the theoretical capability of tensile loading in the abstract. The Board explained its position:

> This functional language – that is – how the leaf spring operates – does not require that the wheel carrier *is* physically on the leaf spring, or that a load *is* actively applied to the leaf spring via the wheel carrier, only that the leaf spring has the capability to support a wheel carrier and receive forces through the wheel carrier that cause tensile loading.

(Appx21, emphasis in original.)

51

Patent Owner agrees the claims do <u>not</u> require a leaf spring, a wheel carrier and a vehicle. But, the claims do <u>not</u> recite a leaf spring that operates in tensile loading in the abstract. Instead, the claims require the leaf spring "is increasingly subjected to tensile loading" – that it operates with structural forces oriented in that certain way – when in the installed state. There is no other way other than the installed state for "increasing load due to ***vertical forces introduced from the wheel carrier.***" (Appx207, 12:31-32.)

The claim language is specific. It is not a leaf spring *capable of tensile loading*. It is not a leaf spring *for tensile loading*. It is not even tensile loading of the leaf spring in response to any vertical force. Instead, the leaf spring "is increasingly subjected to tensile loading" when "vertical forces introduced from the wheel carrier are increased" and oriented in its installed state on a vehicle. It is not functional language; it is how the leaf spring operates under certain conditions, specifically how structural forces are distributed by the leaf spring.

If now deemed "functional language" by the Board, it is well established that functional limitations are limitations on the claim. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("The

functional language is, of course, an additional limitation in the claim."); *see also*, *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443–44 (Fed.Cir.1997). Indeed, the alleged "functional language" provides structural limitations because the "tensile loading" (reactive force) is keyed to a load from the wheel carrier of the vehicle in the installed state (input force). This language is not an intended use or a function, instead, it provides detail regarding the structure of the leaf spring because it is subjected to tensile loading when installed – which is an orientation of structural forces.

The Board apparently held the claim language was directed to *capability* of the claimed leaf spring in the abstract, i.e., when not in the installed state. As explained above, this is contrary to the claim language. The claim covers a leaf spring that "***is*** increasingly subjected to tensile loading" when "vertical forces ***introduced from the wheel carrier are increased***" in its "installed state" on a vehicle. In support of its capability assertion, the Board uses claim language and states: "that the leaf spring 'is *configured to* accommodate the wheel carrier' simply imparts structural capability." (Appx22, emphasis in original.) Not so. Configuring a leaf spring to accommodate a wheel carrier is not the same

as a leaf spring that may be able to support a wheel carrier. The claim language "configured to" is not "capable of." In *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012), the court held the term "adapted to" should be construed to mean the narrower "designed or configured to" and not the broader "capable of or suitable for." Here, the Board simply ignored the plain meaning of the claim language to support its conclusion that the claim was directed to capability. There is no reference to capability. The leaf spring "*is* increasingly subjected to tensile loading" when in the installed state.

In *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984 (Fed. Cir. 2009), the claims required the holder included "protrusions resting upon" the cover "when removed." These active verbs indicate actual orientation is required to meet the language of the claim. **Capability is insufficient.** Indeed, the patent owner plaintiff sought to construe the active "resting upon" as "to rest on" to avoid the active language of the claim, which was rejected by the Court. Failing to understand the proper scope of the claim, "the court erred in reading the claim to cover any product 'reasonable capable' of being configured in the same manner.'" *Id*. at 994. Like the active language in *Ball Aerosal*, the

claims here require the leaf spring "is increasingly subjected to tensile loading" when in the installed state, which is the basis of the invention to provide "an advantageous effect on the driving comfort and driving stability of the motor vehicle." (Appx202, 2:62-63.)

Capability is not implicated by the claims. The claims require the leaf spring is increasingly subjected to tensile loading – structural forces – in the installed state. Any issue or decisions regarding direct or indirect infringement regarding installation does not impact an obviousness determination or the pertinent scope of the claim here.

## C.    The Board's Analysis is Either Irrelevant or Superficial

### 1.    The Board's Analysis Based on an Improper Claim Construction of Capability in the Abstract is Incorrect

The Petitioner and the Patent Owner presented FEA models based on Enomoto. The Board concluded:

> Again, as discussed above, it may be that both models are accurate based on the initial assumptions made by the respective declarants. The fact that Mr. Dilling's model of Enomoto 's complete suspension system indicates that the leaf spring would fail, or never achieve tension based on certain assumptions, does not, however, render Dr. Wagoner's testimony and FE analysis inaccurate, which indicates that Enomoto 's leaf spring is capable of undergoing tension with sufficient displacement.

(Appx67-68.)

Petitioner's expert, Dr. Wagoner, presented an analysis based on the Enomoto-shaped leaf spring in the uninstalled state. Dr. Wagoner concluded: "a leaf spring, fixed on both ends, as taught by Enomoto, also will inevitably experience both compression and tension forces, the first transitioning to the second, when subjected to sufficient forces." (Appx45.)

Patent Owner's expert, Mr. Dilling, presented an analysis based on the leaf spring of Enomoto in the installed state as disclosed in Enomoto. But, the Board held:

> [W]e determine that it is irrelevant whether Enomoto's leaf spring might be designed to fail, or is impeded by an air spring prior to transitioning to tension because the claims are written broadly enough to encompass a leaf spring that is capable of transitioning to tension, whether or not the leaf spring is supporting a wheel carrier and is actually situated on and inclusive in a vehicle's complete suspension system.

(Appx62.)

The Board "assume[d] that both [experts] are correct." (Appx65.) Yet, also held that a leaf spring that "fail[ed] … prior to transitioning to tension" was irrelevant. (Appx62.) Such a determination ignores that for an apparatus to be operable, it must be "capable of being used to the effect of the object proposed." *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1180

(Fed. Cir. 1991). Under this standard, it logically follows that if Enomoto's leaf spring would fail prior to transitioning to tension it is inoperable or incapable of this limitation, so the failure is not irrelevant as it demonstrates Enomoto is not capable of transitioning to tension. Thus, even under a "capability" construction, failure can never be irrelevant.

### 2.    The Board's Obviousness Analysis Based on the Installed State is Conclusory and not Based on Substantial Evidence

Even though the Board found the installed state irrelevant, there are two isolated locations in the Final Written Decision where the Board also apparently concluded that claim 1 was obvious based on Enomoto's capabilities in the installed state. The Board stated:

> In this case we credit Dr. Wagoner's response, who acknowledges that 'Enomoto Fig. 3 leaf spring embodiment *could be* **designed in a particular way** (size, shape, material, strength) and installed into a particular environment (vehicle and suspension) such that it could be prevented from experiencing tension. Examples of such treatments include various means of making the spring too weak or too small for the vehicle, or externally limiting its travel by various vehicle/suspension choices.' Ex. 1033 ¶ 19.

(Appx64, italics in original, boldface added.)

While this passage is written assuming that Enomoto experienced tension in the installed state, the Board found Mr. Dilling's analysis of

Enomoto's "suspension including failure of the leaf spring as well an air spring and shock absorber and dimensions may be ***presumptively correct***." (Appx65.) Thus, the Board effectively found that Enomoto could be designed in some particular but undefined way to experience tensile loading in some unidentified installed state.

Later in the Decision, the Board stated:

> [G]iven Dr. Wagoner's persuasive testimony and FE analysis, a person of ordinary skill in the art would also understand that in an installed or uninstalled state, Enomoto's leaf spring is **capable of transitioning from compression to tension given the appropriate structural dimensions, material characteristics and vertical displacement upon which Dr. Wagoner relies**. *See* Ex. 1033 ¶ 66 (Dr. Wagoner testifying that 'one [of skill in the art] would know that routine design and dimensions and materials would be performed for each specific application to match intended displacements and loads for that vehicle.').

(Appx65.)

Thus, again, the Board found that designing with "appropriate" considerations and "routine design" could lead to tensile loading in the installed state.

These assertions of obviousness are legally incorrect. First, that a POSITA *could design* an FRP leaf spring to operate in tension is irrelevant. Nowhere in this statement is it noted where the "tensile

loading" motivation would come from in the installed state, except for hindsight reconstruction of the '330 Patent. *See Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1570 (Fed. Cir. 1996) ("To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction—an illogical and inappropriate process by which to determine patentability."); *see also Vivint, Inc. v. Alarm.com Inc.*, 754 F. App'x 999, 1006–07 (Fed. Cir. 2018) (unpublished) (affirming finding that a claim was patentable over prior art, crediting the Board's reasoning that "[a]lthough it might have been possible" to modify the reference, there was "no evidence that the ordinarily skilled artisan at the time of the alleged invention … actually would have had a reason to do so in the absence of the teachings of the [challenged] patent itself."). Second, there is no explanation of how or why one skilled in the art would modify Enomoto to use FRP and would also seek to implement such an FRP design with tensile loading. Just because something *could be designed* does not make the claimed invention obvious. *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017) (quoting *Belden Inc. v. Berk-Tek LLC,* 805 F.3d 1064, 1073 (Fed. Cir. 2015))

59

("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combination or modifications of prior art to arrive at the claimed invention.") (emphasis in original).  In *Per. Web. Techs.*, the Court vacated the Board's finding of obviousness. *Per. Web. Techs.*, 848 F.3d at 994. In that case, the Board's most substantial discussion of obviousness "merely agree[d] with Apple's contention that 'a person of ordinary skill in the art reading Woodhill and Stefik would have understood that the combination of Woodhill and Stefik *would have allowed for* the selective access features of Stefik to be used with Woodhill's content-dependent identifiers feature.'" *Id.* at 993 (emphasis in original). But such reasoning "is not enough" to support obviousness. *Id.* Rather, this reasoning "say[s] no more than that a skilled artisan, once presented with the two references, would have understood that they *could be* combined." *Id.* (emphasis in original).

The Board committed the same error made in *Pers. Web Techs.* by adopting Dr. Wagoner's opinion in this case.  Dr. Wagoner merely concluded that "one [skilled in the art] would know that routine design of dimensions and materials would be performed for each specific application to match intended displacements and loads for that vehicle."

(Appx3151, ¶66.) Dr. Wagoner did not support this with any citation to the prior art. Indeed, Enomoto does not teach any of this. Enomoto discloses a suspension system with an air spring 4 that limits travel of the leaf spring to compression ranges and to support the axle when the leaf spring breaks. (Appx1333, ¶8; Appx1336-1337, ¶¶22-23; Appx1343, ¶¶48 and 51.) Dr. Wagoner merely opines on how a POSITA *could have* designed the patented invention. Thus, Dr. Wagoner's opinion and the Board's decision are insufficient to support a determination of obviousness. *Pers. Web Techs.*, 848 F.3d at 993; *Vivint, Inc.*, 754 Fed. App'x at 1006–07.

From this mere conclusory statement, the Board extrapolates that "routine design" would have resulted in Enomoto operating in **tensile loading** in the **installed state**. "Without treating [Dr. Wagoner's] testimony as if it were prior art, there is not substantial evidence" supporting this conclusion. *Rotron, Inc. v. U.S. Int'l Trade Comm'n*, 845 F.2d 1034, 1988 WL 12108, \*5 (Fed. Cir. 1988) (unpublished) (reversing obviousness determination for lack of substantial evidence where the ITC relied on expert testimony that a POSITA "could have built" a prior art motor in a certain manner without the "require[d] sufficient support in

the prior art"); *TQ Delta, LLC v. CISCO Systems, Inc.*, 942 F.3d 1352, 1359 (Fed. Cir. 2019) ("This court's opinions have repeatedly recognized that conclusory expert testimony is inadequate to support an obviousness determination on substantial evidence review.").

## D.    Rassini Improperly Presented a New Obviousness Theory within its Reply

Rassini argued it was obvious to modify Enomoto using a one-piece FRP leaf spring as this would: (1) reduce the overall suspension system's weight; and (2) eliminate the need for the problematic joint Enomoto used to connect the two pieces of metal together. (Appx229.) Rassini's Petition further argued: "Dr. Wagoner's simulations show that Enomoto's leaf spring – *in the illustrated embodiment* – would transition from compressive loading to tensile loading at approximately 7/16 of the estimated range of travel." (Appx252.) In other words, Enomoto's leaf spring design *unaltered* satisfies the recited limitations of claim 1. As explained in Section IV.C.4 above, Muhr rebutted this obviousness theory. (Appx1810-1814.)

Rassini's Reply then included a new argument alleging it would now be obvious to understand Enomoto's leaf spring design could be altered through "routine design of dimensions and material," based on

the capabilities of a POSITA, so that it would be **_capable of transitioning_** from compression to tension. (Appx2509; Appx3151, ¶66.) But this is a vastly different theory not raised in the petition that Rassini untimely injected within its Reply. *In re NuVasive*, 841 F.3d 966, 972 (Fed. Cir. 2016) *citing In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011) (Petitioners are not permitted to change theories of obviousness in their reply even if the petitioner continues to rely on the same prior-art reference.).

In *NuVasive*, the petitioner cited to new passages/figures of the prior art reference from the petition and presented a new theory of obviousness based on these new passages/figures in their reply. The Board denied patent owner's motion to strike and relied on the new theory of obviousness in finding the claims unpatentable. This Court found an APA violation and vacated the Board's decision because the patent owner was denied the opportunity to respond. *In re NuVasive*, 841 F.3d at 972.

The present facts are similar. Again, Rassini's Reply introduced a new theory, based on new expert testimony (Appx3134, Appx3151, Appx3162), which the Board relied on to find claim 1 unpatentable. Like

63

the patent owner in *NuVasive*, Muhr had no opportunity to respond because new evidence is not permitted in a sur-reply. *Lenovo Holding,* IPR2019-01278, Paper 37 at 31-33.

This is why Muhr timely objected and requested the Board strike at least the offending portions of Dr. Wagoner's supplemental declaration and the Petitioner's Reply. (Appx3168-3170.)

Rassini stated (as shown in table below) that certain paragraphs Muhr identified as improper (i.e., ¶¶26, 66, and 94) were to "rebut attacks on Wagoner['s] FEA." (Appx3177.) Muhr maintains paragraphs 26, 66, and 94 of Wagoner's Reply Declaration (Appx3134, Appx3151, Appx3162) are improper as presenting a new obviousness position.

| Exhibit 1033 Rebuttal of Robert H. Wagoner, Ph.D. | ***PO Argument***: Expresses new opinions not previously disclosed contrary to F.R.C.P. 26(a)(2)(B), such new opinions are found in, for example, ¶¶8-14, 15-24, 26-32, 42-45, 47-49, 56-57, 60, 62, 64, 65-70, 72-74, 91. <br> ***Petitioner Response***: ¶¶8-14 rebut PO's claim construction; ¶¶15-24 rebuts PO arguments based on Dilling FEA; ¶¶27-32 rebut attacks on Wagoner's conclusion regarding C-T transition; ¶¶42-45 rebut Dilling FE modeling assumptions; ¶¶47-49 rebut Dilling air spring selection; remaining paragraphs rebut attacks on Wagoner FEA. *See* § 42.23(b). |
|---|---|

**Appx3177**

In denying the Motion to Strike, the Board stated all the paragraphs identified above (including ¶66) were admissible and proper. (Appx91.) But the Board's own reliance on ¶66 demonstrates these were

not proper responses. (*see* Appx65.) Specifically, the Board relied on Wagoner ¶66 to support the following finding:

> Even if Mr. Dilling's analysis is correct based on his initial inputs and assumptions including the air spring and shock absorber, given Dr. Wagoner's persuasive testimony and FE analysis, a person of ordinary skill in the art would also understand that in an installed or uninstalled state, Enomoto's leaf spring is capable of transitioning from compression to tension ***given the appropriate structural dimensions, material characteristics and vertical displacements upon which Dr. Wagoner relies***. *See* Ex. 1033 ¶ 66[.]

(Appx65.)

The Board's findings relied on Wagoner Rebuttal ¶66 to find claim 1 unpatentable. But Wagoner Rebuttal ¶66 recites that a POSITA is capable of redesigning Enomoto's leaf spring structure to allow it transition from compression to tension. (Appx65.) This is not supported by Rassini's Petition as filed. Thus, the Board violated Muhr's procedural rights under the APA by relying on this new evidence to hold claim 1 unpatentable while depriving Muhr of "the APA-required opportunity to respond." *In re NuVasive*, 841 F.3d at 972.

**E.    Reversal is Warranted Because the Board's Findings were not Supported by Substantial Evidence**

Rassini argued it was obvious to modify Enomoto's two-piece metal leaf spring and reconstruct it as a one-piece FRP leaf spring. (Appx2518-

2520.) Rassini reasoned the "primary motivation for substituting a single-leaf FRP spring [in place of Enomoto's] … multiple section leaf spring is reduction in parts and elimination of fasteners, thereby reducing cost and manufacturing complexity." (Appx2520.) Rassini's expert, Dr. Wagoner, further urged the motivation to modify involved a "simple substitution of one well known material for the only other well-known material." (Appx367-368, ¶153.)

Agreeing with Rassini, the Board concluded it was not "particularly difficult" or beyond the skill of a POSITA to "replac[e] a steel leaf spring with an FRP leaf spring." (Appx76.) The Board based this conclusion on the fact that it was "unrebutted on this record that FRP and steel are the two primary materials used for vehicle leaf springs" and that even the '330 Patent "contemplates the use of FRP as a known material for progressive leaf springs." (Appx75.)

But Muhr never contested that FRP leaf springs and metal leaf springs have both been known and used *since the 1960s*. (*See* Appx1855, ¶59; *referencing* Appx309-310, ¶59; *see also* Appx86.) Instead, Muhr contested how and why a POSITA would seek to modify Enomoto's express teachings of a two-piece metal leaf spring with a single FRP leaf

spring when ***both FRP and metal leaf springs had existed for forty years***. (Appx1814-1817; Appx3208-3210.)

Just because another material was known and used for leaf springs does not make the modification Rassini proposed, and the Board adopted, "obvious" because the change strips away the heart and essence of Enomoto's disclosed and ***claimed*** two-piece metal design. *Trivascular Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) (finding no motivation to modify prior art where doing so "would destroy the basic objective" of the prior art); *Chemours Company Fc, LLC v. Daikin Industries, Ltd.*, 4 F.4th 1370, 1377 (Fed. Cir. 2021) (finding Board relied on "inadequate evidentiary basis and failed to articulate a satisfactory explanation based on substantial evidence for why a [POSITA] would have been motivated" to modify the prior art "when doing so would necessarily involve altering the inventive concept" of the prior art.).

Again, the **two-piece metal** design shown below – instead of one-piece metal or one-piece FRP – was expressly chosen by Enomoto because: (1) the front leaf (shaded green below) and rear leaf (shaded red below) could be "individually heat treated so as to retain separate target strengths" and this heat treatment could be done "ahead of time"

67

(Appx1331, Claim 2; Appx1336, ¶0019; Appx1342, ¶0045); (2) the front

leaf could have a separate length, width and thickness to the rear leaf

section (Appx1336, ¶0019); (3) the front leaf could provide tilting of the

vehicle left and right and "rigidity during braking" (Appx1343, ¶0050);

and (4) the rear leaf could be made "thinner than the forward leaf 25A"

thereby lowering the "vertical spring constant" to "improv[e]

maneuverability and ride comfort" (Appx1344, ¶0054).



**Appx1348, Fig. 3**

As the Petitioner, it was Rassini's burden to explain **how** and **why**

a POSITA would modify Enomoto given these express teachings. But it

never addresses why it would be obvious given Enomoto's title,

disclosure, claims and figures are all solely directed to the **two-piece**

**metal** leaf spring design. (*See e.g.,* Appx1330-1331, Claims 1-2.) Rassini

also never explains how the modification would address the problems

**Enomoto** details and seeks to overcome regarding the prior art. Enomoto

instead teaches away from the use of an FRP leaf spring and the Board's obviousness findings were not supported by substantial evidence. *See Chemours Company*, 4 F.4th at 1376 ("The Board's findings were not supported by substantial evidence" because it "appears to have ignored the express disclosure in [Enomoto] that teaches away from the claimed invention and relied on teachings from other references that were not concerned with the particular problems [Enomoto] sought to solve.")

### 1.    There is no Motivation to Modify given Enomoto's Express Teachings of Using a Metal Two-Piece Leaf Spring

*KSR* stresses that it is "important to identify a reason that would have prompted" a POSITA to modify the prior art "in the way the claimed new invention does." *KSR Intern. Co. v. Teleflex Inc.,* 550 U.S. 398, 418, 127 S.Ct. 1727 (2007). Although the KSR test is flexible, the Board "must still be careful not to allow hindsight reconstruction of references ... without any explanation as to ***how*** or ***why*** the references would be combined to produce the claimed invention." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir.2012) (emphases added) (internal quotations omitted).

In the underlying proceeding, the Board held it would be obvious to modify Enomoto to meet the '330 Patent's claimed leaf spring. But one critical question unanswered is ***why*** would a POSITA look to modify Enomoto's two-piece leaf spring when by 2002 (Enomoto's filing date) FRP leaf springs existed and were known since the 1960s? (*See* Appx310, ¶¶59-60.) In fact, ***why*** even begin with a two-piece metal leaf spring that Dr. Wagoner states is an "impractical and dangerous" joint that could break? (Appx367, ¶152; Appx2152, 159:12-24.) ***Why*** did Rassini and Dr. Wagoner not start with other known one-piece metal leaf spring designs that did not include the problematic joint?

The answer is simple. Given the decades of existing leaf spring designs, Rassini sought a leaf spring that resembled the '330 Patent's FRP leaf spring design as the starting point. Rassini's expert then alleged Enomoto's two-piece design included an "impractical and dangerous" joint that could break as the alleged motivation to modify to work back toward the '330 Patented claims.

But ironically, Rassini's __Petition__ failed to explain how or why the FRP design could correct this alleged problematic joint. (Appx1814; Appx3208-3210.) In fact, Dr. Wagoner conceded that his modeling did not

illustrate nor confirm whether an FRP leaf spring would resolve his perceived "dangerous" aspect of Enomoto's design because it "wasn't germane" to his analysis. (Appx2154, 161:18-25.) Dr. Wagoner also conceded he "didn't care" if Enomoto's leaf spring when modified and constructed of FRP included a potential high-stress area that could fail because his only concern was whether it could "go from compression to tension." (Appx2158, 165:9-17.)

Petitioner's only other "motivation" presented was cost savings due to a reduction in parts. (Appx3209.) But this is not true as modifying Enomoto with an FRP leaf spring would require added costs for FRP as well as the addition of a "torsion bar" (i.e., stabilizer).[7] (Appx3209.)

The evidence demonstrates Rassini simply wished to use the shape of Enomoto's leaf spring and argue when constructed of FRP it **could** experience the vertical loading forces claimed by the '330 Patent. (*See,* Appx2158, 165:9-17.) This ignores all the teachings of Enomoto and the problem it looked to solve in an attempt to use improper hindsight bias to meet the claim limitations of the '330 Patent. *Grain Processing Corp.*

---

[7] Enomoto also sought to eliminate this component with its two-piece design.

*v. American Maize-Products Co.,* 840 F.2d 902, 907 (Fed. Cir. 1988)

("Care must be taken to avoid hindsight reconstruction by using 'the

patent in suit as a guide through the maze of prior art references,

combining the right references in the right way so as to achieve the result

of the claims in suit.'"); *Interconnect Planning Corp.*, 774 at 1143.

### 2.    Enomoto Teaches Away from the Use of FRP

Enomoto's "Problem to be Solved by the Invention" discusses a prior

art suspension system (below) having a multi-stacked metal leaf springs

(labeled "e," "f," "g"). (Appx1333-1335.)



**Appx1350, Fig. 8**

Enomoto states this known leaf spring presented many problems

including: (1) the need for shackle (shaded green) to absorb longitudinal

displacement due of the leaf spring – i.e., during braking/acceleration;

and (2) a stabilizer (shaded red) to handle rolling rigidity or lateral forces – i.e., during turning of the vehicle. (Appx1333, ¶0009.)

While FRP leaf springs had existed for forty years, Enomoto did not choose an FRP design to overcome the prior art problems. Instead, Enomoto's solution was a ***two-piece metal*** leaf spring design having: (1) a "thick forward leaf" (below left in red); and (2) a "thin rear leaf"/"section" (17) that includes a "curved section" (below right in green). (Appx1335-1336, ¶0015.)



**Appx1348, Fig. 3**

Enomoto explains the chosen leaf spring is made from two separate pieces of metal where: (1) each piece could be "individually heat treated so as to retain separate target strengths" and this heat treatment is done "ahead of time" (Appx1331, Claim 2; Appx1336, ¶0019; Appx1342, ¶0045); (2) the front leaf section (shaded red above) can have a separate length, width and thickness to the rear leaf section (shaded green);

73

(Appx1336, ¶0019); (3) the front leaf alone can provide tilting of the vehicle left and right and "rigidity during braking" (Appx1343, ¶0050; and (4) the rear "leaf" could be made "thinner than the forward leaf 25A" thereby lowering the "vertical spring constant" to "improv[e] maneuverability and ride comfort" (Appx1344, ¶0054).

Rassini's "modification" of Enomoto using an FRP leaf spring focused solely on whether it could handle vertical forces thereby satisfying the claims of the '330 Patent. But Rassini failed to explain how an FRP leaf spring could handle the longitudinal and lateral forces that Enomoto's two-piece metal design was expressly designed to handle – which also allowed the elimination of the "stabilizer" and "shackle" components. Muhr offered unrebutted evidence that FRP is a "softer material" and using it to modify Enomoto's leaf spring would require the re-addition of a "torsion bar" (i.e., stabilizer) to handle lateral forces for roll stability during turning – the very component Enomoto sought to eliminate. (Appx1973, ¶199; Appx3208-3210.)

Again, the Board found modifying Enomoto was obvious because: (1) FRP leaf springs were known by 2002; (2) modifying Enomoto's metal design with plastic would reduce weight. But these reasons fail to address

how and why a POSITA would start with Enomoto's two-piece metal design and then make such a modifications that exacerbate the ***problems Enomoto sought to solve***. The Board's findings were therefore not based on substantial evidence as Enomoto teaches away from the claimed invention and sought a different two-piece metal design to solve a different problem. *See Chemours Company*, 4 F.4th 1370 at 1376; *Sensonics,* 81 F.3d at 1570.

## F.     The Board Erred by Ignoring the Language of Claim 10

Claim 10 makes crystal clear that it is directed to a leaf spring ***designed*** to operate in a certain way in response to a wheel carrier in the installed state – not capability in the abstract. Claim 10 recites:

> 10.   The leaf spring assembly of claim 1, wherein the leaf spring is designed such that the spring portion, upon elastic deformation due to vertical forces introduced from the wheel carrier, is subjected to pressure loading in a first travel range and is subjected to tensile loading in a second spring travel range.

(Appx208, 13:13-18.)

This Court has held claims reciting "configured to" and "designed to" requires a structure that is more than just capable of performing a function, but is actually made or designed specifically to perform the function. *Aspex Eyewear,* 672 F. 3d at 1349. Therefore, claim 10 requires

Case: 23-2373    Document: 14    Page: 88    Filed: 02/01/2024

a leaf spring "designed such that there is pressure loading in a first travel range, and that the tensile loading of claim 10 occurs in a second spring travel range." As explained in the specification:

> The leaf spring is configured such that, at least when higher vertical forces are introduced from the wheel carrier, the leaf spring is subjected to tensible loads, and therefore it can also be referred to as leaf tensile spring. This applies for at least a part of the entire spring travel that is possible.

(Appx202, 2:33-38.) Only the spring travel range that is designed for and possible in the installed state is considered. Spring capability in the abstract or in undefined travel ranges as presented by Petitioner are irrelevant.

The Board acknowledged "Claim 10 requires that the spring portions *designed such that* upon application of vertical forces introduced from the wheel carrier it 'is subject to pressure loading in a first spring travel range and is subjected to tensile loading in a second spring travel range.'" (Appx81.) But then, the Board continued to state, "we are persuaded that Enomoto's leaf spring is capable of transitioning from compression to tension at the C-T transition point." (*Id.*) The Board's analysis for "designed such that" using merely "capable of" was error. The Board should have evaluated the claim as drafted.

Rassini did not present any evidence that Enomoto was "designed such that upon application of vertical forces introduced from the wheel carrier it is subject to ... subjected to tensile loading in a second spring travel range." Therefore, the Board's determination that claim 10 is unpatentable is not supported by substantial evidence. *See Chemours Company*, 4 F.4th 1370 at 1376. Furthermore, in Enomoto, the vertical forces are mostly supported by the air spring and not the leaf spring as claimed. (Appx1332-1333; Appx1343, ¶¶0007, 0051.)

## VII. CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Muhr respectfully requests that this Court reverse the findings of the Board with respect to its claim construction and determinations of obviousness. Indeed, reversal of the Board's determination of obviousness would dispose of the Board's sole ground of rejection and the sole grounds on which IPR was instituted.

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

 /s/ John P. Rondini
John P. Rondini
Marc Lorelli
Frank A. Angileri
Kyle G. Konz
BROOKS KUSHMAN P.C.
150 W. Second St., Suite 400N
Royal Oak, MI 48067-3846
(248) 358-4400

*Counsel for Appellant*

Date: February 1, 2024

# ADDENDUM

Judgment Final Written Decision Determining All Challenged
Claims Unpatentable Denying in-Part and Dismissing
in-Part Patent Owner's Motion to Exclude and Patent
Owner's Motion to Strike 35 U.S.C. § 318(a), Paper No. 39...... Appx1-94

U.S. Patent No. 9,868,330 B2 .............................................. Appx194-208

Trials@uspto.gov                                    Paper 39
571-272-7822                            Entered: July 5, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

RASSINI SUSPENSIONES, S.A. DE C.V.,
Petitioner,

v.

MUHR UND BENDER KG,
Patent Owner.

———————————

IPR2022-00278
Patent 9,868,330 B2

———————————

Before SCOTT A. DANIELS, BARRY L. GROSSMAN, and
RYAN H. FLAX, *Administrative Patent Judges.*

DANIELS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying in-Part and Dismissing in-Part Patent Owner's Motion to Exclude
and Patent Owner's Motion to Strike
*35 U.S.C. § 318(a)*

IPR2022-00278
Patent 9,868,330 B2

# I. INTRODUCTION

Rassini Suspensiones, S.A. de C.V. ("Rassini" or "Petitioner") filed a Petition requesting *inter partes* review of claims 1–5, 8, 10–15, and 17 of U.S. Patent No. 9,868,330 (Ex. 1001, "the '330 patent"). Paper 2 ("Pet."). Muhr Und Bender KG, ("Muhr" or "Patent Owner") filed a Preliminary Response to the Petition. Paper 5 ("Prelim. Resp.").

Following our Institution Decision (Paper 6, "Inst. Dec."), Patent Owner filed a Response. Paper 15 ("PO. Resp."). Petitioner filed a Reply. Paper 20 ("Pet. Rep"). Patent Owner filed a Sur-Reply. Paper 30 ("PO SUR-Reply"). A hearing was held on March 16. A transcript of the hearing has been entered as Paper 38. ("Tr."). Patent Owner filed a Motion to Exclude Evidence, which Petitioner opposes. Papers 31, 33, 37. Patent Owner also filed a Motion to Strike which Petitioner opposes. Papers. 26, 27.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). For the reasons explained below, we determine that claims 1–5, 8, 10–15, and 17 are unpatentable. Patent Owner's evidence motions are each denied in-part and dismissed in-part.

## A. Real Parties in Interest

Petitioner states that Rassini Suspensiones, S.A. de C.V., and Rassini International, Inc., are the real parties in interest. Pet. 67. Patent Owner states that it is the patent owner and real party in interest. Paper 3, 1.

## B. Related Matters

The parties indicate that they are not aware of any other related proceeding involving the '330 patent. Pet. 67; Paper 4, 2.

2

IPR2022-00278
Patent 9,868,330 B2

### C. The '330 Patent (Ex. 1001)

The '330 patent, titled "Leaf Spring Assembly for Motor Vehicles," issued on January 16, 2018, from U.S. Application No. 14/905,840, which has a filing date of July 23, 2014, and it indicates priority to a PCT application filed January 18, 2016, and to a German application filed on July 23, 2013. Ex. 1001, codes (45), (21), (22), (86), (65). The '330 patent describes a leaf spring assembly for a wheel suspension of a vehicle. *Id.* at Abstract. The '330 patent describes that the leaf spring is made "of fib[er]-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle." *Id.* at 2:19–21. Figure 1A of the '330 patent, as annotated by the Board, is reproduced below.



**Figure 1A**

Figure 1A of the '330 patent illustrates fiber-reinforced plastic ("FRP") leaf spring assembly 2 including the first spring leg (spring portion) 8 annotated in yellow, second spring leg (bendable portion) 10 annotated in pink, and transition portion 9 at the intersection of the pink and yellow annotations.

3

IPR2022-00278
Patent 9,868,330 B2

*Id.* at 7:1–36. First receiving device 4 pivotally secures first end 5 of the leaf spring and a second end 7 of the leaf spring is fixed by second receiving device 6. *Id.* It is to be appreciated that in use "[t]he first spring leg 8 serves to receive a wheel carrier, not illustrated, to which a vehicle wheel is fixed." *Id.*

We note that a wheel and wheel carrier would be positioned on leaf spring assembly 2 approximately in the region of reference numerals 12/14. However, neither Figure 1A nor any other figure of the '330 patent illustrates the leaf spring assembly 2 installed on a vehicle or carrying a wheel.

The '330 patent describes that the leaf spring is fixed between the first and second receiving devices in a non-displaceable manner, i.e., the distance between the first and second receiving devices remains fixed. *Id.* at 2:47–51. The benefit of this structure, the '330 patent describes, is that "the leaf spring is subjected to bending and tensile processes. The tensile and bending stresses occurring in the spring are superimposed on one another and, together, lead to a progressive spring characteristic." *Id.* at 2:40–44. The '330 patent explains that

> [b]ecause the leaf spring ends are received in a substantially nondisplaceable way, the tensile stress increases progressively with an increasing load, so the spring rate of the same also increases progressively. In the installed state, this means that with an increasing load on the motor vehicle, the suspension becomes stiffer, which has an advantageous effect on the driving comfort and driving stability of the motor vehicle.

*Id.* at 2:56–63.

4

IPR2022-00278
Patent 9,868,330 B2

Figure 3C of the '330 patent is reproduced below.



**Figure 1C**

Figure 3C of the '330 patent, above, is a side elevation view of leaf spring 2 illustrating the loaded condition and a "maximum" upward deflection of the leaf spring in dashed lines. *Id.* at 7:59–60.

### D. *Illustrative Claims*

Claim 1 is independent. Each of claims 2–5, 8, 10–15, and 17 ultimately depends on independent claim 1. Claim 1 is reproduced below and illustrates the claimed subject matter including certain limitations of importance italicized:[1]

> 1. [1 pre] A leaf spring assembly for a wheel suspension of a motor vehicle, comprising:
>
> [1a] a leaf spring of fiber-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle, [1b] the leaf spring comprising a first end portion, [1c] a spring portion extending from the first end portion, [1d] a second end portion, [1e] a bendable portion extending from the second end portion,
>
> [1f] *wherein the spring portion extends substantially in a longitudinal direction of the motor vehicle in an installed state* and is configured to accommodate the wheel carrier, [1g] wherein the spring portion and the bendable portion are connected to each other by a curved transition portion and

---

[1] For consistency and convenience, we refer to Petitioner's claim reference sub-numbering nomenclature [1 pre]–[1o].

5

[1h] wherein the spring portion is longer than the bendable portion;

[1i] a first receiving device for supporting the first end portion;

[1j] a second receiving device for supporting the second end portion;

[1k] wherein the first receiving device and the second receiving device are provided so as to hold the first end portion and the second end portion in a non-displaceable way relative to one another, [1l] *wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading;*

[1m] further wherein at least one of the first and second receiving devices provides pivotable support to the associated one of the first end portion and the second end portion around a pivot axis extending transversely to a longitudinal axis of the vehicle;

[1n] and further wherein in the installed state of the leaf spring the first end portion and the spring portion extending therefrom are positioned towards a front end of the motor vehicle, [1o] and the second end portion and the bendable portion extending therefrom are positioned towards a rear end of the motor vehicle.

Ex. 1001, 12:10–44.

6

IPR2022-00278
Patent 9,868,330 B2

*E. Prior Art and Asserted Grounds*

We instituted a trial based on all asserted claims and grounds of unpatentability as follows:[2]

| Ground | Claim(s) Challenged | 35 U.S.C.§ | Reference(s)/Basis |
|--------|---------------------|------------|--------------------|
| 1 | 1–5, 8, 10–14, 17 | 103 | Enomoto[3] |
| 2 | 15 | 103 | Enomoto, Glover[4] |

## II. ANALYSIS

*A. Legal Standards Concerning Patentability*

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 50–51 (1966)). The question of obviousness is resolved based on underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the

---

[2] Petitioner supports its challenges with a Declaration of Robert H. Wagoner, Ph.D. (Ex. 1002), and Patent Owner relies on the Declaration of Scott A. Dilling, P.E. *See infra*.

[3] JP 3872719 B2 (pub. Jan. 24, 2007) (Ex. 1006).

[4] U.S. 9,765,838 B2 (iss. Sept. 19, 2017) (Ex. 1018).

7

IPR2022-00278
Patent 9,868,330 B2

prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

The record of the proceeding does not include any argument or evidence directed to objective indicia of non-obviousness.

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. To support this conclusion, however, it is not enough to show merely that the prior art includes separate references covering each separate limitation in a challenged claim. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness additionally requires that a person of ordinary skill at the time of the invention "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention." *Id.*

Accordingly, an obviousness determination generally requires a finding "that a person of ordinary skill in the art would have been motivated to combine or modify the teachings in the prior art and would have had a reasonable expectation of success in doing so." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (citing *OSI Pharms.*, 939 F.3d at 1382 (quoting *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018))). "Whether the prior art discloses a claim limitation, whether a skilled artisan would have been motivated to modify or combine teachings in the prior art, and whether she would have had a reasonable expectation of success in doing so are

8

IPR2022-00278
Patent 9,868,330 B2

questions of fact." *Strathclyde*, 17 F.4th at 160. In determining whether there would have been a motivation to combine prior art references to arrive at the claimed invention, it is insufficient to simply conclude the combination would have been obvious without identifying any reason why a person of skill in the art would have made the combination. *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1366 (Fed. Cir. 2017). Moreover, in determining the differences between the prior art and the claims, the question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 164 (Fed. Cir. 1985) ("It is elementary that the claimed invention must be considered as a whole in deciding the question of obviousness."); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1537 (Fed. Cir. 1983) ("[T]he question under 35 U.S.C. § 103 is not whether the differences themselves would have been obvious. Consideration of differences, like each of the findings set forth in *Graham*, is but an aid in reaching the ultimate determination of whether the claimed invention *as a whole* would have been obvious.").

As a factfinder, we also must be aware "of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." *KSR*, 550 U.S. at 421. Applying these general principles, we consider the evidence and arguments of the parties.

### B. Level of Ordinary Skill in the Art

Factors pertinent to a determination of the level of ordinary skill in the art include (1) the educational level of the inventor; (2) the type of problems encountered in the art: (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the

9

technology, and (6) educational level of workers active in the field. *Envt'l. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other actors may predominate in a particular case. *Id.* Moreover, these factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art. *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

In determining a level of ordinary skill, we also may look to the prior art, which may reflect an appropriate skill level. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Additionally, the Supreme Court informs us that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

Petitioner proposes that a person of ordinary skill in the art (POSITA) at the time of the '330 patent "would have [had] a B.S. engineering degree in materials, mechanical, metallurgical or an equivalent degree, and at least five years' experience in the automotive industry with automotive structural and operational parts." Pet. 7 (citing Ex. 1002 ¶ 34). Petitioner asserts further that "additional education may substitute for lesser work experience and vice versa." *Id.*

Patent Owner argues that Petitioner's definition is ambiguous. PO Resp. 10. Patent Owner instead proposes that

> a person of ordinary skill in the art of the '330 patent would be someone who had a bachelor or graduate degree in mechanical engineering or closely related field that includes courses which teach the basic principles of statistics, dynamics, and strength of materials along with knowledge of automotive or truck suspensions systems *and about five years of experience*

10

IPR2022-00278
Patent 9,868,330 B2

> *designing vehicle suspension systems and/or components* or
> related systems in industry or academia.

*Id.* at 16 (emphasis added).

Patent Owner alternatively proposes "a person of ordinary skill in the art could have about 10 years of experience designing vehicle suspension components or related systems, without a four-year undergraduate degree, and such a person would typically have experience designing suspension components on large passenger vehicles and/or heavy trucks." *Id.*

The parties mainly agree that a person of ordinary skill in the art would include a person with a mechanical engineering degree or a degree in a similar engineering field and five years of relevant practical automotive experience. *Compare id. with* Pet. 7. The difference between the parties' asserted levels of ordinary skill in the art is that Patent Owner proposes a more specific level of experience, that is, "about five years of experience *designing vehicle suspension systems* and/or components or related systems in industry or academia." *Id.* (emphasis added). This is important, Patent Owner argues, because Petitioner's definition, and "[Dr.] Wagoner's 'spectrum' of POSITA knowledge . . . is overly broad, capturing skilled artisans in remote arts unrelated to the subject matter of the patent at issue." *Id.* at 12 (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1361–63 (Fed. Cir. 2006)). According to Patent Owner, "Petitioner's expert [Dr.] Wagoner gave inconsistent and vacillating testimony regarding what a POSITA would or would not have experience with." *Id.* at 12–15 (citing Ex. 2011, 21:23–22:23, 67:15–70:6, 114:6–111, 65:9–17).

We disagree that Petitioner's proposed level of ordinary skill in the art is ambiguous and that Dr. Wagoner's opinions and testimony as to the level

11

IPR2022-00278
Patent 9,868,330 B2

of skill in the art are "overly broad." PO Resp. 12. As an initial matter,
Patent Owner's narrower view of the person of ordinary skill in the art, and
related questions during Dr. Wagoner's deposition, appear intended to
support its position that Dr. Wagoner lacks sufficient experience with
suspension systems so as to compromise his testimony as to the knowledge
and technical abilities of a person of ordinary skill. *See, e.g.*, Ex. 2011 21:3–
30:4. Dr. Wagoner's deposition testimony, however, was consistent with
Petitioner's broader level of ordinary skill in the art that encompasses
experience with "automotive structural and operational parts," a definition
that could, but might not, specifically include suspension design. *See*
Ex. 2011, 21:23–22:23 (Dr. Wagoner explaining that some persons of
ordinary skill in the art "may or may not" have a working knowledge of
vehicle suspension systems).

The Federal Circuit has clarified recently that "[t]o offer expert
testimony from the perspective of a skilled artisan in a patent case—like for
claim construction, validity, or infringement—a witness must at least have
ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade
Comm'n*, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022). While Patent Owner
maligns Dr. Wagoner as someone who could not testify as to the level of
ordinary skill in the art because his background does not include specifically
designing vehicle suspension systems as a whole, we are not persuaded in
this case to limit the level of ordinary skill in the art to artisans who design
complete vehicle suspension systems. Also, we note that Patent Owner filed
a Motion to Exclude Dr. Wagoner's testimony (discussed *infra*), but did not
move to exclude his testimony on the basis that he is not a POSITA (and
therefore not qualified as an expert under *Kyocera*). Paper 31, 2–5. As
discussed below, Dr. Wagoner's experience in the field of automotive and

12

materials engineering doubtless extends his level of skill well-beyond that of a person of ordinary skill in the art with respect to the subject matter claimed, namely, a leaf spring assembly. *See, e.g.*, Ex. 1002 ¶¶ 56–105 (Dr. Wagoner presenting a detailed historical and technological chronology of leaf spring design, production, and use).

We are compelled to address certain of Patent Owner's arguments regarding Dr. Wagoner's qualifications, because Patent Owner's arguments in this proceeding depend at least in part on the Board not crediting Dr. Wagoner's testimony and his finite element analysis ("FEA" or "FE analysis") and his related conclusions as to obviousness under Section 103. *See* PO Resp. 2 (Patent Owner arguing that "Petitioner's expert Dr. Robert H. Wagoner ('Dr. Wagoner'), and the Finite Element Analysis ('FEA' or 'FE analysis') he offers would not be relied upon by a POSITA and should be given little or no weight.").

With respect to Patent Owner's citation to *DyStar*, Patent Owner insinuates that Dr. Wagoner is not a person of ordinary skill in the art because he is not a designer of vehicle suspension systems. PO Resp. 12–13. We acknowledge that in *DyStar* the Federal Circuit determined that "substantial evidence does not support the jury's finding that a person of ordinary skill is a dyer with no knowledge of chemistry." *DyStar*, 464 F.3d at 1362. However, in *DyStar*, the Federal Circuit determined that "a dyer" was, "a person of only high school education whose skill set is limited to 'flipping the switches.'" *Id.* at 1362. Entirely different in this case, Dr. Wagoner holds a Ph.D. in Metallurgical Engineering from the Ohio State University and is a Professor Emeritus of the Materials Science and Engineering Department at the Ohio State University who, for thirty years, "taught undergraduate and graduate courses in materials science, materials

13

IPR2022-00278
Patent 9,868,330 B2

engineering, and metallurgy." Ex. 1002 ¶ 6. Dr. Wagoner testifies that he was also "Staff Research Scientist at the General Motors Research Laboratories from 1977 until 1983 and [] managed research projects and maintained working connections with the U.S. and international automotive and materials industries on topics related to material processing, forming, and mechanical properties for the past 40 years." *Id.* ¶ 7.

Based at least on Dr. Wagoner's high level of academic and technical experience, the facts that Dr. Wagoner may not have specifically designed a complete automotive suspension and was not willing to commit to a person of ordinary skill specifically understanding how an air spring suspension works, does not in our opinion make his testimony less credible or technically insightful in this case. *See* PO Resp. 13 (Patent Owner arguing that Dr. "Wagoner's POSITA definition is imprecise and is divorced from the purpose of the patent, namely improving ride handling and comfort by using a progressive leaf spring"). To the contrary, Dr. Wagoner presented a thorough discussion and testimony regarding the nature of progressive leaf springs. *See* Ex. 1002 ¶ 77 (Dr. Wagoner explaining, *inter alia,* that "[a] POSITA would know . . . that after 2000 many examples of optimized integral eyes were disclosed with FRP leaf springs, particularly with modern progressive designs such as Greco").

Moreover, Patent Owner's focus on an air spring, an altogether different component of a vehicle suspension system than the claimed leaf spring, and whether Dr. Wagoner has specific experience with air springs, is frankly a distraction in this case. The '330 patent is directed specifically to "the need for *a leaf spring* assembly for motor vehicles which is easy to produce and can easily be mounted and which, when under load, comprises a progressive spring rate." Ex. 1001, 2:9–12 (emphasis added). First,

14

IPR2022-00278
Patent 9,868,330 B2

nowhere in the '330 patent is an air spring described, or claimed, for that matter. Also, Patent Owner brings up air spring technology by referring to the prior art, in particular, Enomoto, which describes an air spring positioned between a leaf spring and a vehicle chassis. *See* Ex. 1007, Fig. 1. Petitioner and Dr. Wagoner, however, rely on Enomoto specifically for the characteristics and construction of a leaf spring, and do not rely on, or refer to, in any aspect of their obviousness analysis, an air spring. *See* Pet. 12–13. It is well-settled that Petitioner's obviousness analysis with respect to an air spring need not incorporate all the structure and elements disclosed in Enomoto's suspension. *See In re Lemelson*, 397 F.2d 1006, 1009 (CCPA 1968) (The Court explaining that "[t]he use of patents as references is not limited to what the patentees describe as their own inventions or to the problems with which they are concerned. They are part of the literature of the art, relevant for all they contain.").

Moreover still, Dr. Wagoner testifies in his declaration that prior to his teaching career he was, for six years, a Staff Research Scientist at the General Motors Research Laboratories in Warren, Michigan. Ex. 1002 ¶ 9. During his career Dr. Wagoner has "authored over 300 journal articles, 2 books, 2 text books, and 4 proceeding volumes dealing with the forming and deformation of metals and alloys." *Id.* ¶ 10. Dr. Wagoner testifies that he is "a member of the National Academy of Engineering ('NAE') and Fellow or equivalent of . . . the Society of Automotive Engineers ('SAE'), [and] the American Society of Mechanical Engineers ('ASME')." *Id.* ¶ 12. Dr. Wagoner explains that part of his research support is "derived from several partnerships with industry, including General Motors, Chrysler, the Auto/Steel Partnership, and the Edison Materials Technology Center (EMTEC)." *Id.* ¶ 13.

15

We determine on this basis that Dr. Wagoner is familiar with basic and, undoubtedly, advanced principles of mechanical engineering and materials testing, including those for the testing and analysis of materials and structures for vehicle leaf springs such as FE analysis. *See Kyocera*, 22 F.4th at 1377 ("[I]t would be improper to require an expert witness to possess ordinary skill in the art and *nothing more*. If that were the case, 'a person of exceptional skill in the art would be disqualified from testifying as an expert because [he is] not ordinary enough.'" (quoting *Endress + Hauser, Inc. v. Hawk Measurement Systems Pty.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997)). Accordingly, Patent Owner does not persuade us that Dr. Wagoner is not sufficiently qualified to provide helpful testimony and evidence in this proceeding.

Getting back to the definition of a person of ordinary skill in the art, we are not persuaded that Patent Owner's proposed specific experience "*designing vehicle suspension systems* and/or components" is required for the hypothetical level of ordinary skill in the art. Patent Owner argues that the definition should be "faithful to the '330 patent, related art, and Federal Circuit precedent." PO Resp. 16. We agree. Notably, the '330 patent is titled "Leaf Spring Assembly for Motor Vehicle." Ex. 1001, code (54). The Abstract of the '330 patent describes "[a] leaf spring assembly for a wheel suspension of a motor vehicle comprises a leaf spring of fibre-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle." *Id.*, code (57). We appreciate that a leaf spring may be a component of a wheel suspension; however, apart from reciting a "wheel carrier," the '330 patent does not describe or reveal additional technical details of a vehicle suspension as a whole. Every figure of the '330 patent illustrating the leaf

16

IPR2022-00278
Patent 9,868,330 B2

spring assembly shows only a "leaf spring assembly" and no more, as shown
for example in Figure 3A reproduced below.



**Figure 3A**

Figure 3A of the '330 patent illustrates fiber-reinforced plastic leaf spring
assembly 2 including the first spring leg (spring portion) 8, second spring leg
(bendable portion) 10, and transition portion 9. Indeed, the figures never
even illustrate a "wheel carrier." Although the claims parrot the Abstract,
reciting "a leaf spring assembly *for* a wheel suspension of a motor vehicle"
(emphasis added), the claims positively recite only elements of the leaf
spring assembly. *See, e.g.*, *id.* at 12:10–14:25. Nowhere does Patent Owner
point us to any relevant substantive description in the '330 patent of wheel
suspensions including, for example, air springs. *See* PO Resp. 10–18. As
Petitioner persuasively points out, "[n]either the patent drawings nor the
specification disclose[s] a leaf spring as part of any particular wheel
suspension." Pet. Reply 1. Even Enomoto, titled "Leaf Spring for
Suspension Structure," focuses almost entirely on describing and claiming
the leaf spring structure itself. *See generally* Ex. 1007. Enomoto really only

17

IPR2022-00278
Patent 9,868,330 B2

describes air spring 4 in terms of the functional suspension environment, such as "when a vertical load acts on the vehicle, the leaf spring 25 and the air spring 4 flex, absorbing the load." *Id.* at 14:7–9. Considering *Kyocera*, we are persuaded that the level of ordinary skill proposed by Petitioner and Dr. Wagoner is faithful to the disclosure and teachings set forth in the '330 patent as well as the prior art.

We also agree that the scope of an ordinary artisan in the field of leaf springs *includes* a person who designs vehicle suspension systems, for example, Mr. Dilling. But we are not persuaded to narrow the level of ordinary skill *only* to a designer of complete vehicle suspension systems as Patent Owner proposes. Considering the nature of the claimed invention relating to a "leaf spring assembly," and Dr. Wagoner's vast education and experience in the arts of metal forming (and deformation) and materials science as well as experience and research in the automotive field and with FEA, we determine that Dr. Wagoner is a person of at least ordinary, if not extraordinary, skill in the art and is qualified to testify as to the perspective of a person of ordinary skill in the art of leaf spring design, regardless of his level of experience designing complete vehicle suspension systems. Indeed, during his deposition, Patent Owner's declarant, Mr. Dilling, who holds a Bachelor and Master's degree in mechanical engineering, confirmed that his own education level was sufficient:

> Q. Okay. But so your ability to understand and work with leaf springs would be based on your education as well as your work with suspension systems; is that fair?
>
> A. Yes.
>
> Q. Would you be able to work with leaf springs based on your education?
>
> A. Yes.

18

IPR2022-00278
Patent 9,868,330 B2

Ex. 1027, 59:4–11.

Where both parties essentially agree that a person of ordinary skill in the art would include a person with a mechanical engineering degree and experience in the automotive industry, Petitioner's position is persuasive that "[a] person with an engineering education and relevant automotive experience would be qualified to understand the kinematics, forces and stresses experienced by a leaf spring during operation." Reply 8. Based on the complete record before us, we do not alter our determination of the level of ordinary skill in the art from our Institution Decision, which is, as proposed by Petitioner, that a person of ordinary skill in the art "would have [had] a B.S. engineering degree in materials, mechanical, metallurgical or an equivalent degree, and at least five years' experience in the automotive industry with automotive structural and operational parts," where "[a]dditional education may substitute for lesser work experience and vice-versa." Pet. 7 (citing Ex. 1002 ¶ 34).

    *C. Claim Construction*

We interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2020). Under this standard, we construe the claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Furthermore, we expressly construe the claims only to the extent necessary to determine whether to institute *inter partes* review. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the

19

controversy.'" (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In our Institution Decision, we agreed with Petitioner's proposed construction of "tensile loading" (in claims 1, 10, and 12), which is "when the horizontal components of the reaction force imposed on each leaf spring end by a respective receiving device are directed in opposite directions away from each other." Inst. Dec. 8; Pet. 10–11 (citing Ex. 1002 ¶ 143).

In its Response, Patent Owner argues that "Petitioner's proposed construction is incomplete insofar as it ignores that the leaf spring *is in its installed state* and the tensile loading is in response to increasing vertical forces from the wheel carrier." PO Resp. 18 (emphasis added). Patent Owner contends that "tensile loading" means "when the horizontal components of the reaction force imposed on each leaf spring end by a respective receiving device are directed in opposition directions away from each other *when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state*." *Id.* at 22 (emphasis added). Patent Owner's construction adds the additional requirement that the imposed reaction forces occur "when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state." *Id.*

Addressing Patent Owner's proposed construction, we first note that Petitioner is not "ignoring" the leaf spring in the "installed state" or that tensile loading occurs when increasing vertical forces occur through "the wheel carrier." Petitioner's position is that, as recited in the claims, "[t]hese are well-accepted statements of intended use." Pet. Reply 9 (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1217 (Fed. Cir. 2014); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204–1205 (Fed. Cir. 2010)).

20

We agree with Petitioner. Claim 1 recites "a leaf spring of fiber-reinforced plastics *for* resiliently supporting a wheel carrier of the motor vehicle," and then goes on to recite specific elements of the leaf spring. Ex. 1001, 12:12–13 (emphasis added). Claim 1 also recites "wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading." *Id.* at 12:30–33. This functional language—that is—how the leaf spring operates—does not require that the wheel carrier *is* physically on the leaf spring, or that a load *is* actively applied to the leaf spring via the wheel carrier, only that the leaf spring has the capability to support a wheel carrier and receive forces through the wheel carrier that cause tensile loading. For instance, the recitation of the leaf spring being "increasingly subjected to tensile loading" is a functional step recited in an apparatus claim. The "tensile loading" therefore occurs because of the underlying characteristics and physical structure of the leaf spring assembly. The fact that a vertical force would need to be applied to subject the claimed leaf spring to tensile loading does not impact the structural requirements for the claimed leaf spring structure itself. *See, e.g.*, *Finjan*, 626 F.3d at 1204–1205 ("In this case, Finjan's non-method claims describe capabilities without requiring that [] any software components be 'active' or 'enabled.'").

Similarly, we are persuaded that the "installed state" clauses in claim 1 are also a statements of intended use, for example:

> wherein the spring portion extends substantially in a longitudinal direction of the motor vehicle *in an installed state* and *is configured to* accommodate the wheel carrier.

Ex. 1001, 12:17–20 (emphases added). Again, *how* the leaf spring assembly is capable of being physically arranged relative to the motor vehicle when

21

installed does not alter or impact the structural requirements of the leaf spring assembly itself, other than allowing for that installation. Here, the clause provides an association or arrangement of the leaf spring with the motor vehicle to define a particular capability or purpose that is served by the leaf spring. And, that the leaf spring "*is configured* to accommodate the wheel carrier" simply imparts structural capability to the leaf spring itself. It is well established that claims directed to an apparatus must be distinguished from the prior art in terms of structure rather than function. *See, e.g.*, *In re Schreiber*, 128 F.3d 1473, 1477–78 (Fed. Cir. 1997). In order to satisfy the functional limitations in an apparatus claim, the prior art apparatus must be capable of performing the claimed function. *Id*. at 1478. Thus, a prior art reference need not expressly envision the device being actually used to perform the claimed functions. Although in this case, there is certainly evidence that the prior art is not only capable of performing the recited functions, but that a person of ordinary skill in the art would have understood the prior art to be directed to the same use and progressive performance characteristics for automotive vehicles. *See* Ex. 1007, 4:29–38 (Enomoto describing: "The leaf spring for a suspension structure . . . provided with eyes pivotably supported by horizontal pins in brackets attached to the chassis frame side on both end sections in the lengthwise direction, is formed substantially rectilinearly towards the eyes towards the front of the vehicle on the side of the vehicle further forward than the axle.").

To be clear, we determine that the plain meaning of the claim language with respect to the functional nature of "installed state" and "increasing load due to vertical forces" is recited in the nature of an intended use and claim 1 encompasses the claimed leaf spring assembly whether or

22

IPR2022-00278
Patent 9,868,330 B2

not it is actually installed in a vehicle or vertical forces from a wheel carrier are actively impacting the leaf spring assembly. Statements of intended use in an apparatus claim do not distinguish the claim over the prior art apparatus. *In re Sinex*, 309 F.2d 488, 492 (CCPA 1962).

Our understanding of the claim language is consistent with the descriptions of intended use in the specification of the '330 patent expressly describing the possible arrangements and orientations of the leaf spring in a vehicle:

> It applies to all the above-mentioned examples that *in the installed state* the first end 5 and, respectively, the long spring leg 8 are positioned in the front of the vehicle, and accordingly that the second end 7 and, respectively, the second receiving device 6 are positioned at the rear. A reversed arrangement is also possible.

*Id.* at 11:56–61. Patent Owner's proposed claim language, specifically the dependent clause "when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state," to a great extent simply reiterates what is already expressly recited in claim 1. *Id.* at 22. That is, claim 1 expressly recites a leaf spring and that tensile loading would occur due to "increasing load due to vertical forces introduced from the wheel carrier" when the leaf spring is "in an installed state."

Considering the prosecution history, our determination is consistent with the Examiner's claim interpretation and application of the prior art during prosecution of the application that issued as the '330 patent. The Examiner found that the leaf spring disclosed in the applied prior art reference Greco (Ex. 1011) was capable of transitioning from compression to tension. Ex. 1004, 85. The Examiner rejected claim 19, which became issued claim 1, with the same "installed state" and "increasing load due to

23

IPR2022-00278
Patent 9,868,330 B2

vertical forces" recitations, because Greco disclosed a leaf spring assembly and "[t]he spring is inherently believed to be subject to increased tensile loading as the vertical load on the vehicle is increased. Although not applied." Ex. 1004, 85. This statement by the Examiner was disputed to some extent, but not necessarily overcome by Applicant during examination. *See id.* at 27–28 (Applicant arguing that "Greco is subjected to compression loading"). The Applicant's assertion that Greco's leaf spring was subject to compression loading does not negate that it can also be subjected to tensile loading. And, in order to overcome the Greco reference, Applicant subsequently amended claim 19 to include specific alignment and positioning limitations of the leaf spring in the "installed state." *See id.* at 23 (Applicant adding, in part, "in the installed state . . . the spring portion extending therefrom [is] positioned towards a front end of the motor vehicle").[5] Given the unambiguous nature of such intended use claim language, we discern no reason to rewrite or alter our previous claim construction, which is the plain meaning of the term.

As discussed above, the first part of Patent Owner's claim construction is almost exactly the same as Petitioner's proposed claim construction. *Compare* Pet. 10–11, *with* PO Resp. 22. Because the parties agree on at least this language and because we determine that Patent Owner's proposed additions to Petitioner's claim construction are superfluous and alter the plain meaning of the claims, we are not persuaded

---

[5] Patent Owner argues that "the Examiner withdrew the rejection that Greco was capable of tensile loading, and Patent Owner received a Notice of Allowance." PO Resp. 20. We do not agree with Patent Owner's characterization of this reason for allowance, nor do we agree that the amended claim language mirroring the previous intended use recitations "require" the leaf spring to be in the installed state. *Id.*

24

IPR2022-00278
Patent 9,868,330 B2

to change our previous determination, that is—the meaning of "tensile loading" is "*when the horizontal components of the reaction force imposed on each leaf spring end by a respective receiving device are directed in opposite directions away from each other*." Inst. Dec. 8 (emphasis added).

Finally, even if we accepted Patent Owner's claim construction, including the clause "when vertical forces are introduced from a wheel carrier of a vehicle while in its installed state," this is also a statement of intended use, and as discussed in detail below in our analysis of the patentability grounds, we are persuaded that Enomoto's leaf spring is capable of transitioning from compression to tension in the "installed state." Similarly, even if the phrase "in an installed state" is considered to include structural limitations, as we discuss below, Enomoto discloses such structural limitations.

### D. Ground 1: Claims 1–5, 8, 10–14, and 17 – Obviousness over Enomoto (Ex. 1007)

On the complete record before us, Petitioner has shown by a preponderance of the evidence that claims 1–5, 8, 10–14, and 17 would have been obvious over Enomoto.

#### 1. Enomoto[6] (Ex. 1007)

Titled "Leaf Spring for Suspension Structure," Enomoto is Japanese Patent Publication No. JP3872719, which was published on October 27, 2006 (also indicates a publication date of January 24, 2007). Ex. 1007, codes (11), (24), (45). There is no dispute that Enomoto is prior art. *See generally* PO Resp.

---

[6] We refer to the English translation of Enomoto, Ex. 1007, in our analysis.

IPR2022-00278
Patent 9,868,330 B2

Enomoto describes a vehicle suspension leaf spring having a thick forward leaf 25A portion that is attached to an eye on the vehicle chassis and a thinner rear leaf 25B portion "which is provided with top and bottom curved sections partway through," and is similarly attached to the vehicle chassis by an eye. Ex. 1007 code (54), ¶ 16.

Enomoto's Figure 3 is reproduced below.



Enomoto's Figure 3, above, is a side elevation view of two-part leaf spring 25 including forward leaf 25A and rear leaf 25B connected at linking section 20. *Id.* ¶ 25. Enomoto's Figure 1 is reproduced below.



Enomoto's Figure 1, above, illustrates attachment of leaf spring 25 to vehicle chassis (frame) 1 at eyes 13, 18, and to vehicle axle 2 at fixing

26

section 12. Air spring 4 is positioned between chassis 1 and leaf spring 25, and shock absorber 23 is connected to chassis 1 and axle 2. *Id.* ¶ 26. Enomoto describes that

> [i]n the suspension structure in FIG. 1 provided with the leaf spring 25, when a vertical load acts on the vehicle, the leaf spring 25 and the air spring 4 flex, absorbing the load. The load is transmitted to the chassis frame 1 from the eyes 13, 18 formed on the front and back end sections of the leaf spring 25, via the bushings 14, 19 and the horizontal pins 7, 9 as well as via the air spring 4. Vertical vibration acting on the vehicle is attenuated by the shock absorber 23.

*Id.* ¶ 48.

### 2. Independent Claim 1

We consider initially the elements of claim 1.

#### (a) Petitioner's Arguments

##### i. Preamble [1pre] – a leaf spring assembly for a wheel suspension of a motor vehicle

To the extent the preamble of claim 1 is limiting, Petitioner asserts that "Enomoto teaches a leaf spring for a vehicle suspension system." Pet. 13 (citing Ex. 1007 ¶¶ 1, 15). There is no dispute that Petitioner is correct and we agree that Enomoto does teach a leaf spring for a vehicle suspension system. *See generally* Ex. 1007.

##### ii. Limitation [1a] – a leaf spring of fiber-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle

Petitioner acknowledges that Enomoto does not expressly disclose any particular material for its leaf spring. Pet. 14. On the other hand, Petitioner asserts that "usage of a composite material, such as fiber-reinforced plastics, as a substitution for metal leaf springs, is well-known as fiber-reinforced plastics are lighter than metal materials and can also be more cost effective

27

IPR2022-00278
Patent 9,868,330 B2

when integrating multiple parts." *Id.* at 14. Petitioner, supported by
Dr. Wagoner, argues that fiber-reinforced plastics have been used for
decades for leaf springs and "[i]ndeed, at this time only two types of
material had been used for leaf springs: steel and fiber-reinforced plastic."
*Id.* (citing Ex. 1002 ¶ 77). Dr. Wagoner testifies that "[b]y the end of the
2000's and the start of the 2010's, car makers were designing new
production cars with FRP springs . . . [a]ny POSITA, or even anyone with
inferior skill in the leaf spring art would know that only two materials are
used for leaf springs: steel and FRP." Ex. 1002 (citing

https://www.automotive-iq.com/chassis-systems/articles/lightweight-
materialsreducing-weight-suspension-systems;

https://www.compositesworld.com/news/worlds-first-glass-fiber-leaf-spring-
for-40-ton-trucks). Petitioner also points out that during prosecution of the
'330 patent the Examiner wrote that "[f]iber reinforced plastic/composite
leaf springs are notoriously well-known in the art," and that the applicant,
i.e., Patent Owner, did not challenge the Examiner's statement. *Id.*
(alteration in original) (citing Ex. 1004, 86).

Dr. Wagoner testifies that a person of ordinary skill in the art would
be motivated to form Enomoto's leaf spring out of fiber-reinforced plastic
first, because it was a well-known substitute material for metal, and a person
of ordinary skill in the art could take "advantage of its light weight"
compared to metal. Ex. 1002 ¶ 160 (citing, *inter alia*, Ex. 1011, U.S. Patent
No. 6,435,485 to Greco (issued Aug. 20, 2002) explaining that "[r]ecently,
fiberglass has replaced steel in longitudinal leaf springs because it
significantly reduces weight."). Second, Dr. Wagoner testifies that a person
of ordinary skill in the art would consider such a substitution "also because

28

IPR2022-00278
Patent 9,868,330 B2

FRP's processing would make the problematic joint of Enomoto unnecessary." *Id.*

### iii. *Limitation [1b] – the leaf spring comprising a first end portion*

Petitioner asserts that Enomoto's leaf spring 25 has a "front end" having eye 13 connected to pin 7 that is secured to the chassis. Pet. 18 (citing Ex. 1007 ¶¶ 26, 47, Fig. 1).

### iv. *Limitation [1c] – a spring portion extending from the first end portion*

For limitation 1[c], Petitioner asserts that the claimed "spring portion" is taught by "Enomoto's leaf spring 25 includ[ing] a 'forward leaf 25A' that extends from the eye 13 located toward the vehicle front." Pet. 19 (citing Ex. 1002 ¶¶ 40, 48).

### v. *Limitation [1d] – a second end portion*

Petitioner asserts that "Enomoto's leaf spring 25 also has a 'rear end'. . . that extends 'towards the back of the vehicle' and '[a]n eye 18 formed curved into a cylinder' on the rear end thereof." Pet. 22 (citing Ex. 1007 ¶ 27, Fig. 3).

### vi. *Limitation [1e] – a bendable portion extending from the second end portion*

Petitioner asserts that Enomoto's rear leaf spring 25B has a curved transition portion and a bendable portion that "moves vertically and bends to accommodate for the change in length of the spring portion when it is subjected to load from the axle." Pet. 24 (citing Ex. 1002 ¶ 172). Petitioner provides two alternatives for the specific structural "curved transition portion," and "bendable portion," referred to as "Position 1" and "Position 2." *Id.* at 24–25 (emphasis omitted). Position 1 and Position 2 are shown in

29

IPR2022-00278
Patent 9,868,330 B2

Petitioner's annotated versions of Enomoto's Figure 3, respectively, reproducedbelow.



Petitioner's annotated Figure 3 from Enomoto, above, illustrates the relative positions of the curved transition portion and bendable portion at Position 1, which starts at a section of the leaf spring immediately adjacent the connection point between the spring and bendable portions. *Id.* at 27–28. The alternative is shown in the second annotated figure below:



Petitioner's second annotated Figure 3 from Enomoto, above, illustrates the relative positions of the curved transition portion and bendable portion in Position 2, which starts in the middle of the annotated bendable portion at a peak of its curved shape. *Id.* Dr. Wagoner testifies that a person of ordinary skill in the art "would understand that this section at the rear of the Enomoto leaf spring after the change in curvature from the curved section 17 satisfies

30

the claimed bendable portion as it bends to accommodate for the change in the length of the spring portion." Ex. 1002 ¶ 172.

> vii. *Limitation 1[f] – wherein the spring portion extends substantially in a longitudinal direction of the motor vehicle in an installed state and is configured to accommodate the wheel carrier*

Petitioner asserts that considering Enomoto's Figure 1, "'forward leaf 25A' is fixed to the 'axle 2' at fixing section 12 and the forward leaf 25A thus extends in the longitudinal direction." Pet. 26 (citing Ex. 1007 ¶ 26, Ex. 1002 ¶¶ 173, 211).

> viii. *Limitation 1[g] – wherein the spring portion and the bendable portion are connected to each other by a curved transition portion*

Petitioner asserts that considering either structural alternative shown in Position 1 and Position 2, "[t]he curved transition portion serves as a transition from the thick spring portion to the vertically curving bendable portion." Pet. 28 (citing Ex. 1007 ¶ 21, Ex. 1002 ¶ 174).

> ix. *Limitation [1h] – wherein the spring portion is longer than the bendable portion*

Petitioner asserts that "Enomoto's figures make clear that the 'spring portion' of the leaf spring 25 is longer than the 'bendable portion.'" Pet. 29. Dr. Wagoner testifies that in considering Enomoto's design, he prepared "finite element models and found them in agreement with the ratios disclosed in the specification text. This lends confidence in the use of Enomoto proportions from the figures." Ex. 1002 ¶ 175 (citing *id.*, Figs. 31(b)-(c)).

31

IPR2022-00278
Patent 9,868,330 B2

> x. *Limitation [1i] – a first receiving device for supporting the first end portion*

According to Petitioner, on Enomoto's leaf spring "[t]he eye 13 is received on the bracket face between its top and bottom surfaces and encapsulates the pin 7 and is thus received by the bracket and supported by the pin 7 through the bushing and meets element 1i." Pet. 33 (citing Ex. 1002 ¶¶ 176–178).

> xi. *Limitation [1j] – a second receiving device or supporting the second end portion*

Petitioner asserts that "Enomoto's leaf spring 25 includ[e]s an 'eye 18' formed on the end directed toward the back of the vehicle. The 'eye 18' is pivotably supported by a 'horizontal pin 9'." Pet. 34. Dr. Wagoner testifies that "Element 1j is the same as Element 1i, except at the right / rear / second end of the leaf spring. Figure 32 shows that the Enomoto connection meets this claim element for the same reasons as for Element 1i." Ex. 1002 ¶ 180 (citing *id.* Fig. 32).

> xii. *Limitation [1k] – wherein the first receiving device and the second receiving device are provided so as to hold the first end portion and the second end portion in a non-displaceable way relative to one another*

Petitioner argues that, unlike the prior art that used shackles permitting longitudinal movement of the leaf spring, and just as recited in claim 1, Enomoto's "brackets 6, 8 are fixed to the chassis frame and keep the horizontal pins 7, 9 in the same location while the eyes 13, 18 rotate about the pins." Pet. 35 (citing Ex. 1007 ¶ 47). Dr. Wagoner provides testimony confirming that Enomoto's "Figure [1] shows clearly that the brackets [6] and [8] are bolted securely to the chassis frame member and therefore are non-displaceable." Ex. 1002 ¶ 181.

32

IPR2022-00278
Patent 9,868,330 B2

> xiii.    *Limitation [1l] – wherein the leaf spring, with*
> *an increasing load due to vertical forces*
> *introduced from the wheel carrier, is*
> *increasingly subjected to tensile loading*

Petitioner asserts that "[t]his [claimed] condition is a functional result of the claimed leaf spring shape and the connection of its ends in a non-displaceable way relative to each other." Pet. 35 (citing Ex. 1002 ¶¶ 182–184). Dr. Wagoner testifies in support that it was well known to a person of ordinary skill in the art that "[a]ny leaf spring with non-displaceable ends will, when deflected sufficiently, be subjected to increasingly tensile loading . . . [t]his behavior is an inherent result of stretching the spring to a length longer that its initial, relaxed length, by deflecting it upward sufficiently." Ex. 1002 ¶¶ 183–184 (citing *Id.* ¶¶78–87, 127–146). Using finite-element simulations and analysis, Dr. Wagoner computed the horizontal forces on the pins in Enomoto's leaf spring, as shown in the graphs of Dr. Wagoner's annotated version of Figure 33, reproduced below. *Id.* ¶ 186.[7]

---

[7] Figure 33 in ¶ 186 is an annotated version of Dr. Wagoner's Figure 21 found in previous ¶ 116.

33

IPR2022-00278
Patent 9,868,330 B2



Dr. Wagoner's annotated Figure 33, in the lower graph (b), above, illustrates that "[u]p to 7mm of deflection, the loading is compressive. At 7mm deflection, it is neutral and is labelled the 'C-T Transition' on Figure 33 for the transition from compressive loading to tensile loading. For deflections larger than 7mm the loading is tensile and increasing." *Id.* ¶¶ 116, 186.

> *xiv.* *Limitation [1m] – further wherein at least one of the first and second receiving devices provides pivotable support to the associated one of the first end portion and the second end portion around a pivot axis extending transversely to a longitudinal axis of the vehicle*

Petitioner asserts that "Enomoto teaches that at one end '[t]he eye 13 is pivotably supported on the horizontal pin 7 by a bushing 14.'" Pet. 40 (citing Ex. 1007 ¶ 26). Petitioner points out, also, that Enomoto "teaches

34

that at the other end '[t]he eye 18 is pivotally supported on the horizontal pin 9 by a bushing 19.'" *Id.* (alteration in original) (citing Ex. 1007 ¶ 27). Petitioner argues further that because the pivot axis is parallel to the pin axis and the eye axes, the eyes 13, 18 are "oriented transversely or perpendicular to the longitudinal axis as required by element 1m." *Id.* at 41 (citing Ex. 1002 ¶ 193).

> xv.   *Limitations [1n] and [1o] – wherein in the installed state of the leaf spring the first end portion and the spring portion extending therefrom are positioned towards a front end of the motor vehicle, and the second end portion and the bendable portion extending therefrom are positioned towards a rear end of the motor vehicle*

Petitioner argues that Enomoto's eye 13 at the forward end of forward leaf spring 25A is positioned towards the front of the vehicle, and that eye 18 formed by rear leaf spring 25B, i.e., the bendable portion, is positioned towards the rear of the vehicle. Pet. 41–42 (citing Ex. 1007 ¶¶ 24, 26, 27, 47, Fig. 1). Enomoto's Figure 1 is reproduced below.

35

IPR2022-00278
Patent 9,868,330 B2



FIG. 1

Enomoto's Figure 1 above, depicts leaf spring 25 as it is attached to vehicle chassis 1 at eyes 13, 18, along with shock 23 and air spring 4.

### (b) Patent Owner's Arguments

Patent Owner focuses most on disputing Dr. Wagoner's analysis and conclusion that Enomoto discloses the limitation [1l] in claim 1 "wherein the leaf spring with increasing load due to vertical forces introduced from the wheel carrier is increasingly subject to tensile loading" and as recited in limitation [1a] whether the skilled artisan would substitute FRP for steel. *See, e.g.,* PO Resp. 1–5. Thus, we begin our discussion with these limitations and related arguments.

> i.    *Whether Enomoto teaches a leaf spring capable of being subject to tensile loading when subjected to increasing load due to vertical forces from a wheel carrier*

Patent Owner and Mr. Dilling dispute the finite element analysis ("FEA" or "FE" analysis) of Enomoto's leaf spring presented by Dr. Wagoner in this proceeding, and make a number of arguments as to the

36

IPR2022-00278
Patent 9,868,330 B2

sufficiency and veracity of the analysis. PO Resp. 28–39. Patent Owner first contends that Dr. Wagoner did not, himself, perform the FEA analysis of Enomoto, and that the analysis did not properly use the actual dimensions of Enomoto's leaf spring. *Id.* 29–31, 33–34. Additionally, Patent Owner asserts that Dr. Wagoner did not consider yield and failure points of the leaf spring, disregarded the pivot connections and did not perform a travel study. *Id.* 34–36. We address these, and other related arguments in turn below.

Before addressing Patent Owner's arguments, we initially summarize Dr. Wagoner's FE analysis presented with the Petition.

> ii. *Dr. Wagoner's FE analysis of a simple arc leaf spring*

Dr. Wagoner testifies that a person of ordinary skill in the art understands that "[a]ny leaf spring with non-displaceable ends will, when deflected sufficiently, be subjected to increasingly tensile loading [], so any prior art leaf spring with non-displaceable ends would read on this claim element." Ex 1002 ¶ 183 (citing *id.* ¶¶ 106–113). Dr. Wagoner explains that for a leaf spring with pinned ends "[a]t some critical deflection point, the horizontal reaction forces would become zero. Thereafter, for increased upward displacement of the spring center, the horizontal reaction forces would become pointed outward, i.e. tensile. *Id.* ¶ 105 (citing *id.* Fig. 15(b)). Dr. Wagoner illustrates this deflection point with the "compression-tension transition" point illustrated in the following graphs.

37



*Id.* ¶ 105. Figures 15(a)-(b) above from Dr. Wagoner's declaration illustrate conceptual development of loading forces with vertical displacement for the simple arc leaf spring pinned at one end and shackled at another, "pinned/shackled," in comparison to a simple arc leaf spring pinned at both ends, "pinned/pinned." *Id.* Dr. Wagoner explains for the pinned/pinned scenario that with sufficient vertical displacement "the horizontal reaction forces would be expected to become zero when the unconstrained spring attains its initial length. This is shown in green on Figure 15(b) and is labelled the Compression-Tension Transition point. Thereafter, tensile loads (pointed outward) increase. Figure 15(b) [above] shows this behavior schematically." *Id.*

Dr. Wagoner presents, and refers to, his FE analyses of several variations of leaf springs illustrating an increasing vertical load being

38

IPR2022-00278
Patent 9,868,330 B2

applied, and the resultant horizontal force (in Newtons) compared to displacement of the leaf spring by the vertical load. Ex. 1002 App'x D–I. As shown in the figures below, an FE analysis divides a large 3-dimensional model into smaller simpler parts for mathematical solution by providing a finite element mesh. Dr. Wagoner explains that his FE analyses

> starts with simulation of a leaf spring with simple arc shape initially (as above) to see how the simple conceptual picture agrees with or varies from the actual case. Then, it continues with simulation of a few examples of new progressive leaf spring designs that are shaped and contoured. This reveals the principles of leaf spring operation for these more general configurations. The finite element simulation technique used for the three-dimensional simulation of arbitrary shapes and attachment strategies to understand their roles and deviations from the simple semi-elliptical, uniform cross-section, mono-leaf case.

Ex. 1002 ¶ 106.

For example, portions of the FE analysis for a simple semi-elliptical (arc) leaf spring with both ends pinned, i.e., fixed, are reproduced below.



**Simple Arc Spring, FE Model**

Pinned on left, Pinned on right

Upward line displacement at center

$U_y$

**Dimensions:**
Length (x) 140 mm
Width (z) 20 mm
Thickness (y) 1.5 mm

The figure above depicts an arc leaf spring (the green, curved rectangle), pinned at both ends, with no vertical load applied and no displacement. Ex. 1002, Appx. E. $U_y$ is the vertical displacement in mm (here 0 mm).

39

IPR2022-00278
Patent 9,868,330 B2

The figures below show the FEA modeling results of a simple arc spring, pinned on the left and right, for certain displacements.



The figure above depicts an arc leaf spring (multicolored, curved rectangle), pinned at both ends, with a vertical load applied and $Uy = 25$ mm displacement. *Id.*



The figure above depicts an arc leaf spring (multicolored, curved rectangle), pinned at both ends, with a vertical load applied and 33 mm displacement.

40

IPR2022-00278
Patent 9,868,330 B2

*Id.* For the simple arc leaf spring, Dr. Wagoner testifies that the FE analysis confirms the understanding of a person of ordinary skill in the art, that is "[f]or pin/pin simple springs there is an initial range of displacement where compression grows, a second region where they decrease, and a third region where they start at zero and grow rapidly in tension." Ex. 1002 ¶ 113, *see also id.* ¶ 112 Fig. 19 (Graphs representing "comparison of finite element results for the mechanical behavior of a simple leaf spring with pin/shackle mounting (black lines) versus pin/pin mounting (pin/fix lines)"). Reproduced below are Dr. Wagoner's vertical and horizontal force graphs showing force in Newtons versus displacement *Uy* for the simple arc leaf spring.





41

IPR2022-00278
Patent 9,868,330 B2

*Id.* ¶ 111.  The FE analysis graphs above represent "[f]inite element results for the mechanical behavior of a simple leaf spring with pin/pin mounting."

*Id.* ¶ 112.  Dr. Wagoner explains that with both ends pinned, these graphs reveal

> dramatic spring progression once the deformation becomes tensile starting at vertical displacements of 32mm.  The pin/pin mounting introduces horizontal reaction forces that are compressive/inward during the first range of motion.  For this pin/pin configuration, the horizontal forces increase up to approximately 30 mm of displacement, then decrease to zero at a displacement around 32mm and increase rapidly in the tensile/outward direction thereafter.  The transition of horizontal reaction forces from compression to tension occurs at approximately 32mm of vertical displacement.

Ex. 1002 ¶ 112.

Thus, as discussed above, it is Dr. Wagoner's conclusion that a simple leaf spring, fixed at both ends, will inevitably experience both compression and transition to tension forces when subjected to sufficient forces.

> iii.  *Dr. Wagoner's FE analysis of Enomoto's leaf spring*

By way of another example, portions of the FE analysis of Enomoto's leaf spring also with both ends pinned (as Enomoto teaches) are reproduced below.

42

IPR2022-00278
Patent 9,868,330 B2



**Enomoto Leaf Spring with Varying Thickness, FE Model**

Pinned on left, Pinned on right

Upward line displacement at center

**Dimensions:**
Length (x) 140 mm
Width (z) 20 mm
Thickness (y): $t_1$=3, $t_2$=2, $t_3$=0.7, and $t_4$=1 mm

The figure above depicts Enomoto's leaf spring (green colored shape), pinned at both ends, with no vertical load applied and no displacement. Ex. 1002, Appx. E.  *Uy* is the vertical displacement in mm.

The figures below show the FEA results for Enomoto's leaf spring, pinned on the left and right, for certain displacements.



*Uy* = 15.6

The figure above depicts Enomoto's leaf spring, pinned at both ends, from a side view and from a perspective view, with a vertical load applied and 15.6 mm displacement.

43

IPR2022-00278
Patent 9,868,330 B2



The figure above depicts Enomoto's leaf spring, pinned at both ends, again from a side view and from a perspective view, with a vertical load applied and 24 mm displacement. For Enomoto's leaf spring, Dr. Wagoner testifies that the FE analysis confirms the understanding of a person of ordinary skill in the art, that is "the Enomoto leaf spring, by virtue of its pinned connection at both ends, will be increasingly subjected to tensile loading when deflected upward sufficiently by vertical forces." *Id.* ¶ 185 (citing *id.* ¶ 144–145).

Reproduced below are the vertical and horizontal force vs. displacement graphs, including Dr. Wagoner's annotations illustrating compressive and tensile ranges, showing force in Newtons versus displacement *Uy* for Enomoto's leaf spring.

44



*Id.* ¶ 186.  The FE analysis graphs and Dr. Wagoner's annotations represent that "[u]p to 7mm of deflection, the loading is compressive.  At 7mm deflection, it is neutral and is labelled the "C-T Transition" on Figure 33 for the transition from compressive loading to tensile loading."  *Id.* Dr. Wagoner explains further, based on his analysis and graphs that "[f]or deflections larger than 7mm the loading is tensile and increasing."  *Id.*

Thus, it is Dr. Wagoner's conclusion that a leaf spring, fixed at both ends, as taught by Enomoto, also will inevitably experience both compression and tension forces, the first transitioning to the second, when subjected to sufficient forces.

45

IPR2022-00278
Patent 9,868,330 B2

> iv.    *Dr. Wagoner's FE analysis as undertaken with assistance from Dr. Zhou and Dr. Taghipour*

Patent Owner argues that Dr. Wagoner did not, himself, actually perform the FE analysis, and instead had a colleague, Dr. Guowei Zhou, perform the FE analysis under a license for the Abaqus FE analysis program. PO Resp. 31 (citing Ex. 2011, 72:2–24). Dr. Wagoner explained during his deposition that he asked Dr. Zhou to do the FE analysis because he (Dr. Wagoner) did not have "have a license to do these things, so I didn't do it myself." Ex. 2011, 75:16–17. Also, Dr. Wagoner explained that a post-doctoral student at Ohio State University, Dr. Ehsan Taghipour, assisted with the CAD models for the analysis. *Id.* at 76:19–77:6.

Patent Owner argues that because Dr. Wagoner did not himself perform the FE analysis, we should ascribe "little or no value" to his report. PO Resp. 30. However, it appears from the record, that Mr. Dilling also did not have license to perform an FE analysis, yet presented results from such an analysis. *See* Ex. 2009 ¶ 110 (Mr. Dilling explaining that "since I do not have an active license of Ansys currently, I needed someone to create, solve, and postprocess the Ansys FEA models in my declaration."). Patent Owner's FEA models produced by the Ansys program, according to Mr. Dilling were conducted by a company called "SimuTech Group, Inc., in Rochester, NY." *Id.* Mr. Dilling explained that he "supervised the creation and postprocessing of each of the Ansys FEA models that are part of my declaration." *Id.* Similarly, in his deposition Dr. Wagoner confirmed that he provided the parameters for his FEA models to Dr. Zhou. *See* Ex. 2011, 81:14–19. (Dr. Wagoner explaining that "I told [Dr. Zhou] what I wanted done on these simulations, and I went over the

46

parameters and what to use, and then I asked him to run the program. So he did it, but I set up how I wanted it to be done.").

Patent Owner argues that Dr. Wagoner was unaware of what specific kind of user-license Dr. Zhou had for the Abaqus program which Dr. Zhou used to produce the FEA models. PO Resp. 30–31 (citing Ex. 2011, 72:2–24). For instance, whether or not it was an "academic license" or was otherwise limited by the licensee. Patent Owner also argues that Dr. Zhou did this work as a favor for Dr. Wagoner, and Dr. Wagoner did not know how much time Dr. Zhou spent doing the analysis. *Id.* at 31 (citing Ex. 2011, 76:12–13). In this way, Patent Owner alleges that Dr. Wagoner's FE analysis may have been limited and incomplete in some way. However, neither Patent Owner nor Mr. Dilling describe the substantive difference between an academic license and, say, a professional license for FEA software such as Abaqus and Ansys. This appears to be mainly attorney argument, because the evidence to which Patent Owner refers, Mr. Dilling's declaration, Ex. 2009 ¶ 110, and Dr. Wagoner's deposition, Ex. 2011, 74:19–21, do not provide compelling or supporting testimony opining on any particular differences. *See* PO Resp. 31. We appreciate that there may be differences between the application capabilities depending on the level of the license held by the user, but this allegation does not explain with any particularity any such differences or show how differences would significantly impact the outcome of Wagoner's FEA models. We acknowledge that there may be differences in the declarants' analyses. But, as Mr. Dilling states "[a]ny model will be, even at its best, an approximation of the actual physical system." Ex. 2009 ¶ 97 (quoting Ex. 2016).

With respect to the apparent lack of financial compensation to Dr. Zhou and the amount of time spent doing the analysis, based on these

47

IPR2022-00278
Patent 9,868,330 B2

questions alone as posed to Dr. Wagoner during his deposition, (Ex. 2011 71–76), we do not have sufficient evidence before us to evaluate whether or not there was a lack of care or attention or time on the part of Dr. Zhou, as Patent Owner's argument insinuates. Based on the facts and evidence with respect to the implementation of Petitioner's and Dr. Wagoner's FE analysis, we do not find that Dr. Zhou's and Dr. Taghipour's involvement in performing the CAD modeling and FE analysis impacts our consideration of Dr. Wagoner's testimony in any detrimental way.

> v.  *Whether Dr. Wagoner's FE analysis fulfills the requirements of 37 C.F.R. § 42.65(a) and (b)*

37 C.F.R. § 42.65(a) states in part:

> (a) Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight . . .

> (b) If a party relies on a technical test or data from such a test, the party must provide an affidavit explaining:

> (1) Why the test or data is being used;

> (2) How the test was performed and the data was generated;

> (3) How the data is used to determine a value;

> (4) How the test is regarded in the relevant art; and

> (5) Any other information necessary for the Board to evaluate the test and data.

Patent Owner argues that "the Board should give little weight to Wagoner's data because he has not 'disclose[d] the underlying facts or data on which the opinion is based.'" PO Resp. 33 (citing 37 C.F.R. § 42.65(a)). We disagree. Dr. Wagoner explained that a person of ordinary skill in the art would have understood

48

IPR2022-00278
Patent 9,868,330 B2

> that progressive leaf spring action arises inherently from having
> non-displaceable ends. That is, by constraining the distance
> between the ends (instead of having one freely displacing end
> from a shackle installation), at some critical deflection, further
> deflection requires longitudinal stretching of the spring, which is
> inherently many, many times stiffer than bending.

Ex. 1002 ¶ 87. Dr. Wagoner testifies that a person of ordinary skill in the art

would have understood the basics of leaf spring design, including the

configurations represented below illustrating conceptualized deformation of

two variations of semi-elliptical leaf springs.



Shown above in Figure (a) is Dr. Wagoner's conceptualized deformation of

a leaf spring restrained by a pin on one end and a shackle on the other (so the

spring maintains a constant length). Figure (b) illustrates a conceptualized

deformation of a leaf spring restrained by a pin on both ends. Different from

Figure (a), Dr. Wagoner explains for Figure (b) that where both ends are

pinned, that "there will be a reaction force at the ends required *to compress*

*or elongate* the spring length to maintain a common distance between the

end points as the center is displaced upward." *Id.* ¶ 95 (emphasis added).

Dr. Wagoner additionally testifies that as upward displacement forces the

Figure (b) pinned/pinned spring through states 4 and 5 "[a]t some critical

deflection point, the horizontal reaction forces would become zero.

49

IPR2022-00278
Patent 9,868,330 B2

Thereafter, for increased upward displacement of the spring center, the horizontal reaction forces would become pointed outward, i.e. tensile." *Id.* ¶ 101, *see also* Ex. 1030, 1:40–2:6 ("When the axle is deflected upward the main part 16 of the spring takes up a curved form which corresponds to the loaded form of a conventional leaf spring. This spring deflection is accompanied by a shortening o1 the main part of the spring which in turn tends to straighten out the bend 17 of the spring and applies a longitudinal tensile load in the spring.").

If this were the extent of Dr. Wagoner's testimony, Patent Owner might have a point, considering § 42.65(a). But, as we have discussed above, besides explaining in detail, for example in Figures (a) and (b) above, what a person of ordinary skill in the art would generally understand with respect to the functional characteristics of pinned and unpinned leaf springs, Dr. Wagoner provides several examples of FE analysis performed on different springs to confirm this understanding. Ex. 1002, App'x. D–G. Therefore, in our opinion Dr. Wagoner has presented evidence and data that is unrebutted in the record to support his testimony with respect to the level of ordinary skill in the art and the commensurate technical understanding and knowledge of basic leaf spring operation.

Considering § 42.65(b), as to *why* the data and test results are being used, Dr. Wagoner explained that the "finite-element simulation results . . . show precisely what happens in real leaf springs whether simple or complex. It starts with simulation of a leaf spring with simple arc shape initially (as above) to see how the simple conceptual picture agrees with or varies from the actual case." Ex. 1002 ¶ 106. Dr. Wagoner explains how the simulations were done and data obtained by "specify[ing] dimensions of 150mm-200mm and 110mm-130mm, respectively, for lengths shown on

50

IPR2022-00278
Patent 9,868,330 B2

corresponding figures. Common material properties were used for each elastic simulation: Young's modulus = 210 GPa, Poisson's ratio = 0.3." *Id.* ¶ 107. And, Dr. Wagoner explains that the "simulations were conducted using Abaqus Standard, Version 6.14 with C3D8R reduced integration brick elements. The mesh sizes varied slightly with the particular case, as shown in Table 1." *Id.* ¶ 108. Table 1 referred to by Dr. Wagoner is reproduced below.

Table 1 - Finite element mesh size by simulation group.

| FE Model | Total number of nodes | Total number of elements | Number of elements in length, width, and thickness directions | Element type |
|---|---|---|---|---|
| Hahn | 2700 | 1888 | 59, 8, 4 | C3D8R |
| Enomoto | 5628 | 990 | 55, 6, 3 | C3D20R |
| Greco | 7693 | 1392 | 58, 8, 3 | C3D20R |
| Simple Arc | 7431 | 1344 | 56, 8, 3 | C3D20R |

Dr. Wagoner's Table 1 illustrates mesh sizes used in the FE analysis for each of the prior art leaf spring described in Hahn, Enomoto, Greco and for a simple arc leaf spring.

Dr. Wagoner further explained *how* the test was performed and the data generated, as well as how the data is used to determine a value. Dr. Wagoner, for example, testifies that "[a] simple leaf spring with initial arc shape, similar to the one treated conceptually in the previous section, was first simulated. The FE mesh for a uniform, rectangular cross-section, mono-leaf configuration in a relaxed state with concave-up circular shape is shown in Figure 16." *Id.* ¶ 109. We reproduce Dr. Wagoner's Figure 16 below.

51

IPR2022-00278
Patent 9,868,330 B2



The caption for Figure 16 describes:

> Figure 16 - Finite element mesh of a simple leaf spring with
> constant rectangular cross-section in the relaxed state (vertical
> displacement Uy=0): (a) perspective view, (b) side view. The
> spring length is taken to be a common 140mm for comparison
> with other configurations.

*Id.* Dr. Wagoner further provides the results, i.e. calculated values for force

v. displacement, of the FE analysis, for example for the simple leaf spring,

illustrated above in a pin/pin configuration. These results are illustrated in

Dr. Wagoner's Figure 18 reproduced below.

52

IPR2022-00278
Patent 9,868,330 B2



Figure 18 depicts graph 18(a) showing vertical force v. displacement, for a pin/pin leaf spring configuration and graph 18(b) showing horizontal force v. displacement.  The caption for Figure 18 states:

> Figure 18 - Finite element results for the mechanical behavior of a simple leaf spring with pin/pin mounting: (a) vertical center force vs. displacement (upward force is positive), (b) horizontal reaction force (right side) vs. displacement (showing tensile/outward reaction force as positive, compressive/inward force as negative).

*Id.* ¶ 111.  On its face, we do not discern in the Petition or in Dr. Wagoner's own cited evidence, analysis and testimony, any specific lack of data, explanation, or information implicating § 42.65(b).

53

Patent Owner argues that in comparison, Mr. "Dilling's analysis satisfies the requirements of §42.65(b)." PO Resp. 33 (citing Ex. 2009 Sections X-XIII). Patent Owner argues further that "Dilling's criticism of Wagoner's FEA demonstrates why Wagoner's FEA should be given little weight under §42.65(b)." *Id.* (citing Ex. 2009 at ¶¶102–107). We address these criticisms below.

*vi.  Whether Wagoner's leaf spring dimensions
used in FEA modeling are sufficient*

Patent Owner argues that the dimensions relied on by Dr. Wagoner for his FE analysis are flawed. PO Resp. 33. Specifically, Patent Owner argues that "Wagoner did not select 140mm by first measuring a real leaf spring, nor did Dr. Wagoner use any industry standard . . . Instead, he took a ruler and measured the printed page of Enomoto (or Hahn, he wasn't certain) and measured it to be about 140mm." *Id.* at 34 (citing Ex. 2011 at 86:23–25, 87:22–23, 139:13–16). Mr. Dilling testifies that "[t]he first major flaw is that the models contained in the Wagoner Declaration are not dimensionally to the proper scale." Ex. 2009 ¶ 104. Mr. Dilling testifies that "[a]ctual leaf springs have an overall length of about 1250mm (or about 49 inches). That means that the models represented in the Wagoner Declaration are about 1/9th the actual size in overall length." *Id.*

Mr. Dilling's ratio of 1/9, is reasonably commensurate with Dr. Wagoner's ratio of 1/10. Dr. Wagoner explained in his deposition that he measured the patent drawing in Enomoto at approximately 140mm, and "looked at one in a Ford truck, a big pickup truck, and it was about 1400 milli[me]ters long, so its roughly a 10-to-1 scaling. And that's how those dimensions were set." Ex. 2011, 87:3–6. We acknowledge, as Patent Owner and Mr. Dilling point out, that Dr. Wagoner did not use in his FEA

54

models the actual length (1400mm) and dimensions of a full-size leaf spring. PO Resp. 33–34, Ex. 2009 ¶ 104. What Patent Owner and Dr. Dilling have not persuasively explained is why scaling is such a significant flaw or drawback for FEA modeling in this case. Dr. Wagoner scaled the leaf spring, by about 1/10, using a length of 140mm for the FE analysis. *See, e.g.,* Ex. 1002 ¶ 107 ("A common leaf spring with scaled length of 140 mm was adopted for the comparisons."). In his rebuttal declaration Dr. Wagoner explained that a person of ordinary skill in the automotive field would have understood that "[n]o matter the actual scaling, whether it is 10:1, 12:1, 1:1 or 1:12, the relative position where the C-T transition occurs is the same." Ex. 1033 ¶ 63.

Further, after considering Mr. Dilling's criticism of scaling, Dr. Wagoner provided a comparison in Figure 7 of his rebuttal declaration using the scaled dimension at 140mm, as compared to a 1400mm leaf spring, which we reproduce below.



Dr. Wagoner's Figure 7 compares force v. displacement for 140mm and 1400 mm. *Id.* ¶ 64. The caption reads "[c]omparison of Wagoner FE simulations of Enomoto: Left: original simulation results with scaled length of 140mm, Right: simulation of 10X larger leaf spring. The C-T transition scales precisely with model length." *Id.* Dr. Wagoner states that "[n]otably,

55

Dilling does not express anything contrary to this simple well-known principle that any mechanical engineer should understand. This simple scaling would be known to anyone familiar with FE analysis or simple mechanics, including any expert in mechanical engineering." *Id.*

Patent Owner and Mr. Dilling criticize the scaling, but neither ever persuasively explains *why* scaling in this case is a flawed technique, or states that a person of ordinary skill in the art would not perform uniform scaling of an article or design for FE analysis. During oral argument we questioned Petitioner's counsel about why Dr. Wagoner used scaling. Petitioner's counsel responded that "[p]eople doing FEA scale things down for processing cost and as he testified in his deposition, everything's elastic. If you changed the dimensions, all it's going to do, it's not going to change, you know, the C to T transition." Tr. 23:5–8.

Dr. Wagoner has been consistent in his testimony—that it was within the level of ordinary skill in the art to scale FEA models, often for purposes of processing costs, and obtain comparative results as to deflection for horizontal compression and tension forces acting on the leaf spring. *See* Ex. 1033 ¶ 59 (Dr. Wagoner testifying that "scaling of dimensions for FE analysis has no effect on the analysis in my Declaration, as would be known to one of ordinary skill or an expert."). Patent Owner has provided no persuasive evidence or argument that rebuts Dr. Wagoner's testimony as to scaling in this proceeding. During his deposition Dr. Wagoner was asked if the vertical *forces* for creating the deflection also scaled up similar to deflection values, and if they were accounted for in his FEA modeling. Ex. 2034, 78:12–25. Dr. Wagoner responded that "[t]hey do not." *Id.* Dr. Wagoner explained that for the vertical forces creating the deflections do not scale up commensurate with the 1/10 ratio, and that "[y]ou could get

forces, but I didn't and I didn't have [to]—I didn't base any conclusions on anything to do with the actual force magnitudes." *Id.*

Without sufficient evidence to the contrary in this case, we discern no reason why Dr. Wagoner's scaled FE analysis at a 1/10 size leaf spring are flawed or improper. We are persuaded that the issue and magnitude value of vertical force for causing deflection, as Patent Owner argues, does not resolve any issue of the compression versus tension transition point. There are no specific vertical forces described in the '330 patent nor recited as limitations in the challenged claims as to when the C-T transition occurs. Dr. Wagoner's FE analysis focuses on the pertinent characteristics and values of horizontal compression and transition to tension forces, during deflection of the leaf springs. The relevant question is whether a person of ordinary skill in the art understood that a leaf spring, longitudinally fixed at both ends, will transition at some point from compression to tension, not the particular magnitude of causal vertical force at which it will occur.

Overall, we credit and find persuasive Dr. Wagoner's testimony and FE analyses confirming that "[t]he finite element simulation results for both traditional arc designs and modern, shaped, progressive designs conform qualitatively to the conceptual understanding that a POSITA would have." Ex. 1002 ¶ 119.

> vii.   *Whether Dr. Wagoner improperly ignored*
> *stress and yield strength in his FE analyses*

Patent Owner argues that "Wagoner admitted that he used a linear model, and he ignored stress and potential failure." PO Resp. 34 (citing Ex. 2011 at 142:23-143:20; 165:9-11. Patent Owner contends that in FEA modeling a person of ordinary skill in the art "would understand that yield and failure cannot be discarded." *Id.* (citing Ex. 2009 ¶

57

IPR2022-00278
Patent 9,868,330 B2

100). Patent Owner points to Dr. Wagoner's testimony arguing that even he testified that "FEA is used as a cost-effective alternative to real-world experimentation during the design and development of a component, because FEA allows a designer to simulate real-world forces to approximate failure limits, namely loads, i.e., stresses and strains." *Id.* at 35 (citing Ex. 2011, 70:2–71:9). According to Patent Owner, despite this, "Wagoner admitted that the forces and stresses in his declaration did not have anything to do with his decision-making process in this case." *Id.* (citing Ex. 2011, 113:15–19). Patent Owner sums up their position in this way, "Wagoner did not evaluate whether the stresses are below the yield values of the materials and thus his analysis is unreliable." *Id.* at 35–36 (citing Ex. 2011, 142:23–143:20; 165:9–11).

Dr. Wagoner uses a linear material analysis, and as Mr. Dilling points out "[i]n a linear material type, the material is assumed to be perfectly elastic, meaning that it will never yield nor break." Ex. 2009 ¶ 87. In other words, according to Mr. Dilling, Dr. Wagoner failed to consider the failure point of the leaf springs in his FEA modeling. Ex. 2011, 106:13–107:15. Dr. Wagoner essentially agreed, explaining that he didn't care about the stress values and failure point because "the simulation would give the same answer. We assume it's linear elastic and that's what we use." *Id.* at 113:17–19

Patent Owner's point is that while Dr. Wagoner's theoretical linear models may show that a leaf spring has a C-T transition point, it may be that in reality, in use, a given leaf spring design could fail prior to the C-T transition point. We acknowledge also that Mr. Dilling provides an FE analysis of Enomoto including a travel study "show[ing] that the axle *should have* approximately 70 mm (263-193 mm) of jounce and 80 mm (342-263

58

IPR2022-00278
Patent 9,868,330 B2

mm) of rebound." Ex. 2009 ¶ 158 (emphasis added). However, Mr. Dilling acknowledged that the study did not account for the stress level in the rear portion of the leaf spring. *Id.* This is because "[t]he stresses in the beam show that the jounce travel needs to be restrained to 30 mm of vertical travel to prevent yielding of the rear portion of the beam." *Id.* ¶ 162.[8] Mr. Dilling testifies that "[i]n the case of Enomoto, we will see that the rear portion of the beam does in fact restrain the beam from reaching either the full jounce or the full rebound due to stress levels in the rear leaf spring beam portion (refer to the stress results for more details on the rear portion of the leaf spring beam portion)." *Id.* ¶ 158. Mr. Dilling's stress results are shown in the graphs of Figure 82 from his declaration for the Enomoto suspension and are reproduced below.

---

[8] "Jounce" is the upward movement of a leaf spring when a vertical force is applied, and "rebound" is the subsequent downward movement. Pet. Reply n.4.

59

IPR2022-00278
Patent 9,868,330 B2



The graphs for Mr. Dilling's Enomoto FE analysis show the reaction load in the vertical direction at the axle location and horizontal load in the beam, both as a function of vertical axle displacement and that the "[d]ashed line in the above graphs indicate that the material strength has been exceeded." *Id.* ¶ 182. Mr. Dilling further testifies that stress failure is shown above 30 mm of displacement and that "[t]he beam remains in compression throughout the suspension travel."

To be clear, Mr. Dilling's FE analysis of Enomoto's leaf spring indicates that the leaf spring fails if it exceeds 30 mm of displacement, which is about 1.2 inches, while it would remain in compression "even well beyond 60 mm of jounce if that were permitted by the material strength of the beam, which it is not." *Id.* ¶ 181. In other words, Mr. Dilling's

60

conclusion based on his FE analysis is that Enomoto's leaf spring would never reach a point where the leaf spring is in tension—due to failure. *Id.*

    Besides the leaf spring itself, Mr. Dilling's FE analysis of Enomoto also includes air spring 4 and shock absorber as it is shown in Enomoto's Figure 1 and described by Enomoto. *See* Ex. 1007 ¶ 48 (Enomoto describing that "[i]n the suspension structure in FIG. 1 provided with the leaf spring 25, when a vertical load acts on the vehicle, the leaf spring 25 and the air spring 4 flex, absorbing the load."). Mr. Dilling constructed a CAD model using Enomoto's Figure 1, as shown in Figure 66 of Mr. Dilling's declaration reproduced below.



*Figure 66*

61

IPR2022-00278
Patent 9,868,330 B2

Figure 66 from Mr. Dilling's declaration illustrates for comparison purposes
Figure 1 of Enomoto above the "3-D CAC Model Based off FIG. 1 of
Enomoto Patent." Ex. 2009 ¶ 151. Mr. Dilling's CAD model includes not
only leaf spring 25, but also air spring 4 and shock absorber 23. *See id.*
¶ 156 ("In my opinion, the CAD model I created for Enomoto fairly
represents the teachings of the Enomoto reference."). Mr. Dilling testifies
further that in addition to the stress levels (failure) in Enomoto's leaf spring,
"the air spring restrains the leaf spring beam in jounce direction and the
shock absorber restrains the leaf spring in rebound direction."). *Id.* ¶ 158.
Mr. Dilling notes for the thinner rear portion of Enomoto's leaf spring is that
"no matter how flexible the rear portion of the beam of Enomoto is made,
the full jounce travel is still restrained by the air spring minimum height and
the full rebound is still restrained by the shock absorber maximum extended
length." *Id.* ¶ 183.

On one hand, we note that Mr. Dilling's analysis of Enomoto appears
to result in an unusable device with only 30mm of displacement before
failure. *See* Ex. 1033 ¶ 21 (Dr. Wagoner testifying that "suspension travel of
30mm is completely unrealistic for nearly every type of motor vehicle wheel
suspension system."). And, on the other hand, we determine that it is
irrelevant whether Enomoto's leaf spring might be designed to fail, or is
impeded by an air spring prior to transitioning to tension because the claims
are written broadly enough to encompass a leaf spring that is capable of
transitioning to tension, whether or not the leaf spring is supporting a wheel
carrier and is actually situated on and inclusive in a vehicle's complete
suspension system. We do not find that Dr. Wagoner's FE analysis is
compromised because it assumed a perfectly elastic beam, and credit
Dr. Wagoner's conclusion "that one of ordinary skill in the art would

62

IPR2022-00278
Patent 9,868,330 B2

understand that the Enomoto Fig. 3 invention is capable of progressive spring rate action, including increasing tension. This occurs naturally for the generally concave-up configuration in unloaded states, as would be seen and expected without assistance of numerical calculations such as finite element analysis." *Id.* ¶ 25.

We determined in our claim construction that the claim "language does not require that the wheel carrier is physically on the leaf spring, or that a load is actively applied to the leaf spring via the wheel carrier, only that the leaf spring is capable of supporting a wheel carrier and receiving forces through the wheel carrier that cause tensile loading." Section II.C. In other words, where Enomoto has the capability to be deflected in such a way as to transition from compression into tension, then Enomoto's leaf spring encompasses this limitation regardless of whether or not the function is activated or utilized in any way. *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010) (The Federal Circuit explaining that whether or not the functional aspects of the claim were "activated or utilized in any way," a product that included the structure for performing the claimed function can still infringe.). Accordingly, Patent Owner's contention that Enomoto's leaf spring *might* fail, or must be considered as installed on a vehicle with an air spring and actively subject to vertical displacement is incorrect from the outset based on the proper claim construction, and in this case, overcome by Petitioner's persuasive evidence that the structure and capabilities of a leaf spring are well known, regardless of whether the leaf spring is installed with a wheel carrier in a complete vehicle suspension system. *See, e.g.*, Ex. 1030 (British Patent No. 1,077,968 to Oldfield explaining that "[t]his spring deflection is accompanied by a shortening of the main part of the spring which in turn tends to straighten out the bend 17

63

of the spring and applies a longitudinal tensile load in the spring. This tensile load increases with increasing spring deflection.").

In this case we credit Dr. Wagoner's response, who acknowledges that "Enomoto Fig. 3 leaf spring embodiment *could be* designed in a particular way (size, shape, material, strength) and installed into a particular environment (vehicle and suspension) such that it could be prevented from experiencing tension. Examples of such treatments include various means of making the spring too weak or too small for the vehicle, or externally limiting its travel by various vehicle/suspension choices." Ex. 1033 ¶ 19. Dr. Wagoner points out that in Mr. Dilling's analysis, Enomoto's leaf spring has "only 30mm of travel beyond which it would catastrophically break or deform into an unusable form." *Id.* ¶ 21. Dr. Wagoner testifies that "[l]eaf springs in widely available commercial suspension systems are known to have travel ranges of 4-6 inches, for example and even over 10 inches in trucks." *Id.*

Dr. Wagoner testifies further that even "without numerical analysis of any kind, one of ordinary skill would understand that Enomoto Fig. 3 leaf spring would transition from compression to tension at approximately halfway through the upper travel range indicated and then would be subjected to increasing tension thereafter." *Id.* ¶ 29. Dr. Wagoner testifies that "[t]he FE analysis confirmed the visual analysis. The visual analysis identified the C-T transition point as approximately halfway to the limit of the air spring compression whereas the combination of FE analysis of the simulated C-T transition point was 7/16 of the CAD-determined full upward travel point for literal Enomoto Fig. 3." *Id.* ¶ 31.

As discussed above, Dr. Wagoner and Mr. Dilling provide competing analyses for the range of Enomoto's leaf spring and its transition from

compression to tension, or not, as in Mr. Dilling's analysis. *Compare* Ex. 1002 ¶¶ 182–192, *with* Ex. 2009 ¶¶ 148–182. The analyses provide differing results at least because different conditions for the leaf spring are assumed by the declarants at the outset of their analyses. There is really no way really to reconcile these analyses because the FE analyses, of course, provide different results based on different initial inputs and assumptions. We can, to an extent, assume that both are correct.

Mr. Dilling's initial assumptions about undertaking the FE analysis of a suspension including failure of the leaf spring as well an air spring and shock absorber and dimensions may be presumptively correct under the conditions imposed by Mr. Dilling. However, this does not show that Dr. Wagoner's material characteristics and linear analysis of a leaf spring alone are incorrect, improper, or that Enomoto's leaf spring is incapable of going into tension under the conditions imposed by Dr. Wagoner. Even if Mr. Dilling's analysis is correct based on his initial inputs and assumptions including the air spring and shock absorber, given Dr. Wagoner's persuasive testimony and FE analysis, a person of ordinary skill in the art would also understand that in an installed or uninstalled state, Enomoto's leaf spring is capable of transitioning from compression to tension given the appropriate structural dimensions, material characteristics and vertical displacements upon which Dr. Wagoner relies. *See* Ex. 1033 ¶ 66 (Dr. Wagoner testifying that "one [of skill in the art] would know that routine design of dimensions and materials would be performed for each specific application to match intended displacements and loads for that vehicle.").

65

> *viii.* *Whether Dr. Wagoner properly validated his FE analysis*

Patent Owner argues that unlike Dr. Wagoner, Mr. Dilling "verified the [FEA] process by creating two simple plate FEA models; a flat plate and an arched plate . . . [t]his allowed Dilling to verify model creation, macro creation, and boundary conditions. PO Resp. (citing Ex. 2009, Section X.A, ¶¶ 88, 120, 139). Mr. Dilling explains that validation of his models ensures that "key model dimensions agree with the actual part dimensions," that "material properties [are] correct and [] properly associated to model regions," and that "the applied loads and constraints [are] correct," also that "the deformations and stresses [are] believable." Ex. 2009 ¶ 139.

Dr. Wagoner responds that he did in fact use a verification process for his FE analysis, explaining that

> I used both mesh refinement and a lower-order and higher-order element to confirm that the results were unaffected by refining the resolution of the mesh. The results are shown unequivocally in Figure 8, below. This technique is the gold standard for proving mesh sufficiency for nonlinear problems; it is required by virtually all peer reviewers.

Ex. 1033 ¶ 72. Dr. Wagoner provides a comparison of the results of mesh refinement for his Enomoto model in Figure 8 of his rebuttal declaration, reproduced below.

IPR2022-00278
Patent 9,868,330 B2



*Id.* Figure 8 is described by Dr. Wagoner as a "[c]omparison of Wagoner

FE simulations of Enomoto over the displacement range of interest with

mesh refinement and lower/higher order elements. The results superimpose

with no detectable difference, indicating a sufficient mesh for accuracy." *Id.*

Dr. Wagoner testifies that Dilling's "'validation' was done with small

displacements that don't test the critical handing of geometric nonlinearity.

Furthermore, his small displacement range[] didn't approach the critical

snap-through points that are known to exist for his simple test case that he

found so objectionable in my simulations." *Id.* ¶ 73.

Despite the criticism leveled by the declarants at one another's FE

analysis, both declarants provide certain evidence and testimony tending to

show they undertook a level of verification and validation to ensure their

respective FEA models are accurate. Again, as discussed above, it may be

that both models are accurate based on the initial assumptions made by the

respective declarants. The fact that Mr. Dilling's model of Enomoto's

complete suspension system indicates that the leaf spring would fail, or

67

IPR2022-00278
Patent 9,868,330 B2

never achieve tension based on certain assumptions, does not, however, render Dr. Wagoner's testimony and FE analysis inaccurate, which indicates Enomoto's leaf spring is capable of undergoing tension with sufficient displacement.

*ix.    Patent Owner's criticism of Dr. Wagoner's FEA models exhibiting snap-through*

Patent Owner argues that a person of ordinary skill in the art would understand that snap-through, as shown in Dr. Wagoner's Figure 18 reproduced below, as annotated by Patent Owner, is an undesirable condition.  PO Resp. 17 (citing Ex. 1002, Fig. 18).



Dr. Wagoner's Figure 18 as annotated by Patent Owner circling in red the graphical representation of snap-through data at approximately 30mm of displacement.  *Id.*  Patent Owner, supported by testimony from Mr. Dilling, argues that "[a] POSITA would avoid each of these undesirable conditions

68

IPR2022-00278
Patent 9,868,330 B2

and operate in the region of compressive forces. *Id.* at 16 (citing Ex. 2009 ¶ 18).

Petitioner responds, arguing that "[o]ptimizing leaf spring performance to account for material changes as well as to address any negative spring rate or snap through is a routine task well known to a POSA. Pet. Reply (citing Ex. 1033 ¶ 77). Dr. Wagoner testifies in response that

> I agree with Dilling's statement that such behavior is undesirable in leaf springs, but if the characteristic is present, then the FE analysis must be able to show it. Shallow curved plates (such as one that Dilling used for his "validation" trials) exhibit snap-through when properly modeled, that is, at the displacements where the phenomenon occurs).

Ex. 1033 ¶ 75 (citing https://www.digitalengineering247.com/article/ansys-workbench-19.2/pre-processing-and-meshing). Dr. Wagoner testifies that "the reason that Dilling's plate models did not show snap-through or reversal of end loads is that he considered only very small displacements, in the linear range, well before snap-through occurs." *Id.* ¶ 76. Moreover, Dr. Wagoner explains that "[s]nap-through can be physically eliminated by normal design parameter changes, as one of ordinary skill could readily accomplish." *Id.* ¶ 77, *see also* Ex. 1027, 149:8–17 (Dr. Wagoner testifying in his deposition that "[w]hether the spring has snap-through or not is going to actually be a combination of . . . the shape, and it can be its configuration.").

Dr. Wagoner's testimony that in actuality, "snap-through," can be eliminated in a leaf spring by properly choosing material and design characteristics is unrebutted in this record. Therefore, while the declarants agree that "snap-through" is undesirable, we are not persuaded by Patent Owner's assertions that Dr. Wagoner's FE analyses are somehow

69

IPR2022-00278
Patent 9,868,330 B2

compromised simply because the data for a simple curved plate exhibit "snap-through."

### x.    Patent Owner's additional arguments

Patent Owner makes several additional arguments.  One, that Dr. Wagoner failed to perform a proper travel study of Enomoto.  PO Resp. 37.  Two, that Dr. Wagoner improperly eliminated the pivot connections.  *Id.* at 36.  Three, that Dr. Wagoner only considered steel, and not FRP for the material in his FE analyses, and four that Dr. Wagoner's analysis uses the '330 patent as a roadmap for the obviousness analysis.  We address each of these arguments in turn.

As to a proper travel study, Patent Owner's argument again improperly relies on the assumption that Enomoto's leaf spring in this case must be analyzed in combination with an air spring and a shock absorber which limit leaf spring travel.  *Id.* at 37.  Patent Owner argues that in his deposition "[r]egarding the limits of suspension travel Dr. Wagoner recognized that if tensile loading occurred beyond the limits of suspension travel, then the leaf spring would, in truth, not go into a tensile loading condition."  *Id.* (citing Ex. 2011, 107:5–15).  It may be that in designing a complete suspension system for a vehicle a person of ordinary skill in the art would account for the leaf spring, air spring and shock absorber characteristics together in determining the limits of jounce and rebound, but that is not what the claims in this case require.  As discussed above, we are persuaded that Enomoto discloses a leaf spring, regardless of design factors that could cause it to fail or not reach a deflection where tension would occur, that *inter alia*, is capable of "with an increasing load due to vertical forces from the wheel carrier, is increasingly subjected to tensile loading." Ex. 1001, 12:31–33.

70

Patent Owner further argues that Dr. Wagoner's leaf spring structural assumptions "cut-off" the portion of the beam that formed the eyelets at either end, and asserts that "[s]ince the beam deflections due to vertical load are so vitally important in this analysis, moving the assumed pivot location from the closed end to a cut-off portion of the beam may lead to erroneous results." PO Resp. 36 (citing Ex. 2009 ¶ 106). Mr. Dilling testifies that in view of this "the location of the boundary condition is not at the center of the closed or partially closed ends. Instead, it appears as if the ends were removed from the beam geometry." Ex. 2009 ¶ 106.

Dr. Wagoner explained during his deposition that to account for the pin/pin rotation "what we did was cut the leaf spring off at the section there, and then we have a surface at the end, and we told that surface that it could rotate freely but could not translate. That's the boundary condition we used for the pin end." Ex. 2011, 187:19–24. We appreciate that the eyelets are removed from Dr. Wagoner's FE analyses, but neither Patent Owner nor Mr. Dilling explain why or how the lack of eyelet modeling specifically compromised Dr. Wagoner's analysis, particularly where the ends of Dr. Wagoner's leaf spring could still rotate as in a pin/pin connection. This argument appears as an effort to cast shade on Dr. Wagoner's analysis, but without sufficient evidence as to why it renders Dr. Wagoner's analysis unusable, we do not find that it undermines his credibility or FE analysis in any way.

Considering Patent Owner's assertion that Dr. Wagoner only used steel as a material in his modeling and not FRP, this fact also does not affect our decision. We credit Dr. Wagoner who explains persuasively that

> [t]he choice of material is moot from a purely technical standpoint because the displacement to the C-T transition (the

71

IPR2022-00278
Patent 9,868,330 B2

>only FE result of interest in Issue 6) is independent of the values
>of the elastic constants used.  Therefore, FRP or steel, or any
>other linear elastic material, would give the same result.

Ex. 1033 ¶ 56.  As shown below, Dr. Wagoner reproduces in Figure 5 of his

Rebuttal Declaration Mr. Dilling's Figure 64, comparing FRP and steel as

the material for the FE analysis.  *Id.* ¶ 57.



Dilling's Figure 64, referred to by Dr. Wagoner, showing in the lower graph

for horizontal reaction load vs. displacement that the C-T transition point is

the same for steel and FRP.  Mr. Dilling testifies that analyzing only steel is

a flaw because "a POSITA in the art of suspensions would anticipate a large

difference between the beam stiffnesses and loads, due to the large

differences between Young's Modulus for both materials."  Ex. 2009 ¶ 146.

Dr. Wagoner responds, explaining that "substituting FRP for steel makes no

difference in the C-T transition displacement, as an expert in mechanical engineering should know without any simulation needed. The only difference in each of the results is the magnitudes of forces, which are proportional to the modulus values." *Id.* ¶ 57. Neither Petitioner nor Mr. Dilling explain sufficiently why the different Young's moduli for FRP and steel and resultant proportional beam stiffness and load impacts the C-T transition point showing that both beams are capable of transitioning from compression to tension. Dr. Wagoner's testimony that the C-T transition is the same no matter which material is analyzed is unrebutted on this record and, in fact confirmed by Mr. Dilling's comparison.

Patent Owner argues also that "Wagoner's statements regarding a POSITA's motivation to modify Enomoto's componentry are untethered to any supporting evidence, other than the disclosures of the '330 patent. PO Resp. 51. Weighing the evidence, as we have above, Petitioner has not drawn particularly on the teachings of '330 patent, nor used the patent as a template for its own reconstruction. Petitioner has, in our opinion, set forth challenges based on the state of the art at the time of filing of the application which became the '330 patent—specifically Enomoto, and the person of ordinary skill in the art who understood the function and structure of leaf springs and how FE analysis is used to determine leaf spring characteristics such as C-T transition points, all of which was well-known in the art. *See In re McLaughlin*, 443 F.2d 1392, 1313–1314 (C.C.P.A. 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

73

IPR2022-00278
Patent 9,868,330 B2

As discussed above, for claim 1, the particular characteristic of a progressive spring rate and the transition of a leaf spring from compression to tension is specifically discussed in British Patent No. 1,077,968 to Oldfield explaining that "[t]his spring deflection is accompanied by a shortening of the main part of the spring which in turn tends to straighten out the bend 17 of the spring and applies a longitudinal tensile load in the spring. This tensile load increases with increasing spring deflection."). Ex. 1030. Dr. Wagoner's testimony and explanations regarding progressive spring rate characteristics are consistent with the prior art, for example Dr. Wagoner testifies that for a leaf spring with pinned ends "there will be a reaction force at the ends required to compress or elongate the spring length to maintain a common distance between the end points as the center is displaced upward." Ex. 1002 ¶ 94.

Additionally, Patent Owner argues that "Petitioner uses hindsight to substitute FRP for steel in Enomoto. While FRP was known to be used in leaf springs it was also known to be more expensive compared to steel as well as much more flexible than steel." PO Resp. 5 (citing Ex. 2009 ¶ 199). Patent Owner also argues that Petitioner's reasoning that Enomoto's joint is a point of failure and would benefit from a single piece FRP leaf spring, is incorrect because "Enomoto's joint is not a point of failure . . . [i]ndeed Enomoto indicates that its two piece design was made in response to a prior one piece design of the same shape." *Id.* (citing Ex. 1025, 5–6).

Petitioner responds, pointing out that "Dr. Wagoner accurately noted any joint as a potential point of weakness (stress riser), the primary motivation for substituting a single-leaf FRP spring for a multiple section leaf spring is reduction in parts and elimination of fasteners, thereby reducing cost and manufacturing complexity. Pet. Reply 26 (citing

74

IPR2022-00278
Patent 9,868,330 B2

Ex. 1002, ¶ 153).  We note that besides this point of failure argument,

Dr. Wagoner testifies that

> [f]irst, FRP eliminates the need for any heat treatment, a goal of
> Enomoto. Second, the ability to shape FRP readily into a wide
> range of designs also allows integration of the two leaves of
> Enomoto into a single, leaf spring, thus reducing the number of
> parts, eliminating fasteners, reducing costs and simplifying
> manufacturing, all through the simple substitution of one well
> known material for the only other well-known material.  Thus,
> adopting FRP for the Enomoto design would be known to a
> POSITA as a win-win change motivated by the teachings and
> objectives of Enomoto: eliminate manufacturing steps, simplify
> the manufacturing, and reduce overall costs while increasing
> reliability.

Ex. 1002 ¶ 153.  It is unrebutted on this record that FRP and steel are the

two primary materials used for vehicle leaf springs.  Clearly the prior art to

the '330 patent contemplates the use of FRP as a known material for

progressive leaf springs.  *See* Ex. 1001, Abstract (Greco describing "[a]

fiberglass composite monoleaf bow spring for use in a vehicle chassis

system."), *see also In re Leshin*, 277 F.2d 197, 199 (CCPA 1960) (the

selection of a known material based upon its suitability for the intended use

is a design consideration within the skill of the art).

Despite the higher cost of FRP compared to steel, we find

Dr. Wagoner's testimony persuasive that "[a] POSITA would understand

that the shaping/contouring approach is practical with either steel [Enomoto]

or FRP [Greco, Schurmann] leaf springs.  The primary difference governing

the choice is the higher cost of FRP but with weight saving and better

flexibility in manufacturing of highly contoured and shaped configurations."

Ex. 1002 ¶ 87, *see also KSR*, 550 U.S. at 416 ([W]hen a patent claims a

structure already known in the prior art that is altered by the mere

75

IPR2022-00278
Patent 9,868,330 B2

substitution of one element for another known in the field, the combination must do more than yield a predictable result . . . [W]hen a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.").

Patent Owner has not presented any persuasive evidence or pointed us to compelling testimony from Mr. Dilling that a person of ordinary skill in the art would have found replacing a steel leaf spring with an FRP leaf spring particularly difficult or beyond the level of ordinary skill in the art. In fact, evidence appears to show that substituting plastics and polymer composites for steel in the automotive industry has increased significantly since 1960. Ex. 1002 ¶ 68 (Dr. Wagoner referring to data from American Chemical Council 2019), *see also id.* ¶ 76 (Dr. Wagoner testifying that "[b]y 2015, 1.3 million FRP leaf springs had been installed in Daimler vehicles, reportedly with 'zero rejection rate and no customer complaints[,]' and by 2019 more than 1 million FRP leaf springs had been installed in Volvo cars.") (citing https://www.compositesworld.com/news/sgl-carbon-delivers-millionth-composite-leaf-spring-to-volvo).

We do not find Petitioner's arguments, nor Dr. Wagoner's testimony as to Enomoto's teaching and the knowledge of a person or ordinary skill in the art with respect to substitution of FRP for steel leaf springs, and all of which relies on explicit prior art teachings and supporting evidence, to be based on improper hindsight.

    *(c)  Conclusion as to Patent Owner's arguments that a*
        *person of ordinary skill in the art would not have*

76

IPR2022-00278
Patent 9,868,330 B2

> *understood Enomoto's leaf spring to transition from*
> *compression to tensile loading with increasing load.*

We are persuaded that Petitioner and Dr. Wagoner have shown that a person of ordinary skill in the art would have understood Enomoto's leaf spring as it constrained by a pinned/pinned connection at each end to be configured to transition from compression to tension "due to vertical forces introduced from the wheel carrier" as recited in independent claim 1.

We reproduce below a comparison of Figure 6(c) from the '330 patent with Enomoto's Figure 3.



Figure 6C (above-top) from the '330 patent depicting leaf spring 8 is shown in direct comparison to leaf spring 25 illustrated in Enomoto's Figure 3 (above-bottom). As an initial matter, in comparing the above figures, we are compelled to credit Dr. Wagoner's testimony that is a person of ordinary skill in the art would have understood the concept of progressive leaf spring

77

IPR2022-00278
Patent 9,868,330 B2

operation, for example as shown by Dr. Wagoner's reference to Figure 39 of
SAE Manual 1944 reproduced below.



Figure 39 of SAE Manual 1944 is shown illustrating deflecting force P
moving the leaf spring between three exemplary spring states, a lower
unloaded state, a generally flat, deflected middle state, and an upwardly
bowed larger deflected state. Considering the SAE Manual 1944 and
referring to his Figure 13(a)-(b), Dr. Wagoner testifies, persuasively, that
"the principles of the three main spring states 1, 3, and 5 [unloaded, flat, and
upwardly bowed] are long-established and would be understood by anyone
with ordinary skill in the leaf spring art, as exemplified for example by a
sketch in an early leaf spring design manual [SAE Manual 1944]."

We credit Dr. Wagoner's testimony and explanations, because, as
discussed above, they are consistent with the prior art and known
progressive spring rate characteristics and the transition of a leaf spring from
compression to tension as specifically discussed, for example, in British
Patent No. 1,077,968 to Oldfield explaining that "[t]his spring deflection is
accompanied by a shortening of the main part of the spring which in turn
tends to straighten out the bend 17 of the spring and applies a longitudinal

78

IPR2022-00278
Patent 9,868,330 B2

tensile load in the spring. This tensile load increases with increasing spring deflection."). Ex. 1030. We do not credit Mr. Dilling's testimony in this case at least because it relies upon Patent Owner's incorrect assumption that "the tensile loading must flow from the leaf spring in the installed state" and because that "installed state" supposedly defines failure of the leaf spring, as well as an air spring in Mr. Dilling's analysis. PO Resp. 49. We determined in our claim construction that statements of intended use, like "in the installed state" in an apparatus claim do not distinguish the claim over the prior art apparatus, and that Petitioner and Dr. Wagoner have shown persuasively that Enomoto is capable of transitioning from the compressive to the tensile state either on its own, or in an installed state. *In re Sinex*, 309 F.2d 488, 492 (CCPA 1962).

### (d)  Conclusion as to independent claim 1

Based on the complete record before us and for the reasons expressed above, we are persuaded that Petitioner has shown a preponderance of evidence that claim 1 would have been obvious in view of Enomoto.

### 3.  Dependent claims 2–5, 8, 10–14 and 17

Petitioner argues that dependent claims 2–5, 8, 10–14 and 17 would have been unpatentable in view of Enomoto. Pet. 42–63. Petitioner has shown, on an element-by-element basis, how Enomoto teaches the subject matter of each dependent claim. *Id.*

Patent Owner argues that "[c]laims 2–5, 8, 10–14 and 17 all depend from claim 1. The patentability of claim 1 should be confirmed for the reasons stated above." PO Resp. 55.

We have considered, and on the complete record in the proceeding, find persuasive Petitioner's arguments and evidence set forth at pages 42–63 of the Petition. Accordingly, we determine that Petitioner has shown

79

preponderant evidence that claims 2–5, 8, 10–14 and 17 would have been obvious in view of Enomoto.

### (a)  Dependent claim 8

Patent Owner argues for claim 8 that "the entirety of Wagoner's analysis of claim 8 is unreliable because it is premised on 5deg of travel and as Dilling points out, Hahn's pin/fixed embodiment has a possible rotation of 27deg in Wagoner's own Figure." *Id.*

Claim 8 recites in part "the associated end portion to be pivotable by at least one of a minimum of up to 10° and a maximum of up to 60° around the pivot axis." Ex. 1001, 13:7–9. Regardless of Dr. Wagoner's discussion in his declaration of "a total unfettered rotation angle of 5°," (Ex. 1002 ¶ 222) as Mr. Dilling points out, Wagoner's Figure 36 appears to show rotation of the '330 patent's leaf spring on the left side at 27 (i.e., 16+11) degrees. Ex. 2009 ¶ 204. 27 degrees falls within the claimed range of 10 to 60 degrees.[9] Moreover, where there is no evidence or argument that the rotations are some type of critical or novel range, we credit Dr. Wagoner's testimony, that is unrebutted on this record that "[t]he baseline pivotable mounting, known to all POSITAs, would allow pivoting over a range of angles limited primarily by the geometry of installation." Ex. 1002 ¶ 222.

Accordingly, we determine that Petitioner has shown preponderant evidence that claim 8 would have been obvious in view of Enomoto.

---

[9] Claim 8 is oddly worded, calling for ". . . a minimum of up to 10°," whereas the specification describes "a minimum of 10° and/or up to a maximum of 60°." Ex. 1001, 3:35–39. The parties do not expressly dispute that the range includes 10–60 degrees.

80

IPR2022-00278
Patent 9,868,330 B2

### (b) Dependent claim 10

Claim 10 requires that the leaf spring portion is designed such that upon application of vertical forces introduced from the wheel carrier it "is subjected to pressure loading in a first spring travel range and is subjected to tensile loading in a second spring travel range." Ex. 1001, 13:13–18. Patent Owner argues that "[f]or the reasons noted above Enomoto does not achieve tensile loading at any point during its spring travel. Rather, the leaf spring of Enomoto remains in compression in response to increasing vertical loads throughout that travel." PO Resp. 56 (citing Ex. 2009 ¶¶191, 208).

As we discussed above, we credit Dr. Wagoner's FE analysis and testimony over that of Mr. Dilling, and we are persuaded that Enomoto's leaf spring is capable of transitioning from compression to tension at the C-T transition point. *See, e.g.*, Ex. 1002 ¶¶ 182–186. We have considered, and on the complete record at this point in the proceeding, find persuasive Petitioner's arguments and evidence set forth at pages 64–68 of the Petition. Accordingly, we determine that Petitioner has shown preponderant evidence that claim 10 would have been obvious in view of Enomoto.

### 4. Ground 2: Claim 15 – Obviousness over Enomoto and Glover (Ex. 1018)

We determine that claim 15 would have been obvious over Enomoto and Glover for the reasons explained below.

### (a) Glover (Ex.1018)

Glover, titled "Composite Leaf Spring and Method of Making Same," issued as U.S. Patent 9,765,838 B3 on September 19, 2017, from U.S. Application No. 12/991,999, filed as the U.S. National Stage of PCT/CA 2011/050751 on December 6, 2011; Glover ultimately indicates priority to a

81

IPR2022-00278
Patent 9,868,330 B2

U.S. Provisional application No. 61/420,085, filed on December 6, 2010.
Ex. 1018, codes (10), (45), (21), (22), (30), (54), (60).

Glover discloses a composite leaf spring 10, where, for attachment to a vehicle frame, "[a] pair of eyelets 12 is attached [] one to either end of the composite leaf spring.  Eyelets 12 are attached to the composite leaf sprin[g] 10 with bolts 15."  *Id.* at 4:44–46.  Glover's Figure 1 is reproduced below.



FIG. 1

Glover's Figure 1, above, illustrates composite leaf spring 10, eyelets 12, and bolts 15.

> *(b) Dependent Claim 15*

Claim 15 depends directly from claim 1 and recites "[t]he leaf spring assembly of claim 1, wherein at least one of the first end portion and the second end portion is unmachined." Ex. 1001, 14:8–10.  Petitioner argues that "[t]he '330 Patent describes 'unmachined' ends to be 'bore-free'. . .  In other words, the ends of the leaf spring disclosed by the '330 Patent are flat in the 'unmachined' claimed embodiment."  Pet. 63 (citing Ex. 1001, 5:13–16).  According to Petitioner, "Glover is one example of composite eyelets

82

IPR2022-00278
Patent 9,868,330 B2

that can be utilized and attached to flat ends of a composite material leaf spring that facilitates rotation of the leaf spring in an installed assembly." *Id.* at 64 (citing Ex. 1018, 2:14–16; 4:44–50). Petitioner contends that a person of ordinary skill in the art "would have been motivated to form separate pivoting eyes and then attach them to the ends of the leaf composite leaf spring of Glover as they would perform the same as integrally formed eyes and would overcome any disadvantages associated with forming eyes from a fiber-reinforced plastic as one piece with the leaf spring." *Id.* at 64 (citing Ex. 1002 ¶¶ 260–262). Patent Owner does not substantively address claim 15 or Petitioner's arguments. Prelim. Resp. 56.

As noted, claim 15 requires at least one end portion to be "unmachined." The parties do not define "unmachined." Considering Figure 1A, the '330 patent describes in one embodiment receiving device 4 having bearing means 17 and clamping member 18 for clamping the first end portion of the leaf spring. Ex. 1001, 8:33–38. It further describes that

> [t]he first end portion 5 of the leaf spring 3 is wedge-shaped and its thickness increases towards its end. In this way, the end portion 5 is effectively prevented from slipping out of the first receiving device 4, even if the leaf spring is under maximum load.

*Id.* at 8:38–42. This embodiment, consistent with at least Figures 1A–C, appears to disclose that the end portion 5 is secured only by clamping. Such an embodiment is within the scope covered by claim 15.

Petitioner argues that a person of ordinary skill in the art, when considering using FRP as a leaf spring material, would have considered along with Enomoto "alternative ways to provide eyes on the ends of Enomoto's spring to maintain pivoting capability of the leaf spring ends. Pet. 64 (citing Ex. 1002 ¶¶ 260–262). And, considering Glover, "[a] POSA

83

would have been motivated to form separate pivoting eyes and then attach them to the ends of the leaf composite leaf spring of Glover as they would perform the same as integrally formed eyes and would overcome any disadvantages associated with forming eyes from a fiber reinforced plastic as one piece with the leaf spring." Pet. 64 (citing Ex. 1002 ¶¶260–262). Patent Owner does not offer any arguments with respect to claim 15. *See, generally* PO Resp.

We find that Petitioner has provided sufficient articulated reasons supported by evidentiary underpinnings to combine Enomoto, the knowledge of one of skill of art regarding FRP as a leaf spring material, and Glover. Glover itself describes a composite leaf spring, and explains for example that for a composite leaf spring to be supported on pinned/pinned connection "[a] pair of eyelets 12 is attached to one to either end of the composite leaf spring . Eyelets 12 are attached to the composite leaf sprint 10 with bolts 15." Ex. 1018 4:44–46. *See KSR*, 550 U.S. at 415-16 (a "patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.") (*quoting Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152-153 (1950)).

We have considered, and on the complete record find persuasive Petitioner's arguments and evidence set forth at pages 63–65 of the Petition. Accordingly, we determine that Petitioner has shown preponderant evidence that claim 15 would have been obvious in view of Enomoto and Glover.

84

### E. Patent Owner's Motion to Exclude

Patent Owner moves to exclude the following exhibits, or portions thereof: Exhibits 1002, 1027, 1029, 1030, 1032, and 1033. Paper 31. We *deny* Patent Owner's Motion to Exclude for the following reasons.

#### 1. Ex. 1002

Patent Owner moves to exclude paragraphs 77, 104–105, 106–119, and 182–192 of Dr. Wagoner's declaration testimony (Ex. 1002) under FRE 402–403 and 702–703. Paper 31, 2–5.

Patent Owner argues that Dr. Wagoner's declaration paragraph 77 is based on inadmissible hearsay under FRE 703. *Id.* In paragraph 77, item 4, Dr. Wagoner cited to two references at footnotes 9 and 10 for support of his testimony that "there were no fundamental engineering issues remaining with the design, production, or use of FRP leaf springs, and that in fact millions had already been made and sold." Ex. 1002 ¶ 77.

Considering FRE 703, Patent Owner has not provided any persuasive evidence or argument that the online website references, which are published blog articles, compiling data about FRP leaf spring use in vehicles relied on by Dr. Wagoner are not admissible as exceptions to the hearsay rule as market reports and commercial publications under FRE 803(c)(17) and would not have been reasonably relied upon by an expert in the field. Paper 31, 2–5. Therefore, we find that these references are information that an expert would rely upon, and determine that they are admissible under FRE 703.

Even assuming for the sake of argument they are inadmissible hearsay, leading up to paragraph 77, as Petitioner points out, Dr. Wagoner "provided extensive support for his determination that millions of FRP leaf springs had already been made and sold for vehicles by 2013 in his

85

IPR2022-00278
Patent 9,868,330 B2

discussion leading to the conclusions offered in ¶77." Paper 33, 3–4. Dr. Wagoner's testimony details and cites to relevant patents in the respective time frames along with the development and use of FRP in place of steel leaf springs starting from the 1960's to the present. Ex. 1002 ¶ 59–69. As discussed above, Dr. Wagoner is undoubtedly a person of more than ordinary skill in the art, he worked at General Motors Research Laboratories, is a member of the Society of Automotive Engineers, and has extensive knowledge and experience in the testing and analysis of automotive components and we find his opinions and conclusions entitled to certain weight based on his extensive expertise and the history of FRP progressive leaf spring development which is probative as to the use of FRP in the automotive industry for leaf springs.

With respect to Dr. Wagoner's declaration paragraphs 104–105, Patent Owner argues that Dr. Wagoner's "visualization methodology" and graphs at Figure 15 of his declaration should be excluded under FRE 403, 702. Patent Owner argues specifically that the graphs at Figure 15 conflict with the computer simulation graphs at Dr. Wagoner's Figure 18 and therefore "the probative value is substantially outweighed by the danger of confusing the issues and misleading the Board." Paper 31, 4.

We are not persuaded that the differences between graphs in Figures 15(a)–(b) and Figures 18(a)–(b) obfuscate any issues in this case. Dr. Wagoner explained clearly using Figure 15(b) that a person of ordinary skill in the art would understand *conceptually* that, for a pinned/pinned progressive leaf spring, "the horizontal reaction forces would be expected to become zero when the unconstrained spring attains its initial length. This is shown in green on Figure 15(b) and is labelled the Compression-Tension Transition point." Ex. 1002 ¶ 105. Dr. Wagoner then provides in Figure

86

IPR2022-00278
Patent 9,868,330 B2

18(b) a similar compression-to-tension transition point in the FEA results of a simple leaf spring, including a result consistent with the conceptual figure that "[t]he transition of horizontal reaction forces from compression to tension occurs at approximately 32mm of vertical displacement." *Id.* ¶ 112.

For paragraphs 106–119 of Dr. Wagoner's declaration testimony, Patent Owner argues that these paragraphs should also be excluded under FRE 403 and 702.  Paper 31, 4–5.  Patent Owner argues that "Wagoner does not provide any support to suggest that the testimony in these paragraphs is based on sufficient facts or data, that the testimony is the product of reliable principles and methods." *Id.* at 4.  Patent Owner asserts that Dr. Wagoner failed to examine forces in his FEA and "did not check for stress limits and how close you get to failure." *Id.*

However, we are persuaded, as Petitioner argues in its response, that

¶¶106–119 of Wagoner I contain a detailed discussion of Wagoner's computer simulation methodology and summary of results.  Specifically, Wagoner modeled and simulated leaf springs with various end fixing configurations.  Wagoner has decades of experience with finite element modeling and analysis and has a prolific CV in this regard with numerous honors, awards, grants, publications and work experience.

Paper 32, 5 (citing Ex. 1002).  In addition, as discussed above, Patent Owner has not explained why a determination of forces and stress limits was necessary for Dr. Wagoner's analyses, particularly when such characteristics have no bearing on the claims of the '330 patent.  Patent Owner's argument may go to the weight of the evidence, but they are not a basis to exclude Dr. Wagoner's FEA analyses.  On the complete record before us, we determine that Wagoner's FEA methodology and opinions offered in paragraphs 106–119 comply with Rule 702 and therefore we do not exclude them.

87

Patent Owner argues next that we should exclude Dr. Wagoner's declaration paragraphs 182–192, also under FRE 403 and 702, because they cite to the declaration's paragraphs 106–119. Paper 31, 5. Because we determine, as discussed above, that paragraphs 106–119 are admissible, and because Patent Owner has not asserted any other basis to exclude them, paragraphs 182–192 are also admissible.

Therefore, we *deny* Patent Owner's Motion to Exclude Exhibit 1002.

### 2. Ex. 1027

Patent Owner argues that we should exclude a portion of Mr. Dilling's testimony from his deposition under FRE 403 because "[t]he question asked by Petitioner is not specific to the air spring and leaf spring of Enomoto, but instead asked Mr. Dilling whether different types of air springs could be used in different suspensions with a leaf spring." Paper 31, 6 (quoting Ex. 1027, 127:19–128:10. Because we do not rely on any part of the questioning or answers provided by Mr. Dilling in this portion of his deposition, the Motion to Exclude Exhibit 1027 is *dismissed* as moot.

### 3. Exhibit 1029

We do not rely on Exhibit 1029 in our Decision. Accordingly, Patent Owner's Motion to Exclude Exhibit 1029 is *dismissed* as moot.

### 4. Exhibit 1030

Patent Owner argues that Exhibit 1030 (Oldfield) is irrelevant under FRE 403 because "Petitioner failed to comply with 37 C.F.R. 42.123 by not seeking authorization from the Board to submit supplemental information prior to serving Ex. 1030. Paper 31, 8.

Oldfield is a prior art reference including specific explanations of the concept of a pinned/pinned leaf spring transitioning from compression to tension. *See* Ex. 1030 21:43–2:54. Petitioner submitted Oldfield with its

88

IPR2022-00278
Patent 9,868,330 B2

Petitioner's Reply to Patent Owner's Response. Pet. Reply 9, 14. The Oldfield reference was provided in response to Patent Owner's challenges to Dr. Wagoner's historical and technological explanations that progressive leaf springs transitioning from compression to tension were well known in the art. This reference and citations to Oldfield were in direct response to Patent Owner's assertions that "Wagoner also wrongly claims that *any* pin/pin leaf springs will transition to tensile loading – if deflected a sufficient distance." PO Resp. 4. To this end, the Federal Circuit has explained that evidence presented in a reply that is legitimately responsive to an argument is allowable in *inter partes* review proceedings. *See VidStream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1065 (Fed. Cir. 2020) (The Federal Circuit explaining that the Board has broad discretion to regulate the presentation of evidence and "it was appropriate to permit Twitter to respond to *VidStream's* challenge by providing additional evidence to establish the Bradford publication date.").

Even if Patent Owner's argument here based on 37 C.F.R. 42.123 can be shoehorned in to a motion to exclude under FRE 403, we determine that Oldfield is relevant to Petitioner's arguments and Dr. Wagoner's testimony that leaf spring were known to transition from compression to tensile forces upon sufficient deflection, And, Patent Owner was given the opportunity to respond to Oldfield in its Sur-Reply, which it did. Paper 30, 24. *See VidStream*, 981 F.3d at 1065 (The Court explaining that "we conclude that the Board acted appropriately, for the Board permitted both sides to provide evidence concerning the reference date of the Bradford book, in pursuit of the correct answer.").

Therefore, we *deny* Patent Owner's Motion to Exclude Exhibit 1030.

89

IPR2022-00278
Patent 9,868,330 B2

### 5. Ex. 1032

We do not substantively rely on Exhibit 1032 in our Decision. Accordingly, Patent Owner's Motion to Exclude Exhibit 1032 is *dismissed* as moot.

### 6. Ex. 1033

In our Decision, we refer to three of Dr. Wagoner's paragraphs, paragraphs 21, 75, and 77 from Exhibit 1033, which Patent Owner contends should be excluded under at least one of FRE 402–403, 702–703, and 802. Paper 31, 9–14. Considering Patent Owner's arguments as to paragraph 21, namely that Dr. Wagoner "has not testified that he was made aware of or personally observed that suspension systems have such travel ranges," again, Dr. Wagoner is experienced in automotive component analysis, and materials testing and we accord his testimony certain weight. Ex. 1002 ¶¶ 5–17. That Patent Owner does not agree with Dr. Wagoner's testimony based on his experience, expertise, and technical knowledge of leaf springs and suspension systems and leaf spring travel distances, is not a sufficient reason to exclude it. To the extent that the webpage which Dr. Wagoner refers to in paragraph 21 is admissible or not, the information is helpful in evaluating Dr. Wagoner's testimony as to the level, skill, and knowledge of those of ordinary skill in the art and substantially outweighs any prejudicial effect to Patent Owner.

With respect to paragraphs 75 and 77, we do not rely on these paragraphs as disparagement of Mr. Dilling's analysis in any manner, but mainly for the agreement between Mr. Dilling and Dr. Wagoner that "snap-through" exists under certain circumstances in leaf spring deformation. *See* Section D.2.(b).ix ("while the declarants agree that "snap-through" is undesirable, we are not persuaded by Patent Owner's assertions that

90

IPR2022-00278
Patent 9,868,330 B2

Dr. Wagoner's FE analyses are somehow compromised simply because the data for a simple curved plate exhibit "snap-through."). Again, Patent Owner's arguments go to the weight to be accorded to the evidence. The Board is capable of determining and assigning the appropriate weight to the evidence and is not, in this case, a persuasive reason to exclude it.

For these reasons, we *deny* Patent Owner's Motion to Exclude Exhibit 1033.

### F. Patent Owner's Motion to Strike

Patent Owner also filed a Motion to Strike Exhibits 1029, 1030, 1032, 1033 and related arguments in Petitioner's Reply as improper under 37 C.F.R. §§ 42.23 and 42.123. Paper 26. Petitioner filed an Opposition to Petitioner's Motion to Strike. Paper 27. We did not rely on Exhibits 1029 and 1032 and, thus, the Motion to Strike with respect to these exhibits is *dismissed* as moot.

For Exhibit 1030, as discussed above with respect to the Motion to Dismiss we do not find Oldfield untimely or a new basis for invalidity as it was provided by Petitioner in response to Patent Owner's contentions as to leaf spring compression to tension transition points. As for Exhibit 1033, and relevant paragraphs to which we refer, these paragraphs were also legitimately provided as rebuttal testimony in response to Patent Owner's arguments and Mr. Dilling's testimony in the Patent Owner Response and are therefore not new arguments or bases for invalidity. Overall, we agree with, and accept Petitioner's responses in this case, as proper responses under 37 C.F.R. §§ 42.23 to Patent Owner's arguments. Specifically, we agree that Petitioner's responses, as set forth in Petitioner's table at pages 4–5 of Petitioner's Opposition to Patent Owner's Motion to Strike, are

91

IPR2022-00278
Patent 9,868,330 B2

appropriate responses to Patent Owner's juxtaposed arguments in the table.
Paper 27, 4–5.

For these reasons, we *deny* Patent Owner's Motion to Strike Exhibits
1030 and 1033.

### III. CONCLUSION[10]

For the reasons discussed above, we determine Petitioner meets its
burden of establishing, by a preponderance of the evidence, that the
challenged claims are unpatentable, as summarized in the following table:

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 8, 10–14, 17 | 103(a) | Enomoto | 1–5, 8, 10–14, 17 | |
| 15 | 103(a) | Enomoto, Glover | 15 | |
| **Overall Outcome** | | | 1–5, 8, 10–15, 17 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg.
16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

92

IPR2022-00278
Patent 9,868,330 B2

## IV. ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, claims 1–5, 8, 10–15, and 17 of U.S. Patent 9,868,330 B2 have been shown to be unpatentable;

FURTHER ORDERED, that Patent Owner's Motion to Exclude is denied in-part and dismissed in-part;

FURTHER ORDERED, that Patent Owner's Motion to Strike is denied in-part and dismissed in-part; and

FURTHER ORDERED that, because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

93

IPR2022-00278
Patent 9,868,330 B2

For PETITIONER:

John Artz
Paul A. Rodriguez
DICKINSON WRIGHT PLLC
jsartz@dickinsonwright.com
prodriguez@diskinsonwright.com

For PATENT OWNER:

Thomas E. Bejin
Charles A. Bieneman
William K. Broman
BEJIN BIENEMAN PLC
bejin@b2iplaw.com
bieneman@b2iplaw.com
broman@b2iplaw.com

94



US009868330B2

(12) **United States Patent**
Hahn et al.

(10) Patent No.: **US 9,868,330 B2**
(45) Date of Patent: **Jan. 16, 2018**

(54) **LEAF SPRING ASSEMBLY FOR MOTOR VEHICLES**

(71) Applicant: **Muhr und Bender KG**, Attendorn (DE)

(72) Inventors: **Christoph Hahn**, Attendorn (DE); **Rainer Forster**, Odenthal (DE); **Vladimir Kobelev**, Attendorn (DE); **David Muller**, Lennestadt (DE); **Lutz Manke**, Hagen (DE)

(73) Assignee: **Muhr und Bender KG**, Attendorn (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/905,840**

(22) PCT Filed: **Jul. 23, 2014**

(86) PCT No.: **PCT/EP2014/065801**
§ 371 (c)(1),
(2) Date: **Jan. 18, 2016**

(87) PCT Pub. No.: **WO2015/011181**
PCT Pub. Date: **Jan. 29, 2015**

(65) **Prior Publication Data**
US 2016/0159181 A1    Jun. 9, 2016

(30) **Foreign Application Priority Data**
Jul. 23, 2013    (DE) ....................... 10 2013 107 889

(51) **Int. Cl.**
**B60G 11/02**        (2006.01)
**B60G 11/04**        (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. **B60G 11/04** (2013.01); **B60G 11/12** (2013.01); **F16F 1/3686** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... F16F 1/185; F16F 2224/0241; B60G 7/04; B60G 11/02; B60G 11/04; B60G 11/107; B60G 2202/112; B60G 2206/408
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,182,181 A    5/1916 Laycock
3,022,991 A    2/1962 Billard
(Continued)

FOREIGN PATENT DOCUMENTS

DE    898154 A1    11/1953
DE    3613804 C1    7/1987
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion for PCT/EP2014/065801 dated Oct. 30, 2014 (with English translation; 16 pages).
(Continued)

*Primary Examiner* — Christopher P Schwartz
(74) *Attorney, Agent, or Firm* — Bejin Bieneman PLC

(57) **ABSTRACT**

A leaf spring assembly for a wheel suspension of a motor vehicle comprises a leaf spring of fibre-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle. The leaf spring comprises a first end portion, a spring portion, a bendable portion and a second end portion. The leaf spring further comprises a first receiving device for supporting the first end portion and a second receiving device for supporting a second end portion. The first receiving device and the second receiving device are designed such that the first end portion and the second end portion are held in a non-displaceable way relative to one another. At least one of the first and second receiving devices are designed such that the respective associated end portion is supported in a moment-free way in the receiving device.

**18 Claims, 6 Drawing Sheets**



RASSINI EX. 1001; Pg 1
Rassini v. Muhr IPR2022-00278

**US 9,868,330 B2**

Page 2

(51) **Int. Cl.**
    *F16F 1/368*            (2006.01)
    *B60G 11/12*            (2006.01)
(52) **U.S. Cl.**
    CPC .. *B60G 2202/112* (2013.01); *B60G 2206/428*
        (2013.01); *B60G 2206/7101* (2013.01)
(58) **Field of Classification Search**
    USPC ....... 267/25, 36.1, 40, 43–47, 53, 260, 261;
                280/124.11, 124.17–124.175
    See application file for complete search history.

(56)                **References Cited**

                U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,685,812 A | | 8/1972 | Buchesky et al. |
| 4,512,559 A | * | 4/1985 | Aoyama ............... B60G 11/113 |
| | | | 267/158 |
| 4,637,594 A | * | 1/1987 | Saito ..................... F16F 1/185 |
| | | | 267/158 |
| 4,802,659 A | | 2/1989 | Hope |
| 4,969,633 A | * | 11/1990 | Ryan ................... B29C 33/005 |
| | | | 267/149 |
| 5,161,785 A | * | 11/1992 | Ingvarsson ............ B60G 11/04 |
| | | | 267/45 |
| 5,351,986 A | * | 10/1994 | Hedenberg ........... B60G 11/465 |
| | | | 267/31 |
| 6,361,026 B2 | * | 3/2002 | Reast ............................ 267/47 |
| 6,428,025 B1 | | 8/2002 | Suh |
| 6,435,485 B1 | * | 8/2002 | Greco ..................... F16F 1/185 |
| | | | 267/148 |
| 2002/0101012 A1 | | 8/2002 | Greco |

| | | | |
|---|---|---|---|
| 2003/0080527 A1 | | 5/2003 | Bryant |
| 2005/0051933 A1 | * | 3/2005 | Platner ....................... B60G 7/04 |
| | | | 267/38 |
| 2006/0103103 A1 | * | 5/2006 | Land ......................... B60G 7/02 |
| | | | 280/124.163 |
| 2008/0252033 A1 | | 10/2008 | Platner et al. |
| 2013/0049271 A1 | * | 2/2013 | Schurmann ........... B60G 11/10 |
| | | | 267/47 |
| 2013/0127133 A1 | | 5/2013 | Enomoto et al. |

                FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 3637281 A1 | 1/1988 |
| DE | 4411286 C2 | 8/1999 |
| DE | 10202114 A1 | 9/2002 |
| DE | 102009015662 B3 | 10/2010 |
| DE | 10 2009 032919 A1 | 2/2011 |
| DE | 10 2010 015951 A1 | 9/2011 |
| EP | 0425880 A1 | 5/1991 |
| EP | 0752934 B1 | 7/2000 |
| EP | 2570694 A1 | 3/2013 |
| JP | S62-258804 A | 11/1987 |
| JP | H03-19626 A | 4/1991 |
| JP | 2002-059725 A | 2/2002 |
| JP | 2004-306805 A | 11/2004 |
| JP | 2012-051403 A | 3/2012 |
| WO | 9003281 A1 | 4/1990 |

                OTHER PUBLICATIONS

SAE, AE-11 Spring Design Manual, Jan. 1, 1990, Chapter 6,
Society of Automotive Engineers, Inc., Warrendale, PA (US).

* cited by examiner

RASSINI EX. 1001; Pg 2
Rassini v. Muhr IPR2022-00278



Figure 1A

Figure 1B

Figure 1C

RASSINI EX. 1001; Pg 3
Rassini v. Muhr IPR2022-00278



Figure 2

RASSINI EX. 1001; Pg 4
Rassini v. Muhr IPR2022-00278



Figure 3A

Figure 3B

Figure 3C

Figure 3D

Figure 3E

Figure 3F

RASSINI EX. 1001; Pg 5
Rassini v. Muhr IPR2022-00278

Appx198



**Figure 4**

RASSINI EX. 1001; Pg 6
Rassini v. Muhr IPR2022-00278



Figure 5A

Figure 5B

Figure 5C

RASSINI EX. 1001; Pg 7
Rassini v. Muhr IPR2022-00278

Appx200



Figure 6A

Figure 6B

Figure 6C

RASSINI EX. 1001; Pg 8
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

**1**

# LEAF SPRING ASSEMBLY FOR MOTOR VEHICLES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a national stage of, and claims priority to, Patent Cooperation Treaty Application No. PCT/EP2014/065801, filed on Jul. 23, 2014, which claims priority to German Application No. DE 10 2013 107 889.3 filed on Jul. 23, 2013, each of which applications are hereby incorporated by reference in their entireties.

## BACKGROUND

From DE 10 201 0 015 951 A1 there is known a leaf spring for motor vehicles which is produced from fibre-reinforced plastics. The leaf spring shall accommodate any lateral guiding forces and transfer those to a leaf spring receiving device. The leaf spring comprises a bending joint portion and a spring portion, wherein the bending joint portion is able to compensate for a change in length of the spring portion. Both ends of the leaf spring are fixed in the leaf spring receiving device in a moment-resistant and non-displaceable way.

From DE 102 02 114 A1 a fiberglass composite monoleaf bow spring for use in a vehicle chassis system is known. The ends of the bow spring are connected to the vehicle frame by pinned end attachments and in the middle secured to an axle. The bow spring has a curved form which is symmetric around a central vertical axis. The spring comprises a central upwardly curved region which is arranged between two downwardly curved regions that are arranged between two more upwardly curved regions. The bow spring is compressed under load, i.e. subjected to pressure loads.

U.S. 2008/0252033 A1 proposes a leaf spring for a wheel suspension of a motor vehicle. The leaf spring is produced from fibre-reinforced plastics and, at its ends, it is connected to resilient members which, in turn, are fixed to the chassis of the motor vehicle. In one embodiment, the ends are bent upwardly and are each supported in a resilient bush so as to be pivotable around a longitudinal axis of the motor vehicle.

From DE 10 2009 032 919 A1 there is known a spring assembly with a leaf spring made from a fibre composite material. The leaf spring comprises a central portion and two adjoining end portions which are each received in a bearing block. For changing the spring characteristic, one of the bearing blocks is provided with supporting means against which the leaf spring can rest when under load.

DE 898 154 A1 proposes a suspension system for rail vehicles with a leaf spring. An end of the leaf spring is provided with an eye via which it is supported on the undercarriage. With an increasing bending rate, the spring ends of the leaf spring are supported on resilient supports.

From DE 36 37 281 A1 a spring block is known which is fixed to the frame of a chassis. A leaf spring made of plastics is provided which, at one end, comprises a bearing eye and which, at its other end, is vertically supported relative to the spring block.

From DE 2009 015 662 B3 there is known a spring assembly with a leaf spring for a motor vehicle. The leaf spring is produced from a fibre composite material and, at one end, it is held in a clamping member. The clamping member is pivotably fixed at the bearing block of the motor vehicle. There is provided a stop at the bearing block against which the clamping member can be supported.

**2**

From DE 36 13 804 C1 a device is known comprising a leaf spring made of fibre-reinforced plastics and an end sided force introduction part. The leaf spring has a wedge-shaped end portion that is form-fittingly clamped into the force introduction part.

## SUMMARY

This disclosure addresses the need for a leaf spring assembly for motor vehicles which is easy to produce and can easily be mounted and which, when under load, comprises a progressive spring rate.

Disclosed herein is a leaf spring assembly for a wheel suspension of a motor vehicle, wherein the leaf spring assembly comprises a leaf spring, a first receiving device for supporting a first spring end and a second receiving device for supporting a second spring end.

Accordingly, disclosed herein is a leaf spring assembly for a wheel suspension of a motor vehicle, comprising: a leaf spring of fibre-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle, wherein the leaf spring comprises a first end portion, a spring portion, a bendable portion and a second end portion; a first receiving device for supporting the first end portion; a second receiving device for supporting a second end portion; wherein the first receiving device and the second receiving device are designed such that the first end portion and the second end portion are held substantially in a non-displaceable way relative to one another; wherein at least one of the first and second receiving devices are designed such that the respective associated end portion is pivotally supported around a pivot axis extending transversely to the longitudinal axis of the vehicle. The leaf spring is configured such that, at least when higher vertical forces are introduced from the wheel carrier, the leaf spring is subjected to tensile loads, and therefore it can also be referred to as leaf tensile spring. This applies for at least a part of the entire spring travel that is possible.

The advantage of the leaf spring assembly is that, because the end portions are fixed in a non-displaceable way, the leaf spring is subjected to bending and tensile processes. The tensile and bending stresses occurring in the spring are superimposed on one another and, together, lead to a progressive spring characteristic. The tensile forces are generated in the leaf spring in that the end portions of same are each fixed in a non-displaceable way in the respective receiving devices. "Non-displaceable" in this context means that the end portions are fixedly clamped in the longitudinal direction of the motor vehicle, so that they cannot substantially be displaced in the longitudinal direction when the spring is under load. It is understood that a small degree of displaceability which, for example, may occur more particularly at a pivotable receiving device due to a load-related elastic deformation, is meant to be included. Said slight degree of displaceability can amount to up to 20 mm, preferably up to 10 mm, at each receiving device. Because the leaf spring ends are received in a substantially non-displaceable way, the tensile stress increases progressively with an increasing load, so that the spring rate of same also increases progressively. In the installed state, this means that with an increasing load on the motor vehicle, the suspension becomes stiffer, which has an advantageous effect on the driving comfort and driving stability of the motor vehicle.

The stresses generated in the spring portion and the bendable portion, respectively, change with an increasing load and differ from each other with regard to their single stress components. With vertical forces introduced by the

RASSINI EX. 1001; Pg 9
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

**3**

wheel carrier, the spring portion is particularly subjected to tensile load and the bendable portion, with the spring portion being under tensile load, is particularly subjected to bending. In this context "particularly" or "substantially" shall also cover that at any given load condition further load components, respectively stress components, can be generated in the respective portion of the spring and, respectively, that the single stress components vary with changing load.

"At least one of the receiving devices" means that according to a first possibility only one of the first and second receiving devices is designed as a pivotable and moment-free bearing for the associated spring end, whereas the respective other receiving device is provided in the form of a stiff and moment-resistant bearing. Pivotability leads to moment-free conditions around the pivot axis, so that in the present disclosure the terms of "pivotable" and "moment-free" are used synonymous. A moment-resistant bearing is not pivotable and, in the present disclosure, is therefore referred to as "stiff". Associating a pivotable (moment-free) and a stiff (moment-resistant) bearing with the spring portion and, respectively, the bendable portion, can be freely selected depending on the requirement to be met by the spring behaviour. According to a second possibility, it is also possible for both receiving devices to be provided in the form of moment-free bearings.

A moment-free bearing leads to reduced forces at the receiving device between the spring and the receiving device. The moment-free bearing is achieved more particularly in that the associated end portion is supported so as to be pivotable around a pivot axis in the receiving device and, respectively, relative to a stationary component. The pivot axis can extend at least substantially transversely to the longitudinal vehicle axis, wherein angular deviations of ±10° relative to a normal of the longitudinal vehicle axis shall be included. The pivot bearing can be designed such that rotational movements of the pivotably received spring end up to a minimum of 10° and/or up to a maximum of 60°, preferably by a rotational angle of 25° to 45° around the pivot axis, are possible.

According to an example spring, the suspension portion is provided in the form of a first spring leg and the bendable portion in the form of a second spring leg of the leaf spring, wherein the first and the spring legs can differ from one another in respect of length and/or curvature. In the installed state, i.e., when installed in a vehicle, of the leaf spring, a wheel carrier is fixed at the spring portion, via which wheel carrier the forces of the vehicle wheel are introduced into the leaf spring. Thus, in a mounted state the spring portion preferably extends substantially in the longitudinal direction of the motor vehicle, and, respectively, horizontally. The bendable portion, when the leaf-spring is installed in the vehicle, preferably has a main direction of extension in vertical direction. The vertical forces introduced by the wheel carrier into the spring portion lead to a tensile load in the spring portion which, in turn, causes the bendable portion to bend towards the spring end remote from the bendable portion.

By constructively designing the spring portion and the bendable portion in respect of physical parameters such as cross-sectional area, length or width, the suspension behaviour and, respectively, the progression of the leaf spring can be set. Thereby it applies that the longer the bendable portion and the smaller the cross-sectional area, the softer the spring, and vice versa; the shorter or thicker the bendable portion, the stiffer the spring.

In an example, the spring portion comprises a lower convex curvature in the unloaded installed state of the

**4**

spring. "Unloaded installed state" means in particular that no forces are applied to the leaf spring. However, it is provided that the spring portion has a lower concave curvature in a loaded installed state of the leaf spring at a maximum spring deflection. In other words, upon increasing load a change in curvature of the spring portion from convex to concave takes place, wherein a neutral position is traversed between these two positions. At initial loading, wherein the spring portion lower side is convex, in particular bending stresses and compressive stresses are present. With increasing load the lower convex curvature is flattened, wherein the compressive stresses in the spring portion initially increase, then decrease again and eventually become zero. The position in which the spring portion is substantially free from compressive and tensile stresses defines a neutral position. The leaf spring can be designed such that the neutral position is present in a mounted ready-to-deflect load condition, i.e. with a stationary unladen or slightly laden vehicle. At increasing load, i.e. in a laden condition or under dynamic spring deflection, the leaf spring is further deformed elastically, wherein the spring portion is increasingly tension loaded. In other words, the leaf spring can be designed such that the spring portion, in case of elastic deformation due to vertical forces introduced from the wheel carrier, is pressure loaded in a first spring travel range and, upon increasing load and thus increasing elastic deformation, is tensile loaded in a second spring travel range.

The bendable portion can comprise a lower concave curvature in the installed state of the spring. Between the spring portion and the bendable portion a curved connecting portion can be provided whose radius is smaller than a radius of the bendable portion and/or smaller than a radius of the spring portion.

According to an example, the spring portion is longer than the bendable portion, with the ratio between the suspension portion and the bendable portion, more particularly, being greater than 3:1, more particularly greater than 4:1 or even greater than 5:1. According to a possible example, the ratio between the spring portion and the bendable portion is in particular smaller than 10:1, more particularly smaller than 9:1 or even smaller than 8:1, wherein it is understood that said upper and lower values can be combined with each other arbitrarily.

The association of the longer spring leg, respectively the shorter spring leg, relative to the moment-free and, respectively, moment-resistant receiving device, can be freely selected as a function of the required spring behaviour. If the long spring leg is supported in a moment-resistant way and if the short spring leg is supported in a moment-free way, there is achieved a relatively high spring rate and a high spring force. Vice versa, i.e., if the long spring leg is supported in a moment-free way and if the short spring leg is supported in a moment-resistant way, the spring rate and the spring forces will be reduced by a multiple. The lowest spring rate and spring forces occur if both ends of the leaf spring are supported in a moment-free way.

It is possible that one or more further spring legs can be provided in addition to the first spring leg that is configured as spring portion and the second spring leg that is configured as a bendable portion. More particularly, it can be proposed that at both ends of the spring portion a respective bendable portion is attached. However, at least one bendable portion is provided with which the tensile stresses acting on the spring portion under load conditions can be set.

The at least one receiving device with the associated spring end being supported in a moment-free way can

RASSINI EX. 1001; Pg 10
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

**5**

comprise a stop which limits a pivot movement of the leaf spring around the pivot axis. If moment-free bearings are used at both ends of the leaf spring, the first and/or the second receiving device can, accordingly, be provided with a limit stop. By suitably designing the stop, it is possible to influence the springing behaviour of the leaf spring. This is due the fact that, if the leaf spring comes to stop and thus the pivot moment of the leaf spring is limited, the spring force increases which leads to an increasing progression of the spring rate. In an example, the limit stop can be variably set, so that the characteristic force-travel-curve is easy to vary or set.

To achieve a simple production process and a high strength, it is proposed more particularly that the first end portion and/or the second end portion remain unmachined, more particularly bore-free. To ensure that the spring ends are securely received in the receiving devices, even under high loads, it is advantageous if the first end portion and/or the second end portion are/is wedge-shaped, with the thickness increasing towards the ends. In this way, the leaf spring is prevented from slipping out of the receiving device.

The spring portion preferably comprises a central receiving region for accommodating the wheel carrier, with the central receiving region more particularly having a greater thickness than adjoining regions of the spring portion. The greater thickness ensures that the stresses in the receiving region which, at the same time, forms the region of force introduction from the wheel carrier, are kept low. The receiving region comprises more particularly a planar upper side and/or planar underside which can extend parallel relative to one another. This ensures good force introduction conditions of a carrier part to be connected to the leaf spring for the vehicle wheel. Said planar receiving region can comprise a length of approximately 150 mm to 200 mm.

According to an example embodiment, the leaf spring is produced in one piece. The leaf spring can be produced for example by resin transfer moulding (RTM) or by pressing. By producing the leaf spring in one piece, it is possible to avoid a reduction in the mechanical strength in joins and the like. More particularly, the spring can be produced out of uni-directional, pre-impregnated fibres, so-called pre-pregs, with a duroplastic or thermoplastic matrix in a pressing process. In this way, it is easy to provide the leaf spring with the required shape in the unloaded condition.

The receiving device for providing a moment-free support can comprise a receiving member which, relative to a fixed component, is supported so as to be pivotable around the pivot axis, as well as a clamping member which can be releasably connected to the receiving member, wherein the end portion of the leaf spring can be clamped in between the receiving member and the clamping member. The releasable connection between the receiving member and the clamping member can be achieved by any suitable connectors, for example by bolted connections.

A receiving device for providing a moment-resistant support can comprise a receiving member which is attached to a fixed component, as well as a clamping member which is releasably connectable to the receiving member, wherein the end portion of the spring can be clamped in between the receiving member and the clamping member. The receiving member is held in a displacement-free and rotationally fixed way at the stationary component, for example a chassis part of the motor vehicle, so that any bending moments acting around a transverse axis of the motor vehicle can be introduced from the leaf spring into the receiving device.

According to one example, at least one of the spring portion and the bendable portion comprises a variable thick-

**6**

ness along the length. As an alternative or in addition hereto, at least one of the spring portion and the bendable portion can comprise a substantially constant width along the length. "Substantially constant" shall include certain tolerance deviations of in particular up to ±5%. According to a further possible embodiment, the cross-sectional face of the leaf spring can be substantially constant along the length, whereas the thickness along the height can be variable. More particularly, the thickness of the leaf spring can be increased in the region of the wheel carrier receiving device or the end portions of the leaf spring. As a result of the constant cross-sectional face it is ensured that the leaf spring fibres extend uniformly along the length, which leads to a high strength. However, it is also possible that the cross-sectional area is variable along the length of the leaf spring, which could be achieved for instance by providing additional layers of pre-pregs in the regions concerned.

Preferred embodiments of the invention will be explained below with reference to the drawing figures wherein

FIG. 1A shows a leaf spring assembly for a wheel suspension of a motor vehicle in a first example in a three-dimensional view;

FIG. 1B shows the leaf spring assembly of FIG. 1A in a plan view;

FIG. 1C shows the leaf spring assembly of FIG. 1A in a side view;

FIG. 2 shows characteristic load displacement curves of the leaf spring assembly according to FIG. 1;

FIG. 3 shows a second example of a leaf spring assembly for a wheel suspension of a motor vehicle in a three-dimensional view;

FIG. 3B shows the leaf spring assembly of FIG. 3A in a plan view;

FIG. 3C shows the leaf spring assembly of FIG. 3A in a side view;

FIG. 3D shows the leaf spring assembly of FIG. 3A with the first bearing in a stress-relieved condition;

FIG. 3E shows the leaf spring assembly of FIG. 3A with the first bearing in a first stopped position and;

FIG. 3F shows the leaf spring assembly of FIG. 3A with the first bearing in a second stopped position;

FIG. 4 shows the characteristic load displacement curves of the leaf spring assembly according to FIG. 3A with different stop settings;

FIG. 5 shows a third example of a leaf spring assembly for a wheel suspension of a motor vehicle in a three-dimensional view;

FIG. 5B shows the leaf spring assembly of FIG. 5A in a plan view;

FIG. 5C shows the leaf spring assembly of FIG. 5A in a side view;

FIG. 6 shows a fourth example of a leaf spring assembly for a wheel suspension of a motor vehicle in a three-dimensional view;

FIG. 6B shows the leaf spring assembly of FIG. 6A in a plan view; and

FIG. 6C shows the leaf spring assembly of FIG. 6A in a side view.

Below, FIGS. 1A to 10 will be described jointly. They show a leaf spring assembly 2 in a first example. The leaf spring assembly 2 comprises a leaf spring 3 made of fibre-reinforced plastics for resiliently supporting a wheel carrier of a motor vehicle, a first receiving device 4 for supporting a first end portion 5 of the leaf spring 3 and a second receiving device 6 for supporting the second end portion 7 of the leaf spring.

RASSINI EX. 1001; Pg 11
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

Starting from the first end **5**, the leaf spring **3** comprises a first spring leg **8** and a second spring leg **10**, with the two spring legs **8**, **10** being connected to one another by a transition portion **9**. The second spring leg **10** ends with a second end portion **7** which is fixed in the second receiving device **6**. The first spring leg **8** serves to receive a wheel carrier, not illustrated, to which a vehicle wheel is fixed. For this purpose, the first spring leg **8** comprises a central receiving region **12** which comprises a thickness D12 which is greater than that of the laterally adjoining regions. The upper side **13** and the underside **14** of the receiving region **12** comprise planar faces which, more particularly, extend parallel relative to one another. As a result of said planar faces, the mounting procedure is easy and there is ensured a uniform introduction of force from the wheel carrier into the leaf spring **3**. The receiving region **12** can comprise a length of 150 mm to 200 mm, for example.

In the mounted condition, the main direction of extension of the first spring leg **8** is in the longitudinal direction of the motor vehicle and, respectively, in the horizontal direction, whereas the main direction of extension of the second spring leg **10** is in the vertical direction of the motor vehicle. In the mounted condition, the first end **5** can point in the direction of driving (forward), whereas the second end **7** is positioned at the rear end and, more particularly, points downwardly. When the leaf spring assembly is under load, the first spring leg **8** is deflected and thus forms a spring portion. When the leaf spring **3** is under load, the second spring leg **10** bends and thus forms a bendable portion. After exceeding of the neutral position of the leaf spring, the vertical forces introduced from the wheel carrier into the spring portion **10** lead to a tensile load in the spring portion, which causes the bendable portion to bend towards the end portion **5** which is remote from the bendable portion. Until the neutral state of the spring is reached, in particular bending stresses and compressive stresses are present in the spring portion **8**.

The first and the second spring leg **8**, **10** can differ from one another in respect of their length and/or curvature. In the present example, the length of the spring portion **8** is greater, by a multiple, than that of the bendable portion **10**, with the ratio of the length of the spring portion relative to the length of the bendable portion preferably being greater than five and smaller than ten. Furthermore, it can be seen that the spring portion **8**, in the unloaded installed state, which is shown with dashed line, comprises a lower convex curve and, respectively, an upper concave curvature, more particularly with a mean radius of curvature R8. With the spring being loaded due to vertical forces introduced, the spring portion is acted upon upwardly, whereby initially bending and compressive stresses are generated up to reaching a neutral position in which the spring portion is substantially straight. When the neutral position is exceeded the curvature of the spring portion **8** changes, i.e. it gets a lower concave and upper convex curvature. With exceeding the neutral position the bending stresses in the spring portion **8** are superimposed by tensile stresses. Thereby, the tensile stresses increase with an increasing load and thus increasing elastic deformation of the leaf spring **3** which leads to a progressive spring characteristic. The loaded mounted condition at maximum deflection is drawn in with dashed lines. It can be seen that the spring portion **8** is clearly curved upwards and that the bendable portion **10** is bent towards the first receiving device **4**.

The first spring leg **8**, via the transition portion **9**, changes into the second spring leg **10**, with the second spring leg **10** comprising a lower concave and, respectively, an upper convex curvature. Thus, a change in curvature of the leaf spring extension takes place in the transition portion **9**. By configuring the first spring leg **8**, which is also referred to as the spring portion, the transition portion **9**, and the second spring leg, which is also referred to as the bendable portion, it is possible to set the springing behaviour and thus the progression of the leaf spring **3** when under load. In this instance, it is generally the case that the longer the bendable portion **10**, the stiffer the spring. In the present example, the radius R8 of the spring portion **8** is greater, by a multiple, than the radius R9 of the transition portion **9** and greater than the radius R10 of the bendable portion **10**.

The first receiving device **4** is designed such that the first end **5** of the leaf spring **3** is received therein in a non-displaceable and moment-free way. More particularly, it is proposed that the first end **5** is held so as to be substantially stiff in a displacement sense with reference to all three axes (x, y, z). In accordance with the above definition, the non-displaceable bearing is to comprise slight displacements of up to 20 mm, which, for example, can result from elastic deformation of the receiving device when the spring is under load. The moment-free support is accomplished in that the end portion **5** is supported so as to be pivotable around the pivot axis X4 of the first receiving device **4**. In the installed state, the pivot axis X4 extends approximately transversely to the longitudinal vehicle axis, with certain angular deviations being conceivable. More particularly, it is proposed that the spring end **5** is pivotable relative to the receiving device by a minimum of 10° and/or a maximum of 60°, preferably by an angle of rotation of 25° to 45°. Relative to the other two axes (y, z), the spring end **5** is held so as to be substantially stiff in a rotational sense, i.e. it is not pivotable.

The first receiving device **4** comprises a receiving member **15** which, relative to a fixed carrier **16**, is supported by suitable bearing means **17** so as to be rotatable around the pivot axis X4; as well as a clamping member **18** which is releasably connectable to the receiving member **15** by bolted connections **19** for example. The first end portion **5** of the leaf spring **3** is wedge-shaped and its thickness increases towards its end. In this way, the end portion **5** is effectively prevented from slipping out of the first receiving device **4**, even if the leaf spring is under maximum load. The pivotable, moment-free support of the first end portion of the leaf spring **3**, leads to a reduction in forces in the receiving device **4** which are effective between the spring and the receiving device.

The opposed second end portion **7** is received in the second receiving device **6**, with the second receiving device **6** forming a moment-resistant and non-displaceable bearing for the second end **7**. For this purpose, the second receiving device **6** comprises a receiving member **20** which is to be connected to a stationary component, as well as a clamping member **22** which is releasably connectable to the receiving member **20**, for example by bolted connections **23**. The second end portion **7** is fixedly clamped in between the clamping member **22** and the receiving member **20**, wherein also in this case it is proposed in particular that the leaf spring **3** widens in a wedge-shaped way towards its end. In this way, secure fixing conditions are ensured, even under maximum loads.

Furthermore, it can be seen that the leaf spring **3**, along its length, features a substantially constant width B3, whereas the thickness D3 is variable along its length. Locally thickened portions, especially in the region of the end portions **5**, **7** or in the central region **12** ensure a reduction in tension. The locally thickened portions can be achieved for example by additional layers of pre-pregs in the respective regions.

RASSINI EX. 1001; Pg 12
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

9

The leaf spring 3 can be produced in one piece, for example by a pressing process involving the use of unidirectional, pre-impregnated fibres, so-called pre-pregs with a duroplastic or thermoplastic matrix. Other production processes such as resin injection moulding (RMT) are also possible.

FIG. 2 shows a force path characteristic curve F(s) of the leaf spring assembly 2 according to FIG. 1. The Y-axis shows the force F and, on the X-axis, the displacement s. It can be seen that the force F increases with an increasing spring travel s. With an increasing motor vehicle load and an increasing spring deflection, respectively, said progressive characteristic spring curve leads to a stiffer suspension, which advantageously affects the driving comfort and the driving stability of the motor vehicle.

The neutral position N, in which the spring portion 8 is substantially straight respectively free from compressive and tensile stresses, is shown with dashed line in FIG. 2. In the spring travel range up to reaching the neutral position N, the spring portion is curved convex on the downside. In this area, which is left of the neutral position N, the spring rate F(s) of the leaf spring 3 is substantially constant. In particular, bending stresses and compressive stresses are present in the spring portion 8 which are reduced with increasing elastic deformation up to reaching the neutral position N. When exceeding the neutral position N, i.e., upon changing from the lower convex to the lower concave curvature of the spring portion 8, in addition to the bending stresses, tensile stresses are generated which increase with an increasing load so that accordingly the spring rate F(s) of the leaf spring 3 increases progressively. This area is on the right hand side of the neutral position N.

The course of the characteristic force displacement curve F(s) of the leaf spring assembly can be influenced by appropriately designing the leaf spring 3 in respect of its physical characteristics such as the length, width and thickness of the individual leaf spring portions as well as the receiving devices 4, 6. In principle, associating the longer spring leg 8 and the shorter spring leg 10, respectively, to the moment-free receiving device 4 and to the moment-resistant receiving device 6, respectively, is freely selectable. In the example according to FIG. 1 with the moment-free support of the long spring leg 8 and a moment-resistant support of the short spring leg 10 there occur relatively low spring forces in the leaf spring 3 which, accordingly, also feature relatively low spring rates. However, depending on the requirements to be met by the suspension system, it is also possible to select different assemblies which will be referred to below in greater detail.

FIGS. 3A to 3F, which will be described jointly below, show a leaf spring assembly 3 in a second example which largely corresponds to the example according to FIG. 1 so that, as far as common features are concerned, reference is made to the above description. Identical components and components corresponding to one another have been given the same reference numbers as in FIG. 1.

A special design feature of the present example according to FIGS. 3A to 3F is in the design of the first receiving device 4. It is also designed for the purpose of providing a moment-free and displacement-resisting support for the first end portion 5 of the leaf spring 3. In addition to the example according to FIG. 1, in the present example a stop 24 is provided which limits a pivot moment of the receiving member 25, and of the clamping member 18, respectively, in the circumferential direction. The limit stop 24 comprises two plates 25 which are fixedly connected to the carrier 16, for example by threaded connections. At the upper end of the

10

stop plates there are provided threaded bores through which threaded bolts 26 are threaded. The threaded ends of the threaded bolts 26 cooperate with the clamping member 3 in such a way that the clamping member 18, when the leaf spring 3 is under load and pivots around the pivot axis X4, stops against the pins ends. The limit stop 24 has the effect that the generally moment-free support is fixed, so that after the leaf spring 3 has reached the stop, any bending moments acting around the pivot axis X4 are accommodated and supported by the first receiving device 4. Thus, the progression of the characteristic force displacement curve F(s) of the leaf spring assembly 3 is displaced towards shorter distances (s). The limit stop 24 and thus the characteristic force displacement curve F(s) can be steplessly adjusted by rotating the threaded bolt 26, as required.

FIG. 3D shows the first receiving device 4 in a lateral view as a detail in the unloaded condition of the leaf spring 3. It is possible to see a distance between the clamping member 18 and the end of the threaded bolt 26. FIG. 3E shows the first receiving device 4 in a loaded condition of the leaf spring assembly 3. It can be seen that, because of the load on the leaf spring 3, the first spring leg 8 has been pivoted rotated around the pivot axis X4 anti-clockwise until the clamping member 18 has come to stop against the end of the threaded pin 26. The associated force displacement curve F(s) is shown in FIG. 4 in the form of a dashed line. The kink point 27 is drawn in with which a sudden increase in the spring force F is achieved.

FIG. 3F shows the first receiving device 4 wherein the stop 24 becomes effective at an earlier stage, so that the rotational movement of the spring bearing is already inhibited at a shorter rotational travel. For this purpose, the threaded bolt 26 has been rotated further into the threaded bore of the carrier plate 25, so that the clamping member 18 comes to rest against the stop 24 after a shorter spring travel. The associated characteristic force displacement curve F(s)' is shown in FIG. 4 in the form of a continuous line. It can be seen that already at a short spring travel (s)' the point 27' is reached, from which point onwards a sudden increase in the force F' occurs. Overall, there is thus achieved a steeper force displacement curve F(s)' than in the case of a longer spring travel up to the switch-off point as shown in FIG. 3E.

FIGS. 5A to 5C show a leaf spring assembly 2 in a further example which largely corresponds to the example according to FIG. 1, so that as far as common features are concerned, reference is made to the above description. Therein, identical details and details corresponding to one another have been given the same reference numbers (with indices), as in FIG. 1.

A feature of the present example according to FIG. 5 is that the moment-free and the moment-resistant bearings have been exchanged relative to FIG. 1, which means that the first receiving device 4' forms a displacement-resistant and moment-resistant support for the spring end 5, whereas the second receiving device 6' forms a displacement-resistant and moment-free support for the second spring end. In this case, too, the term "displacement-resistant" may comprise slight displacements of the ends 5, 7 in the longitudinal direction of the motor vehicle with the spring 3 being under load. In the present example, the first end 5—with reference to all three axes (x, y, z)—is held so as to be substantially stiff, both in the displacement sense and in the rotational sense. The second end 7 is held to be movable in the rotational sense with reference to the transverse axis (x) and—with reference to the longitudinal axis and perpendicularly axes (y, z)—it is held so as to be at least substantially stiff in the rotational sense.

RASSINI EX. 1001; Pg 13
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

**11**

The receiving member **15'** is fixedly connected to a carrier **16**, for instance to a chassis part, with "fixidly" meaning that no relative movements, such as displacement movements or pivot movements can take place between the receiving member **15'** and the carrier **16**. The end portion **5** of the leaf spring **3** is clamped in between the clamping member **18'** and the receiving member **15'**, with tensioning bolts (not illustrated) being threaded into the respective threaded bores.

The second receiving device **6'**, in which the second end portion **7** of the leaf spring **3** is supported, is provided in the form of a moment-free bearing. There is provided a pivotable receiving member **20'** which is supported by a suitable bearing **17'** relative to a stationary carrier element **16'** so as to be pivotable around a pivot axis X6'. The wedge-shaped end **7** of the leaf spring **3** is clamped in between the pivotable receiving member **20'** and the clamping member **22'**, so that it is non-displaceable, but rotationally movable in the second receiving device **6'**.

By associating the moment-free bearing with the first end portion **5**, respectively with the first spring leg **8**, a relatively high spring rate and a relatively high spring force is generated, i.e., the associated characteristic load displacement curve F(s) has a steeper progression than in the example according to FIG. **1**.

FIGS. **6A** to **6C**, which will be described jointly below, show a leaf spring assembly **2** in a further example which corresponds to a combination of the example according to FIG. **1** and according to FIG. **5**, so that, as far as common features are concerned, reference is made to the above description. Thereby, identical details and details corresponding to one another have been given the same reference numbers as in FIGS. **1** to **5**.

The special feature of the present example according to FIG. **6** is that the first receiving device **4** and the second receiving device **6'** both form moment-free bearings. For this purpose, the first receiving device **4** for clamping in the end **5** of the first spring leg **8** is supported so as to be pivotable around the pivot axis X4. The opposed second end **7** of the second spring leg **10**, accordingly, is supported in the receiving device **6** so as to be pivotable around the pivot axis X6. At both spring ends **5**, **7**, there should preferably be a pivotability of a minimum of 10° and/or a maximum of 60° relative to the associated receiving device, preferably of 25° to 45°. The two ends **5**, **7** of the leaf spring **3** are each non-displaceably clamped into the two receiving devices **4**, **6'** in the longitudinal direction, and in this case, too, the above definition of a "non-displaceable bearing" applies. To achieve a non-displaceable support, the wedge-shaped ends **5**, **7** are each fixed between the receiving member **15**, **20'** and the clamping member **18**, **22'**.

By supporting the two spring ends **5**, **7** in a moment-free way in accordance with the present example, there are generated particularly low spring rates and spring forces, i.e. the characteristic force displacement curve F(s) of the leaf spring assembly **2** has a particularly flat course.

It applies to all the above-mentioned examples that in the installed state the first end **5** and, respectively, the long spring leg **8** are positioned in the front of the vehicle, and accordingly that the second end **7** and, respectively, the second receiving device **6** are positioned at the rear. A reversed arrangement is also possible.

An advantage of the leaf spring assembly **2** is that, due to the end portions **5**, **7** being fixed in a non-displaceable way, the leaf spring **3** can be subjected to both bending and tensioning loads. The tensile and bending stresses occurring in the spring **3** are superimposed on one another and, together, lead to a progressive characteristic spring curve

**12**

F(s). The tensile forces are generated in that the end portions **5**, **7** are axially fixedly clamped in in the longitudinal direction. When the spring **3** is subjected to load, said end portions **5**, **7**, as a result, cannot move towards one another, which leads to a progressive characteristic spring curve. The moment-free support of at least one of the end portions **5**, **7** leads to reduced stresses in the leaf spring, as compared to a moment-resistant support.

The invention claimed is:

**1**. A leaf spring assembly for a wheel suspension of a motor vehicle, comprising:

a leaf spring of fiber-reinforced plastics for resiliently supporting a wheel carrier of the motor vehicle, the leaf spring comprising a first end portion, a spring portion extending from the first end portion, a second end portion, a bendable portion extending from the second end portion, wherein the spring portion extends substantially in a longitudinal direction of the motor vehicle in an installed state and is configured to accommodate the wheel carrier, wherein the spring portion and the bendable portion are connected to each other by a curved transition portion and wherein the spring portion is longer than the bendable portion;

a first receiving device for supporting the first end portion;

a second receiving device for supporting the second end portion;

wherein the first receiving device and the second receiving device are provided so as to hold the first end portion and the second end portion in a non-displaceable way relative to one another, wherein the leaf spring, with an increasing load due to vertical forces introduced from the wheel carrier, is increasingly subjected to tensile loading;

further wherein at least one of the first and second receiving devices provides pivotable support to the associated one of the first end portion and the second end portion around a pivot axis extending transversely to a longitudinal axis of the vehicle;

and further wherein in the installed state of the leaf spring the first end portion and the spring portion extending therefrom are positioned towards a front end of the motor vehicle, and the second end portion and the bendable portion extending therefrom are positioned towards a rear end of the motor vehicle.

**2**. The leaf spring assembly of claim **1**, wherein a ratio of a length of the spring portion to a length of the bendable portion is greater than 3:1 and smaller than 10:1.

**3**. The leaf spring assembly of claim **2**, wherein the spring portion comprises a variable thickness and a substantially constant width along the length of the spring portion.

**4**. The leaf spring assembly of claim **1**, wherein the spring portion comprises a central receiving region to receive the wheel carrier, wherein the central receiving region has a greater thickness than adjoining regions of the spring portion.

**5**. The leaf spring assembly of claim **1**, wherein the receiving region comprises a planar upper side and a planar underside, wherein the planer upper side and the planar underside of the receiving region extend parallel relative to one another.

**6**. The leaf spring assembly of claim **1**, wherein one of the first and second receiving devices provides support to the associated one of the first and second end portion in a moment-resistant way.

**7**. The leaf spring assembly of claim **6**, wherein, to ensure moment-resistant support, said one of the first and second receiving devices comprises a receiving member which is

RASSINI EX. 1001; Pg 14
Rassini v. Muhr IPR2022-00278

US 9,868,330 B2

| 13 | 14 |

fixed to a stationary component, and a clamping member which is releasably connectable to the receiving member, wherein the end portion of the leaf spring can be clamped in between the receiving member and the clamping member.

**8**. The leaf spring assembly of claim **1**, wherein at least one of the first receiving device and the second receiving device is configured to allow the associated end portion to be pivotable by at least one of a minimum of up to 10° and a maximum of up to 60° around the pivot axis.

**9**. The leaf spring assembly of claim **1**, wherein at least one of the first receiving device and the second receiving device comprises a stop which limits a pivot movement of the leaf spring around the pivot axis.

**10**. The leaf spring assembly of claim **1**, wherein the leaf spring is designed such that the spring portion, upon elastic deformation due to vertical forces introduced from the wheel carrier, is subjected to pressure loading in a first spring travel range and is subjected to tensile loading in a second spring travel range.

**11**. The leaf spring assembly of claim **1**, wherein the spring portion comprises a lower convex curvature in the installed state of the leaf spring, and a lower concave curvature in a loaded installed state of the leaf spring at a maximum spring deflection.

**12**. The leaf spring assembly of claim **1**, wherein the spring portion is substantially free of tensile and compressive stresses in a partly loaded installed state of the leaf spring.

**13**. The leaf spring assembly of claim **1**, wherein the bendable portion comprises a lower concave curvature in the installed state of the leaf spring.

**14**. The leaf spring assembly of claim **1**, wherein a radius of the transition portion is smaller than a radius of the bendable portion and smaller than a radius of the spring portion.

**15**. The leaf spring assembly of claim **1**, wherein at least one of the first end portion and the second end portion is unmachined.

**16**. The leaf spring assembly of claim **1**, wherein at least one of the first end portion and the second end portion is wedge-shaped with a thickness increasing towards an end.

**17**. The leaf spring assembly of claim **1**, wherein the leaf spring is produced by resin transfer moulding or by pressing.

**18**. The leaf spring assembly of claim **1**, wherein, to ensure a moment-free support, at least one of the first receiving device and the second receiving device comprises a receiving member which is pivotably supported relative to a stationary component around the pivot axis, as well as a clamping member which is releasably connectable to the receiving member, wherein the first end portion of the leaf spring can be clamped in between the receiving member and the clamping member.

* * * * *

RASSINI EX. 1001; Pg 15
Rassini v. Muhr IPR2022-00278

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATIONS

This filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☒ the filing has been prepared using a proportionally-spaced typeface and includes 13,678 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

 /s/ John P. Rondini
John P. Rondini
Marc Lorelli
Frank A. Angileri
Kyle G. Konz
BROOKS KUSHMAN P.C.
150 W. Second St., Suite 400N
Royal Oak, MI 48067-3486
(248) 358-4400

*Counsel for Appellant*

Date: February 1, 2024